**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| PLANNED PARENTHOOD GREAT NORTHWEST, HAWAII, ALASKA, INDIANA and KENTUCKY, INC., on behalf of itself, its staff, and its patients, <br><br>       Plaintiff, <br><br>   v. <br><br> DANIEL CAMERON, in his official capacity as Attorney General of the Commonwealth of Kentucky; ERIC FRIEDLANDER, in his official capacity as Secretary of Kentucky's Cabinet for Health and Family Services; MICHAEL S. RODMAN, in his official capacity as Executive Director of the Kentucky Board of Medical Licensure; and THOMAS B. WINE, in his official capacity as Commonwealth's Attorney for the 30th Judicial Circuit of Kentucky, <br><br>       Defendants. | Case No.: 3:22-cv-198-RGJ |

## COMPLAINT

Plaintiff, Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana and Kentucky, Inc. ("Plaintiff"), by and through its attorneys, brings this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1. This is a constitutional challenge to House Bill 3 (the "Act"), attached hereto as **Exhibit A**, on the ground that it is tantamount to a ban on abortion. The Act became effective on

April 13, 2022, resulting in an immediate ban on abortion state-wide in the absence of this Court's intervention.

2.      The Act is an omnibus law that will immediately and adversely impact one million people of reproductive age throughout Kentucky. The Act consists of over 70 pages of revisions to Kentucky's existing abortion laws and creates new requirements, including an extensive regulatory regime for the provision of abortion-inducing medication, significantly expanded and invasive reporting requirements, and new requirements for cremation or interment of fetal remains. The Act directs the Cabinet for Health and Family Services (the "Cabinet") to promulgate the needed regulations and create the required forms, but those forms and regulations have not yet been promulgated. Accordingly, it is impossible for Plaintiff to comply with the Act. The Act imposes the immediate potential for criminal penalties, civil liability (including in one instance, potential penalties up to one million dollars), and potential loss of facility and medical licenses due to non-compliance.

3.      The result is an unconstitutional ban on abortion in Kentucky because Plaintiff (as well as the other abortion-providing clinic in Kentucky) must cease providing abortions immediately. This ban violates Plaintiff's and its patients' procedural and substantive due process rights under the Fourteenth Amendment.

4.      In addition, the Act will lead to sweeping violations of patient privacy from the provisions requiring abortion providers to submit to the Commonwealth highly detailed information regarding each abortion provided, which will be deemed by the Act to be public records. Those reports will necessarily include information that may be used to identify the individual and would reveal an individual's most sensitive confidential information, including that the individual had an abortion, as well as information such as whether the patient has a sexually

DCACTIVE-66182417.2

transmitted disease or other stigmatizing pre-existing medical condition in addition to the reason for her abortion, including abuse, coercion, harassment, or trafficking.

5.      A copy of the Act is attached as Exhibit A.

6.      The Kentucky Legislature passed the Act and delivered it to Governor Beshear on March 30, 2022. Governor Beshear vetoed the bill on April 8, 2022. The governor's veto statement observed that the new administrative burden associated with the Act is an estimated $1 million, a testament to its complexity and wide-reaching nature, and noted that the Cabinet is under no legal obligation to carry out an unfunded mandate. On April 13, 2022, the legislature voted to override Governor Beshear's veto and the Act became law and took immediate effect.

7.      Plaintiff brings this civil rights action, on behalf of itself, its staff and its patients seeking abortions, under the U.S. Constitution to challenge the constitutionality of the Act and to seek immediate, emergency relief from this Court to enjoin enforcement of the Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

9.      Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

10.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occur (or will occur) in this judicial district.

## PLAINTIFF

11.     Plaintiff Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana and Kentucky, Inc. is a nonprofit Washington corporation.

DCACTIVE-66182417.2

12.     Plaintiff operates the Louisville Health Center of Louisville, Kentucky. Plaintiff has been providing reproductive health care, including abortion, since 2020 at the Louisville facility.

13.     Plaintiff provides a variety of medical services to its patients in its Louisville facility, including birth control, HIV services, pregnancy testing, STD testing and treatment, vaccines, and abortions, to name a few. Its Louisville facility is a Commonwealth-licensed abortion provider. It is one of only two outpatient facilities in Kentucky that provides abortions.

## DEFENDANTS

14.     Defendant Daniel Cameron is the Attorney General of the Commonwealth of Kentucky, and, as such, is the Commonwealth's chief law enforcement officer. Pursuant to KRS 15.241, the Attorney General may enforce the Act by seeking injunctive relief as well as civil and criminal penalties. Furthermore, the Attorney General may initiate or participate in criminal prosecutions for violations of the Act at the request of, *inter alia*, the Governor, any court of the Commonwealth, or local officials. KRS 15.190, 15.200. Defendant Cameron is likewise charged with seeking injunctive relief against "abortion facilities" to "prevent violations of the provisions of KRS Chapter 216B regarding abortion facilities or the administrative regulations promulgated in furtherance thereof." KRS 15.241. Those regulations include the requirement that all abortion facilities ensure "compliance with . . . state . . . laws," including the Act. 902 KAR 20:360, § 5(1)(a). Defendant Cameron is sued in his official capacity.

15.     Defendant Eric Friedlander is the secretary of the Cabinet for Health and Family Services ("the Cabinet") – an agency of the Commonwealth of Kentucky. In his capacity as secretary of the Cabinet, Defendant Friedlander is charged with, *inter alia*, oversight and licensing of abortion providers and the regulatory enforcement of those facilities. KRS

4

216B.0431(1); 902 KAR 20:360, § 5(1)(a). The Cabinet's regulations include the requirement

that all abortion facilities ensure "compliance with . . . state . . . laws," including the Act. 902

KAR. 20:360, § 5(1)(a). Defendant Friedlander is sued in his official capacity.

16.     Defendant Michael S. Rodman serves as Executive Director of the Kentucky

Board of Medical Licensure ("KBML" or "the Board"), which is located in Jefferson County.

Defendant Rodman and the Board possess authority to pursue disciplinary action up to and

including license revocation against Kentucky physicians for violating the Act. KRS 311.565;

KRS 311.606. Defendant Rodman is sued in his official capacity.

17.     Defendant Thomas B. Wine serves as Commonwealth's Attorney for the 30th

Judicial Circuit of Kentucky. In this capacity, Defendant Wine has authority to enforce the Act's

criminal penalties in Jefferson County, where Plaintiff is located. *See* KRS 15.725(1); KRS

23A.010(1). Defendant Wine is sued in his official capacity.

## FACTUAL ALLEGATIONS

### Medical Facts About Abortion

18.     People seek abortions for a variety of deeply personal reasons, including familial,

medical, and financial. Some have abortions because they conclude that it is not the right time in

their lives to have a child or to add to their families. Some decide to end a pregnancy because

they want to pursue their education and the demands of that pursuit are incompatible with

responsible parenting. Some have abortions because they feel they lack the necessary economic

resources or level of partner support or stability. Many are concerned that adding a child to their

family will make them less able to adequately provide and care for their existing children. Some

seek abortions to preserve their life or health, including their mental health. Some do so because

they have become pregnant as a result of rape, and others because they decide not to have

5

children at all. Some decide to have an abortion because of an indication or diagnosis of a fetal medical condition or anomaly. Some families do not feel they have the resources – financial, medical, educational, or emotional – to care for a child with special needs or to simultaneously provide for the children they already have.

19.     The decision to terminate a pregnancy for any reason is motivated by a combination of diverse, complex, and interrelated factors that are intimately related to the individual person's values and beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability.

20.     Approximately one in four women in this country will have an abortion by age forty-five. A majority of people having abortions (61%) already have at least one child, while most (66%) also plan to have a child or additional children in the future.

21.     Legal abortion is one of the safest medical procedures in the United States, and is substantially safer than continuing a pregnancy through to childbirth.[1]

22.     There are two main methods of abortion: medication abortion and procedural abortion.

23.     Medication abortion involves a combination of two pills, mifepristone and misoprostol, which expel the contents of the uterus in a manner similar to a miscarriage, after the patient has left the clinic in a location of the patient's choosing, typically her own home.

24.     Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery," as it involves no incisions. Instead, in a

---

[1] Natl. Academies of Sciences, Eng. & Medicine, *The Safety & Quality of Abortion Care in the United States*, at 77–78, 162–63 (2018), *available at* https://www.nap.edu/catalog/24950/the-safety-and-quality-of-abortion-care-in-the-united-states.

DCACTIVE-66182417.2

procedural abortion, the provider inserts a thin, flexible tube, and in some instances, other instruments, to empty the contents of the patient's uterus.

25.     Approximately half of all abortions in the United States and in Kentucky are procedural abortions, and the other half are medication abortions.[2]

26.     The earlier in pregnancy a person is able to access an abortion, the safer it is: first, remaining pregnant itself entails significant health risks; second, the health risks specifically associated with abortion increase as pregnancy advances.

27.     For young people under age 18, Kentucky requires the consent of one parent before she obtains an abortion. Alternatively, a minor may seek judicial authorization for an abortion without parental consent. In Kentucky, almost all abortion patients under 18 years old obtain a parent's consent for their abortion; a small fraction of them obtain a judicial bypass allowing them to end their pregnancies without parental consent.

28.     In Kentucky, as in the nation as a whole, the vast majority of people who seek abortions do so in the first trimester of pregnancy.[3]

29.     Pregnancy is commonly measured from the first day of a person's last menstrual period ("LMP").

30.     People face many obstacles in accessing abortion care in Kentucky. There are only two outpatient abortion providers in the entire Commonwealth. Both are located in Louisville. Both provide medication abortion up to 10 weeks LMP. Plaintiff's Louisville facility provides procedural abortion until 13 weeks and 6 days LMP.

31.     Plaintiff provides both medication abortions and procedural abortions once a week at its Louisville facility.

---

[2] Kentucky Annual Abortion Report for 2020, Dept. for Public Health, Office of Vital Statistics, at 12.
[3] *Id.* at 7.

7

## THE CHALLENGED STATUTE

32.     The Act creates numerous new and unnecessary requirements for providers of abortion, many of which cannot be complied with immediately.

33.     <u>New Requirements to Report Detailed Information Regarding Each Abortion</u>. Section 4 of the Act requires immediately that abortion providers submit to the Vital Statistics Branch reports containing detailed information about each abortion within three (3) days after the end of each month. Act § 4(1), <u>KRS 213.101(1)</u>. Reports must include, among other things:

- The full name and address of the physician who performed the abortion

- The full name and address of the referring physician, agency or service

- The patient's city, county, state, and zip code

- That patient's age, race, and ethnicity

- The age of the "father" of the fetus

- The total number and dates of the patient's previous pregnancies, live births, and abortions

- A list of the patient's pre-existing medical conditions that may complicate the pregnancy

- "Whether the fetus was delivered alive and the length of time the fetus survived"

- "Whether the fetus was viable, and if viable, the medical reason for termination"

- "Whether a pathological examination of the fetus was performed"

- Whether the patient had a follow-up examination, and the date and results of the examination

- Whether the patient suffered any complications or adverse events

- Whether the patient is RH negative

8

- The amount billed for treatment for complications or adverse events, whether it was billed to Medicaid, private insurance, private pay or another method, and the medical procedure codes used for the billing

- The reason for the abortion, and

- Whether the patient was tested for sexually transmitted diseases and the outcome of those tests.

Act § 4(2), KRS 213.101(2).

34.    While the Act provides that the report shall not include the name of the patient, the patient's Social Security number or motor vehicle operator's number, or "other information or identifiers that would make it possible to ascertain the patient's identity," Act § 4(3), KRS 213.101(3), it contains no protection for patients whose identities can be determined based on the information required to be included in the report (e.g., zip code, age, race, pre-existing conditions, previous pregnancies).

a.    The Act provides that the reports and/or report forms containing this information shall be public records. Act § 13(3).

b.    Pursuant to KRS 213.101(10), the Vital Statistics Branch "shall promulgate administrative regulations in accordance with KRS Chapter 13A to assist in compliance with this section." Regulations addressing new provisions of KRS 213.101 added by the Act have not been promulgated and could take months to promulgate and implement.

35.    Multiple other provisions of the Act require the same information called for in the above Section 4 to be included in connection with other report forms to be created by the Cabinet, including:

9

a.      The requirement that health care facilities and physicians file a written report of any complication or adverse event suffered after an abortion, to include "at minimum the information required by Section 4 of this Act."  Act § 25(1).  The Act contains no protection for patients whose identities can be determined based on the information required to be included in the report (e.g., zip code, age, race, pre-existing conditions, previous pregnancies). Act § 25(2).

b.      The requirement that each prescribing "qualified physician" report "at minimum the information required by Section 4 of this Act." Act §§ 9, 26.

c.      The requirement that, for each abortion conducted, the physician additionally "submit a report on a form provided by the cabinet" reporting the probable gestational age of the fetus and "at a minimum the information required by Section 4 of this Act." Act § 27(4) (KRS 311.783(4)).

36.     New Restrictions and Reporting Requirements for Abortions Performed for Minors. The Act immediately requires that for a minor seeking an abortion: (a) the attending physician secures written consent for the abortion by the minor and a consenting parent or guardian; (b) 48 hours prior to providing consent, the consenting parent or guardian makes a "reasonable attempt" to notify any other parent with joint or physical custody (absent limited exceptions for parents enjoined or subject to a protective order on account of domestic abuse or convicted of certain criminal offenses); (c) the written consent includes a copy of the minor's government-issued identification, a copy of the consenting parent or guardian's government issued identification, and documentation of parental or guardian status such as a birth certificate, court-ordered custodial paperwork, or tax return; (d) a notarized certification of consent by the consenting parent or guardian; (e) the physician keeps the notarized written consent in the medical file for at least 5 years after the minor reaches 18, or for 7 years, whichever is longer; and (f) an affidavit by the attending physician certifying,

10

"according to my best information and belief, a reasonable person under similar circumstances would rely on the information presented by both the minor and her parent or legal guardian as sufficient evidence of identity." Act § 1(2)(a)(1-4) (KRS 311.732(2)(a)(1-4)).

37.     Requirement for Creation of a "Drug Certification Program" and Associated Regulations and Reporting Requirements for Medication Abortions.

a.     Under the Act, medication abortions can now only be provided pursuant to the Kentucky Abortion-Inducing Drug Certification Program by "qualified physicians" and "certified" abortion facilities, pharmacies, manufacturers, and distributors. Act § 15. The Cabinet is tasked with promulgating administrative regulations to create the Drug Certification Program and establish certification requirements for abortion facilities (licensed under KRS 216B.0431), including Plaintiff's Louisville facility, in addition to pharmacies, manufacturers, and distributors of abortion-inducing medication. *Id.* at § 15(1). The Act does not provide a timeframe for the promulgation of the requisite regulations or the creation of the Drug Certification Program.

b.     The Act sets out numerous new procedures a physician must follow to be deemed "qualified" and to register under the Act, including, but not limited to, signing an annual "Dispensing Agreement Form" to be developed and provided by the Cabinet (Act § 17(1)) (the form does not yet exist), and securing admitting privileges or entering into a written associated physician agreement. Act § 17(2); *see also* Act §§ 7 and 8. There is no process established yet to confirm that a physician is qualified and registered for purposes of compliance with the law, and there are criminal penalties associated with non-compliance. Act § 28(6) (KRS 315.990(6)); 39(a) (KRS 311.990(39)(a)).

c.     The Act requires that abortion providers obtain written consent from a patient 24-hours prior to dispensing abortion medication to the patient, absent limited exceptions for

risk of death or physical impairment or major bodily injury, on "a form created by the Cabinet for Health and Family Services to obtain the consent required prior to providing an abortion-inducing drug" and that they submit the completed form to the Cabinet. Act § 8(1-2). The required consent form does not exist, and there are criminal penalties associated with violations of these provisions. Act § 39(a) (KRS 311.990(39)(a)).

       d.     The Act requires that for any adverse event experienced by a patient within 15 days after use of abortion medication, the physician who provided the medication must report such adverse event within three days of the event to the federal Food and Drug Administration. Act § 9(2) *see also* Act §§ 25(1), 26(3) (also requiring submission of report for adverse events and/or complications). Any physician or health care provider who diagnoses or knowingly treats a patient experiencing an adverse event related to the medication abortion must make a report to the Cabinet of such adverse event on a report form provided by the Cabinet within three days after the diagnosis or treatment was provided. *Id.* at § 9(3). Forms have not yet been created for purposes of complying with these requirements.

       e.     The Act requires physicians providing medication abortions to a patient to, within three days after providing the medication, report the issuance of the prescription "on a form provided by the cabinet" and signed by the physician. Act § 26(1). It also requires physicians to state in the report of all abortions required by KRS 213.101 whether there were "adverse events" as defined by the Act. *Id.* at §26(3). This report must include all of the personal and identifying information required in the form to be created by the Cabinet for all abortions under Section 4 of the Act, as well additional information. Act § 26(4).

       f.     The Act makes it unlawful for any manufacturer, distributor, physician or any other person to provide abortion inducing drugs to a pregnant person via courier, delivery or

DCACTIVE-66182417.2

mail service. Act § 6(2). There are criminal penalties associated with violations of these provisions. *Id.* at § 3(39)(a).

g.      The Act sets forth the penalties for, *inter alia*, physician noncompliance with the Drug Certification Program, including but not limited to, referral to law enforcement, assessment of a $100,000 per offense fine on physicians, suspension or revocation of certification, and reporting and recommending sanctions to the Board of Medical Licensure or Board of Pharmacy. Act § 18(1). In addition, it provides that individuals shall have a private right of action to seek restitution and damages for any intentional, knowing or reckless violation of Sections 14-19 of the Act. *Id.* at § 18(2).

38.     New Restrictions and Reporting Requirements on Handling of Fetal Tissue Derived from an Abortion.

a.      The Act defines "fetal remains" to mean "the biological remains of a human child resulting from the termination of a pregnancy by a surgical or medication abortion prior to birth or miscarriage." Act § 22(1).

b.      Under the Act, fetal tissue derived from an abortion may no longer be disposed of as medical waste, Act § 22(4)(a), as has consistently been permitted under Kentucky law.  *See* 902 K.A.R. § 29:106; 902 K.A.R. § 20:360. With limited exceptions for law enforcement or pathological examination purposes or private interment by the patient, the Act further bars transport of such fetal tissue for any purpose other than final disposition by a licensed crematory or funeral establishment.  Act §§ 22(4)(d)(1)-(6). Thus, in most instances, products of conception now must be cremated or interred.

c.      The Act provides that "[t]he Cabinet shall design forms through administrative regulations that document (a) the age of the parent or parents of the fetal remains";

DCACTIVE-66182417.2

(b) consent by the parent or guardian of the patient and/or the father if either is a minor; (c) "[t]he status of fetal remains from an abortion for the purpose of cremation that shall meet any requirements for a birth-death, provisional death, or death certificate for transport or cremation;" (d) "[a] designation of how the fetal remains shall be disposed of and who shall be responsible for final disposition;" and (e) "any other information required by the cabinet." Act § 22(3). The forms do not yet exist, and the Act does not specify a timeframe within which the Cabinet is required to make such forms available.

39.     <u>Ban on Abortion at or After 15 Weeks Gestational Age</u>. The Act immediately bans all abortions at 15 weeks or more, except in instances where abortion is necessary to prevent the death of the pregnant woman or to avoid a risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman. Act § 34(1) (<u>KRS 311.782(1)</u>, <u>(3))</u>.

a.     While Plaintiff does not provide abortions at that stage of pregnancy, the 15-week ban adds the new requirement for every abortion to report on a form to be created by the Cabinet that includes the gestational age of the fetus and the "results of inquiries of the pregnant person and any medical examinations or tests performed." Act § 27(4). These terms are not defined.

b.     A physician's failure to comply with these requirements "shall" result in the state Board of Medical Licensure suspending his or her license.  <u>KRS 311.783(3)</u>.

40.     <u>Creation and Publication of Report Forms and Promulgation of Regulations</u>.

a.     Pursuant to Section 13 of the Act, "[t]he cabinet shall create and distribute the report forms required in Sections 1, 4, 8, 9, 15, 25, 26, 27 and 29 of this Act within sixty (60) days after the effective date of this Act." Act § 13(1). As stated above, these sections require several different forms required for use in all abortions, abortions by minors, medication abortions, and

abortions involving complications or adverse events. The forms have not yet been created for purposes of compliance with these requirements.

b.  Pursuant to Section 13, the reports "shall be deemed public records and shall be provided to the Kentucky Board of Medical Licensure, the Kentucky Board of Pharmacy, state law enforcement offices, and child protective services upon request for use in the performance of their official duties." Act § 13(3).

41.  <u>Criminal and Civil Penalties for Violation of the Act</u>. The Act provides that "any person who intentionally, knowingly, or recklessly performs an abortion upon a minor without obtaining the required consent pursuant to Section 1 of this Act shall be guilty of a Class D felony" (Act § 3(12)(a)) and "a person who intentionally, knowingly, or recklessly violates Sections 5 to 11 of [the] Act [restrictions on medication abortions] is guilty of a Class D felony." Act § 3(39)(a). Similarly, it provides that "[a]ny person who intentionally, knowingly, or recklessly violates Sections 14 to 19 of this Act [abortion Drug Certification Program] is guilty of a Class D felony." Act § 28(6)(a). And it provides "[a]ny person who intentionally, knowingly, or recklessly violates Sections 14 to 19 of this Act is guilty of a Class D felony" and "shall be fined not more than one million ($1,000,000)." Act §§ 31(2)(a), (b).

42.  <u>Denial, Suspension or Revocation of License for Violation of the Act</u>. Pursuant to the Act, the Board may deny, suspend, limit, restrict or revoke a provider's license upon proof of a failure to comply with the requirements of the Act regarding reporting of all abortions under Section 4 (Act § 4(8)(c)) and regarding abortions by minors under Section 1 of the Act. Act § 2(27) (<u>KRS 311.595</u>). The Attorney General and the of the Cabinet may also take action against facility licenses for violations. *See* <u>KRS 216B.990</u>; <u>KRS 15.241</u>.

DCACTIVE-66182417.2

43.    <u>Civil Liability for Violation of Act</u>. Pursuant to the Act, violations of the restrictions on medication abortions can provide the basis for a civil malpractice action for actual and punitive damages, provide a basis for a professional disciplinary action, and provide a basis for recovery for a patient's survivors for wrongful death. Act § 11(1).

44.    "Emergency Clause". The Act took "effect upon its passage and approval by the Governor or upon its otherwise becoming law." Act § 39. The forms and regulations required by the Act do not presently exist.

### *De Facto* Ban on Abortion Based on Impossibility of Compliance

45.    Because the Act is effective immediately, Kentucky abortion providers including Plaintiff are at immediate risk of committing felonies or incurring serious fines, civil liability or revocation of their licenses if they continue to provide abortions.

46.    Until the Cabinet publishes the forms required for compliance with the Act and/or promulgates the required administrative regulations, no facility or physician, including Plaintiff, can provide abortion services in compliance with the Act. Thus, the Act is an unlawful ban on all abortions in Kentucky.

47.    Within 60 days of its enactment, the Act requires the Cabinet to create at least eight new forms providers must use to comply with its provisions:

- Section 1 requires a new form for providers to document provision of emergency medical abortion services to minors without consent;

- Section 4 requires a new form through which abortion providers report *every* abortion they perform within the Commonwealth;

- Section 8 requires a new form through which abortion providers obtain the informed consent of a patient before providing medication abortion;

- Section 9 requires a new form through which abortion providers report each provision of medication abortion and any complications or adverse events, as well as any resulting treatment, related to abortion medication;

16

- Section 25 requires a new form through which abortion providers report any complications or adverse events related to abortion;

- Section 26 requires a new form through which abortion providers report each abortion medication prescription issued, each abortion performed, and all adverse events;

- Section 27 requires abortion providers to report the gestational age of the fetus as well as the results of inquiries of the patient as to gestational age and any medical exams or tests performed; and

- Section 29 requires a report of each prescription dispensed by a pharmacy for abortion medication.

Act § 13(1). Such forms do not presently exist. Rather, they are "to be developed and provided by the [C]abinet." *Id.*

48.    The Act requires that the Cabinet create additional forms without any deadline for completion and/or the creation of programs and promulgation of regulations to enable compliance, but those forms, regulations and programs do not presently exist:

- Section 4, which requires abortion providers to report *every* abortion they perform within the Commonwealth, provides that "[t]he Vital Statistics Branch shall promulgate administrative regulations in accordance with KRS Chapter 13A to assist in compliance with this section" (KRS 213.101(10));

- Sections 5 through 9 require that a physician be "registered" as a "nonsurgical abortion provider" in order to lawfully provide abortion medication to a patient;

- Sections 15 and 17 bar a facility from providing abortion medication to a patient unless it is certified under the Kentucky Abortion-Inducing Drug Certification Program, pursuant to regulations to be promulgated;

- Section 17 requires providers to sign a "Dispensing Agreement Form" to register as a "nonsurgical abortion provider," a prerequisite to being legally authorized to prescribe and provide abortion medication to patients (Act § 17(1));

- Section 22 directs that the disposition of tissue remains be documented through forms to be created by the Cabinet "through administrative regulations" (Act § 22(3)); and

DCACTIVE-66182417.2

- Section 29, which requires a report of each prescription dispensed by a pharmacy for abortion medication, provides that "[t]he Vital Statistics Branch shall promulgate administrative regulations in accordance with KRS Chapter 13A to assist in compliance with this section."

49.     Plaintiff also cannot immediately comply with provisions of the Act that require engagement or contracting with third parties for compliance.  For example:

a.     It is impossible for Plaintiff to comply immediately with the provisions regarding handling of fetal tissue because Plaintiff currently contracts with third-party vendors to safely dispose of and incinerate products of conception as pathological waste, pursuant to Commonwealth regulations for infectious waste. Upon information and belief, Plaintiff's vendors are not able or licensed at present to provide transportation of remains for purposes of interment or cremation. Compliance with the Act with respect to handling of fetal tissue will necessarily require Plaintiff to enter into one or more new contracts with a third-party crematorium or funeral establishment, and Plaintiff will need time to identify such businesses that are willing and able to provide services in compliance with the Act.

b.     The Act authorizes simultaneous cremation in Kentucky for the first time. On information and belief, Kentucky crematoria are not immediately equipped to carry out simultaneous cremation of tissue remains, which may result in the cremation requirement of the Act posing a substantial burden on the ability of Plaintiff to provide, and Plaintiff's patients to obtain, lawful abortions.

c.     With respect to abortions for minors, the Act does not establish processes for convenient access to notaries to carry out the required consent. Act § 1(2)(a)(2)(b). On information and belief, some of Plaintiff's patients may not have confidential access to a notary in a timely manner, or at all.

18

50.     The Act stands as a substantial obstacle in the path of a woman seeking an abortion because it is tantamount to an abortion ban. It is arbitrary and unconstitutional to enforce penalties for noncompliance while failing to provide a means of immediate compliance. Plaintiff, in fairness, must be granted time to comply with these sweeping changes to the provision of abortion care. Otherwise, the existence of regulatory requirements uncoupled from the means to comply with them will result in a complete ban on abortion within Kentucky.

**Impact of Personal Information Disclosures Required by the Act**

51.     As noted, the Act dramatically increases the personally identifiable and sensitive information that must be reported to the Office of Vital Statistics by abortion providers for each and every abortion (medical and procedural) in Kentucky. The Act specifically mandates the disclosure of a patient's personal identifying information including:

- Her city, county, state and zip code;

- her age, race, and ethnicity

- the age of the "father" of the fetus

- the total number and dates of her previous pregnancies, live births, and abortions

- a list of her pre-existing medical conditions that may complicate the pregnancy

- whether she is RH negative

- the reason for the abortion; and

- whether she was tested for sexually transmitted diseases and the outcome of those tests. Act, § 4.

52.     The Act provides that the reports containing this private medical and personal identifying information about people who undergo abortions shall be "public records." Act § 13(3).

DCACTIVE-66182417.2

53.     These public reports will make sensitive and confidential information related to sexually transmitted diseases, prior pregnancies, current and prior abortions, and pre-existing medical conditions available to the public. Act § 4; *see also* Act §§ 25, 26, 27, 29.

54.     On information and belief, the public reports required under the Act will make individually identifiable health information available to the public. For example, reports disclosing the combination of county, zip code, age, and/or race may readily reveal patient identity. Kentucky is comprised of 759 zip codes[4] and 120 counties.[5] Hundreds of Kentucky zip codes have a population of less than 1,000.[6] Kentucky is 50.7% female. Per the U.S. Census, Kentucky is 87.5% white, 8.5% black or African American, 1.6% Asian, 2% two or more races, and 3.9% Hispanic or Latino. 54.7% of Kentuckians are between the ages of 18 and 65.[7] Accordingly, where the patient's zip code, age, race, ethnicity and other personal information such as previous pregnancies, are of public record, there are numerous zip codes where the identity of the patient may be determined.

55.     Further, once the patient's identity is ascertained, the Act's public record reports may reveal highly sensitive, personal information about a patient, such as whether she has a sexually transmitted disease or other stigmatizing pre-existing medical condition in addition to the reason for her abortion, including abuse, coercion, harassment, or trafficking.

56.     By mandating the disclosure of individually identifiable health information of the most sensitive nature (abortions, sexually transmitted infections, victim of abuse or trafficking, etc.), the Act requires the unlawful disclosure of private medical information about an

---

[4] https://www.kentucky-demographics.com/zip_codes_by_population (based on U.S. Census Bureau data collected on March 17, 2022)
[5] "States, Counties, and Statistically Equivalent Entities" U.S. Census Bureau https://www2.census.gov/geo/pdfs/reference/GARM/Ch4GARM.pdf
[6] https://www.kentucky-demographics.com/zip_codes_by_population (based on U.S. Census Bureau data collected on March 17, 2022)
[7] https://www.census.gov/quickfacts/fact/table/KY/fips#fips (last accessed April 8, 2022).

DCACTIVE-66182417.2

individual's sexual life and procreation (among others) in violation of their fundamental right to privacy.

57.     The prospect of such disclosures will dissuade some women from seeking a wanted abortion, particularly if they have a need to keep their abortion decision from an abusive parent, partner or spouse. As such, the Act imposes an undue burden on a woman's right to access abortion in Kentucky.

### Irreparable Harm

58.     The Act's *de facto* ban on all abortions in Kentucky will irreparably harm Plaintiff and Plaintiff's patients for multiple reasons.

59.     First, Plaintiff and its physicians and staff will not be able to provide abortions in Kentucky.

60.     Second, Plaintiff's patients will not be able to obtain abortions in Kentucky. They either will be unable to obtain an abortion and will remain pregnant against their will (at great physical, emotional and financial cost to them and their existing families), or they will be forced to seek an abortion out-of-state, which, due to costs and time of travel, may require them to sacrifice food or other necessities, or potentially lose income from not working.

61.     Plaintiff and Plaintiff's patients have no adequate remedy at law.

### CLAIMS FOR RELIEF

### COUNT I

### (Procedural Due Process)

62.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 61.

63.     By taking effect immediately, without providing Plaintiff and other abortion providers time to comply, and by subjecting Plaintiff to the Act's penalties when the Cabinet has not yet created the forms that Plaintiff is required to use, or promulgated the required regulations, the Act violates Plaintiff's right to procedural due process under the Fourteenth Amendment to the United States by depriving it of liberty and/or property without due process of law.

## COUNT II

### (Substantive Due Process)

64.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 61.

65.     By requiring Plaintiff to comply with the Act despite compliance being impossible – thereby preventing Plaintiff from providing abortions and operating its business – the Act is arbitrary and violates Plaintiff's rights as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it is not rationally related to any legitimate state interest.

## COUNT III

### (Substantive Due Process - Right to Liberty and Privacy)

66.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 61.

67.     By passing a law that takes effect immediately, and making compliance impossible by requiring Plaintiff to use agency forms and processes not yet available, Plaintiff will be forced to stop providing abortion immediately, creating a de facto ban on all forms of legal abortion in violation of its patient's rights to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

DCACTIVE-66182417.2

COUNT IV

(Substantive Due Process – Plaintiff's Patients' Right to Informational Privacy)

68.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 61.

69.     By requiring involuntary disclosure of Plaintiff's patients' individually identifiable health information of the most sensitive nature and/or the public disclosure of such information, the Act violates Plaintiff's patients' rights to privacy as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff asks this Court:

A.     To immediately issue a temporary restraining order and/or preliminary injunction, and a permanent injunction, restraining Defendants, their employees, agents, and successors in office from enforcing the Act.

B.     To declare that the Act violates the Fourteenth Amendment to the United States Constitution by depriving Plaintiff's patients of their rights to liberty and privacy.

C.     To declare that the Act violates the Fourteenth Amendment to the United States Constitution by depriving Plaintiff of property without due process of law.

C.     To award Plaintiff its attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D.     To grant such other and further relief as the Court deems just and proper.

DCACTIVE-66182417.2

Dated:  April 14, 2022

*s/ Michael P. Abate*
Michael Abate
Casey L. Hinkle
KAPLAN JOHNSON ABATE & BIRD LLP
mabate@kaplanjohnsonlaw.com
chinkle@kaplanjohnsonlaw.com
710 West Main Street, 4th Floor
Louisville, KY 40202
(502) 416-1630

Jennifer S. Romano (*pro hac application forthcoming*)
Marlee Santos (*pro hac application forthcoming*)
CROWELL & MORING LLP
JRomano@crowell.com
MSantos@crowell.com
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
(213) 622-4750

Miranda Turner (*pro hac application forthcoming*)
Gloria Martinez Trattles (*pro hac application forthcoming*)
CROWELL & MORING LLP
MTurner@crowell.com
GTrattles@crowell.com
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500

Julie Murray (*pro hac application forthcoming*)
Carrie Y. Flaxman (*pro hac application forthcoming*)
PLANNED PARENTHOOD FEDERATION OF
AMERICA
julie.murray@ppfa.org
carrie.flaxman@ppfa.org
1110 Vermont Avenue, NW, Suite 300
Washington, D.C. 20005
(202) 973-4830

ATTORNEYS FOR PLAINTIFF

DCACTIVE-66182417.2