UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PLANNED PARENTHOOD GREAT                                              Plaintiff
NORTHWEST, HAWAII, ALASKA,
INDIANA, AND KENTUCKY, INC., ON
BEHALF OF ITSELF, ITS STAFF, AND
ITS PATIENTS,

v.                                                Civil Action No. 3:22-cv-198-RGJ

DANIEL CAMERON, IN HIS OFFICIAL                                       Defendants
CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF
KENTUCKY; ERIC FRIEDLANDER, IN
HIS OFFICIAL CAPACITY AS
SECRETARY OF KENTUCKY'S
CABINET FOR HEALTH AND FAMILY
SERVICES; MICHAEL S. RODMAN, IN
HIS OFFICIAL CAPACITY AS
EXCECUTIVE DIRECTOR OF THE
KENTUCKY BOARD OF MEDICAL
LICENSURE; AND THOMAS B. WINE, IN
HIS OFFICIAL CAPACITY AS
COMMONWEALTH'S ATTORNEY FOR
THE 30TH JUDICIAL CIRCUIT OF
KENTUCKY,

* * * * *

## MEMORANDUM OPINION & TEMPORARY RESTRAINING ORDER

Plaintiff Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky, Inc. ("Plaintiff") moves for a temporary restraining order or, in the alternative, a preliminary injunction [DE 3 (the "Motion")]  blocking the enforcement of Kentucky House Bill 3, the Humanity in Healthcare Act of 2022 [DE 1-1 ("HB 3")].  Defendant Attorney General Daniel

1

Cameron ("Attorney General Cameron")[1] responded [DE 21], and Plaintiff replied [DE 22]. This matter is ripe.

For the reasons below, Plaintiff's Motion for a Temporary Restraining Order [DE 3] is **GRANTED** to the extent that Defendants are restrained from enforcing HB 3 related to reporting and registration based on forms and programs not yet created or promulgated by the Cabinet for Health and Family Services ("Cabinet"). The Court does not consider at this stage the constitutionality of the substance of the requirements in HB 3, but merely the enforceability of the provisions based on the impossibility of compliance. The Court restrains enforcement of the entirety of HB 3 at this time, as it lacks information to specifically determine which individual provisions and subsections are capable of compliance. The Court will consider additional proof on this issue at the preliminary injunction hearing which will be scheduled prior to the expiration of this restraining order. This Order does not prevent the Cabinet from promulgating requisite regulations or creating any of the programs and forms required under HB 3. It also does not affect the enforcement of previously enacted legislation which HB 3 amended. KRS § 311.732.

## I.     BACKGROUND

Plaintiff filed its Complaint, asserting four claims, and now seeks emergency relief. [DE 1; DE 3]. Plaintiff claims that HB 3 violates: (1) procedural due process under the Fourteenth Amendment on its behalf, "[b]y taking effect immediately, without providing Plaintiff and other abortion providers time to comply, and by subjecting Plaintiff to HB 3's penalties when the Cabinet has not yet created the forms that Plaintiff is required to use, or promulgate the required

---

[1] Responses have not been filed by Defendants Eric Friedlander, in his official capacity as Secretary of Kentucky's Cabinet for Health and Family Services, Michael S. Rodman, in his official capacity as Executive Director of the Kentucky Board of Medical Licensure, and Thomas B. Wine, in his official capacity as Commonwealth's Attorney for the 30th Judicial Circuit of Kentucky. When the Court refers to "Defendants" it refers to all defendants in this action in their official capacities.

regulations," (2) substantive due process under the Fourteenth Amendment on its behalf, "[b]y requiring plaintiff to comply . . . despite compliance being impossible - . . . prevent[s] Plaintiff from providing abortions and operating its business . . . ," (3) substantive due process on its patients' behalf under the Fourteenth Amendment in violation of patient's rights to liberty and privacy by taking "effect immediately, and making compliance impossible by requiring Plaintiff to use agency forms and processes not yet available," and (4) substantive due process on its patients' behalf under the Fourteenth Amendment in violation of Plaintiff's patients' rights to informational privacy. [DE 1 at 21-23].

Plaintiff argues that emergency relief from HB 3 is warranted to protect itself and its patients from immediate and irreparable harm. [DE 3 at 109]. Plaintiff operates the Louisville Health Center of Louisville, Kentucky. [*Id.* at 112]. It provides various medical services to its patients, including birth control, HIV services, pregnancy testing, STD testing, treatment, and vaccines. [*Id.*]. Along with these services, Plaintiff provides procedural and medication abortion services once a week on Fridays.[2] [*Id.*]. Plaintiff is one of two remaining abortion clinics in Kentucky and only provides abortions until 13 weeks and 6 days. [*Id.*; DE 1 at 7].

On March 29, 2022, the Kentucky Legislature passed HB 3, and Governor Andy Beshear vetoed it on April 8. [DE 3 at 113]. On April 13, the Kentucky Legislature voted to override Governor Beshear's veto. [DE 1 at 3]. HB 3 contains an emergency provision which states that it has immediate effect under the Kentucky Constitution. 2022 HB 3, § 39. HB 3 revises Kentucky's existing abortion regulations and creates new requirements, including a new regulatory regime for

---

[2] Attorney General Cameron notified the Court that his office intended to respond to the Motion by Wednesday, April 20, 2022. [DE 5]. Given the nature of the requested relief, the potential irreparable harm, and the representation that relevant abortion services are only performed by Plaintiff on Fridays, the Court issued an Order requesting that Defendants respond by Tuesday, April 19 at 12:00 p.m., to allow the Court time to consider any responses and replies. [DE 13].

abortion-inducing medication, new reporting and registration requirements, and new requirements for disposition of fetal remains.  [DE 3 at 109–110].  Violating HB 3 could result in a Class D felony, fines of up to $1 million, and revocation of physician and facility licenses.  [*Id.* at 113].

HB 3 directs the Cabinet to promulgate requisite regulations and create forms.  [*Id.* at 110]. Specifically, section 13(1) of HB 3 requires the Cabinet to create new forms to comply with Sections 1, 4, 8, 9, 25, 26, 27, and 29.  2022 HB 3, § 13.  Section 1 requires a new form for providers to document emergency medical abortion services provided to minors without consent. *Id.* § 1.  Section 4 requires a new form for providers to report abortions performed in Kentucky. *Id.* § 4.  Section 8 requires a new form for providers to use when obtaining informed consent before providing medication abortions.  *Id.* § 8.  Section 9 requires a new form for providers to report medication abortions and any complications or resulting treatment.  *Id.* § 9.  Section 25 requires a new form for providers to report any complications resulting from abortions.  *Id.* § 25.  Section 26 requires a new form for providers to report any complications or adverse events related to abortions.  *Id.* § 26.  Section 27 requires a new form for providers to report the result of inquiries of patients as to gestational age and any medical exams or tests performed.  *Id.* § 27.  Section 29 requires a new form to report each prescription dispensed by a pharmacy for abortion medications. *Id.* § 29.  HB 3 also requires physicians to sign an annual form prior to providing medication abortions, *id.* § 16, and the Cabinet must design forms to collect additional information related to the disposition of fetal remains under § 22(3).  In sum, HB 3 requires the Cabinet to create or amend at least ten forms.  Attorney General Cameron concedes that these forms have not been created or distributed.  [DE 21 at 194].

HB 3 also creates a "Abortion Inducing Drug Certification Program" governing access to medication abortions.  *Id.* § 15.  Under HB 3, medication abortions can now only be provided by

4

"qualified physicians" who are registered as non-surgical abortion providers. *Id.* Abortion facilities, manufacturers, and distributors must be certified under HB 3. *Id.* § 16. HB 3 does not specify how physicians are to register and the Court is unaware of any registration process. Nor has the Cabinet promulgated rules or regulations for complying with the Kentucky Abortion-Inducing Drug Certification Program. Attorney General Cameron agrees that the Cabinet has not yet created the certification programs. [DE 21 at 200–01].

## II.   DISCUSSION

In light of the emergency clause, Plaintiff's Motion asserts that until the Cabinet creates the requisite forms and promulgates all necessary rules and regulations, it cannot provide abortion services without violating HB 3 because it is impossible to comply with all HB 3's registration and reporting requirements. [DE 3 at 118]. Plaintiff asserts that by performing such services, it risks severe criminal and civil penalties associated with HB 3 which prevent it from providing legal abortion services. [*Id.*]. Plaintiff has patients who have services scheduled as early as April 22, 2022. [*Id.* at 119]. Without a restraining order preventing HB 3 from being enforced, Plaintiff claims that it will be unable to provide services to its patients at their scheduled appointments and thus, irreparable harm will result. [*Id.*].

Attorney General Cameron asserts that "Planned Parenthood is wrong that HB 3 requires it to submit forms and comply with regulations before they exist," [DE 21 at 194] and urges the Court to adopt a "better interpretation, and the one that accounts for HB 3 as a whole, [] that Planned Parenthood will not be required to use and/or submit such forms until the Cabinet has created and distributed them." [*Id.* at 199].

### A.  The Emergency Clause

The Kentucky Constitution provides that "No act . . . shall become a law until ninety days

after the adjournment of the session at which it was passed, *except in cases of emergency*[.]"  Ky. Const. § 55 (emphasis added).  "When a law takes effect 90 days after the Legislature adjourns, this gives time for the law to be published and for the officials of the state, as well as the people, to conform to them."  *McIntyre v. Commonwealth*, 221 S.W. 931, 933 (Ky. App. 1927).  A law "containing an emergency clause becomes effective upon the Governor's approval."  *Beshear v. Acree*, 615 S.W.3d 780, 806 (Ky. 2020).  If the Governor of Kentucky vetoes a law with an emergency clause, then the law becomes effective when the legislature overrides the veto. *Commissioners of Sinking Fund v. George*, 47 S.W. 779, 782 (Ky. App. 1989) *overruled in part on other grounds by Pratt v. Breckinridge*, 65 S.W. 136 (Ky. App. 1901) ("[W]hen [the governor] disapproves [of a law], then it does not take effect, unless passed, as the constitution requires, over his objection.").  "[I]f 'any rational basis for concluding that the circumstances cited as constituting an emergency justified more expeditious action than would ordinarily be true, the courts should not interfere with the legislative discretion.'"  *Zuckerman v. Bevin*, 565 S.W.3d 580, 604 (Ky. 2018) (quoting *Am. Ins. Ass'n v. Geary*, 635 S.W.2d 306, 307 (Ky. 1982)).

HB 3 includes an emergency clause stating that "an emergency is declared to exist, and this Act take effect upon its passage and approval by the Governor or its otherwise becoming law." 2022 HB 3, § 39; *see also* Ky. Const. § 55.  Because Governor Beshear vetoed HB 3, it became effective on April 13, 2022, when the Kentucky Legislature overrode the veto.  *See George*, 47 S.W. at 782.  The Kentucky Legislature's inclusion of the emergency clause, 2022 HB 3, § 39, specifically excluded HB 3 from the 90-day period ordinarily provided for the Commonwealth and its citizens to conform to the law.  *See McIntyre*, 221 S.W. at 933.

The Kentucky Legislature has reasoned that an emergency exists because "the Commonwealth of Kentucky has a paramount interest in protecting all human life."  2022 HB 3,

6

§ 39. As the Kentucky Legislature has expressed a "rational basis" to justify more expeditious action and the parties do not argue invalidity of the emergency clause, the Court will not interfere with the Kentucky Legislature's discretion. *Zuckerman*, 565 S.W.3d at 604. As a result, HB 3 became effective and enforceable by the Kentucky Attorney General, 2022 HB 3, § 31(1), on April 13, 2022.

### B. Plaintiff's Ability to Comply With HB 3

Plaintiff has argued that it is impossible to comply with HB 3 because the Cabinet has not created the necessary forms or implemented the requisite programs for compliance with the law. [DE 3 at 114–16]. Attorney General Cameron claims that "[i]t would be unreasonable to construe the General Assembly's mandates relating to forms it directs the Cabinet to create and distribute by a date certain to apply before the Cabinet even creates such forms." [DE 21 at 200]. Instead, he argues that Plaintiff need not use or submit the required forms until the Cabinet creates them. [*Id.*]. He also argues that compliance with any program required by HB 3 is unnecessary until the Cabinet promulgates the appropriate regulations. [*Id.* at 200–01]. Yet Attorney General Cameron also suggests that even though the forms are not yet available, Planned Parenthood can fully comply with many of the reporting requirements "by simply reporting the required information in a manner it finds expedient." [*Id.* at 202 (discussing the ability to comply with Section 4 of HB 3)].

When a federal court interprets state law, it must "follow state interpretations of [those] statutes, and must predict how the state Supreme Court would [interpret the statute] if it has not yet done so." *Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019). Under Kentucky law, the "plain meaning" of the statute controls. *Com. v. McBride*, 281 S.W.3d 799, 803 (Ky. 2009), *as modified* (Apr. 27, 2009). "[T]he plain meaning of the statutory language is

presumed to be what the Legislature intended, and if the meaning is plain, then the court cannot base its interpretation on any other method or source." *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005). "[O]ur rules of statutory interpretation assume the Legislature knows what it is doing and intends the clearly expressed language of the legislation." *Dolt, Thompson, Shepherd & Conway, P.S.C. v. Com. ex rel. Landrum*, 607 S.W.3d 683, 689 (Ky. 2020). The Court must follow the plain-meaning rule "unless to do so would constitute an absurd result." *Exec. Branch Ethics Comm'n v. Stephens,* 92 S.W.3d 69, 73 (Ky. 2002).

The plain language of HB 3 is clear that the entire law became effective and enforceable on April 13, 2022. HB 3 states, pointedly, "this Act take effect upon its passage[.]" 2022 HB 3, § 39. Assuming the Kentucky Legislature "intends the clearly expressed language" of HB 3, then the entire Act, including the enforcement and penalties provisions, went into effect on its passage.[3] *Dolt, Thompson, Shepherd & Conway, P.S.C*, 607 S.W.3d at 689. It would be unreasonable for Plaintiff to assume that HB 3 does not mean what it states.

Moreover, Plaintiff has no guarantee that HB 3 will not be enforced against it or its providers. The plain language of HB 3 gives the Attorney General authority to enforce HB 3 whether or not the Cabinet has created the forms or promulgated the requisite regulations. 2022 HB 3, § 31(1). Nowhere in Attorney General Cameron's response was it represented that his office

---

[3] Had the Legislature wished to exclude the emergency provision in the event it made HB 3 unenforceable, then the Legislature could have included a savings provision as it has with other newly enacted laws. *See, e.g.*, Act of March 23, 2021, Ch. 89, § 5, 2001 Ky. Laws. Moreover, the Legislature could have stated that the enforcement and penalties provisions were not in effect until the 60 day period for performance by the Cabinet had lapsed.

would not enforce HB 3 until the Cabinet creates a means to comply with it.[4]  [DE 21].   For the

reasons above, the Court finds that based on the plain language of HB 3, the Kentucky Legislature

intended for the entire law to become effective immediately, regardless of whether the Cabinet has

created a means for compliance.

### C.  Temporary Restraining Order

"[A] temporary restraining order is an extraordinary remedy designed for the limited

purpose of preserving the status quo pending further proceedings on the merits[.]" *Stein v. Thomas*,

672 F. App'x 565, 572 (6th Cir. 2016).  "TRO's are of a short duration and usually terminate with

a ruling on a preliminary injunction." *Id.* at *26 (citing *Workman v. Bredesen*, 486 F.3d 896, 922

(6th Cir. 2007); Fed. R. Civ. P. 65(b)).

To determine whether a temporary restraining order should issue under Fed. R. Civ. P.

65(b), the Court considers four factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether
> the movant would suffer irreparable injury without the injunction; (3) whether
> issuance of the injunction would cause substantial harm to others; and (4) whether
> the public interest would be served by the issuance of the injunction.

---

[4] Attorney General Cameron has asserted that while the Cabinet is required to create forms under Section
13, this does not relieve Plaintiff of the requirement to report certain information in whatever manner
Plaintiff finds "expedient."  [DE 21 at 202].  For example, under Section 4 Attorney General Cameron
argues that:

> To be sure, Section 13 specifies that the Cabinet is to create a form for this purpose. But
> that is an independent requirement on the Cabinet, not on an abortion provider. Planned
> Parenthood can fully comply with Section 4's requirements by simply reporting the
> required information in a manner it finds expedient. Once the Cabinet creates and
> distributes its form, Planned Parenthood can use that form to comply with Section 4.
> Further, the direction in Section 4(10) for Vital Statistics to "promulgate administrative
> regulations . . . to assist in compliance with this section" does not prevent Planned
> Parenthood from complying with the reporting requirement immediately.

[DE 21 at 202; *see also id.* at 203 (making a similar argument for ability to comply with Section 25)].  Based
on these representations, Plaintiff must assume that failure to report or comply can and will be enforced,
regardless of a clear methodology for reporting or complying.  This requires Plaintiff to guess on what
"expedient" method of reporting would be considered sufficient under HB 3, and yet the penalties would
be severe for not sufficiently reporting.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  The Court need not make findings on each factor if fewer resolve the issue.  *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. Sch. Dist. of Ferndale, Mich.*, 577 F.2d 1339, 1352 (6th Cir. 1978)).  "The party seeking [injunctive relief] bears the burden of justifying such relief, including irreparable harm and likelihood of success."  *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 441 (1974)).

The moving party need only show a likelihood of success on the merits on one claim where there are multiple claims at issue in a complaint.  *See e.g.*, *Transtex Composite, Inc. v. Laydon Composite, Ltd.*, No. CIV.A. 12-150-C, 2012 WL 5362191, at *2 (W.D. Ky. Oct. 30, 2012); *see also Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1384 (M.D. Fla.), *aff'd,* 403 F.3d 1223 (11th Cir. 2005) ("Plaintiffs have asserted five constitutional and statutory claims. To obtain temporary injunctive relief, they must show a substantial likelihood of success on at least one claim"); *725 Eatery Corp. v. City of New York,* 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) ("Plaintiff need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims.'").

1. <u>Likelihood of Success on the Merits</u>

Plaintiff asserts violations of substantive due process on behalf of its patients[5] because HB 3, "by passing a law that takes effect immediately, and making compliance impossible by requiring Plaintiff to use agency forms and processes not yet available, Plaintiff will be forced to stop providing abortion immediately, creating a de facto ban on all forms of legal abortion in violation of its patient's rights to liberty and privacy."  [DE 1 at 22].

The Court recognizes that there is a constitutionally protected right to a pre-viability abortion under the Fourteenth Amendment.  *See Planned Parenthood of Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992); *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2135 (2020) ("*Casey* reaffirmed the most central principle of *Roe v. Wade*, a woman's right to terminate her pregnancy before viability.").  The Sixth Circuit has held that "[t]he right to an abortion before viability is *not* absolute."  *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 520 (6th Cir. 2021) (en banc) (emphasis in original).  A "[s]tate may regulate abortion *before viability* as long as it does not impose an undue burden on a woman's right to terminate her pregnancy." *Id.* (emphasis in original) (quoting *Women's Med. Pro. Corp. v. Taft*, 353 F.3d 436, 443 (6th Cir. 2003)).  A law regulating pre-viability abortions is valid if it satisfies two requirements: (1) it must be "reasonably related to a legitimate state interest" and (2) it "must not have the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *EMW Women's Surgical Ctr., P.S.C.*

---

[5] The Supreme Court has established that abortion providers have standing to assert their patients' rights. *Singleton v. Wulff*, 428 U.S. 106, 117 (1976); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 794 n. 2 (6th Cir.), *reh'g en banc dismissed,* 831 F. App'x 748 (6th Cir. 2020), *cert. granted in part sub nom. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 141 S. Ct. 1734 (2021), and *rev'd and remanded sub nom. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002 (2022) (hereinafter "*EMW I*"); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1395-96 (6th Cir. 1987). In *Singleton*, the Court stated that abortion providers are "uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against," the patient's decision to have an abortion.  428 U.S. at 117.

*v. Friedlander*, 978 F.3d 418, 433–34 (6th Cir. 2020) (hereinafter "*EMW II*") (internal citations omitted).

The Court will not address whether HB 3 is reasonably related to a legitimate state interest because HB 3 does create a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* Because HB 3 became effective immediately from the time the Kentucky Legislature overrode the Governor's veto, the Cabinet did not have time to create the necessary forms or programs for Plaintiff to comply with HB 3. [DE 21 at 193]. Providers of legal abortion services cannot comply with HB 3 until the Cabinet creates the required forms and promulgates the necessary regulations and HB 3 includes no language excusing compliance during the 60-day promulgation period. Because Plaintiff cannot comply with HB 3 and thus cannot legally perform abortion services, its patients face a substantial obstacle to exercising their rights to a pre-viability abortion. *EMW II*, 978 F.3d at 433–34. This undue burden on the patients' rights to a pre-viability abortion would likely violate substantive due process. *McCloud*, 994 F.3d at 520. Therefore, Plaintiff, on behalf of its patients, has a strong likelihood of success on the merits of Count 3.

After reviewing the elements of Plaintiff's due process claims, the Court also finds that Plaintiff has a strong likelihood of success on the merits of Counts 1 and 2. Because there is likelihood of success on the merits of one or more of Plaintiff's claims, the Court need not consider in detail the merits of each and every claim. *Transtex Composite, Inc.*, 2012 WL 5362191, at *2.

2. Plaintiff's Irreparable Injury Absent an Injunction

The next factor that the Court must balance is whether Plaintiff would suffer irreparable injury absent an injunction. *See S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).

12

The Sixth Circuit has held that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd sub nom. McCreary Cty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844 (2005) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905, 924–25 (S.D. Ind. 2011) (quoting *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) ("It is well-established that, 'when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'")). As noted above, women have a constitutionally protected right to a pre-viability abortion under the Fourteenth Amendment. *See Casey*, 505 U.S. at 846.

Courts have also held that irreparable harm may be present where engaging in the prohibited conduct would result in the realistic possibility of felony prosecution. *United States v. Williams*, 872 F.2d 773, 777 (6th Cir. 1989) ("[A] felony conviction irreparably damages one's reputation."); *Michigan Chamber of Com. v. Land*, 725 F. Supp. 2d 665, 699 (W.D. Mich. 2010) ("[S]taying today's injunction would irreparably harm these plaintiffs by leaving them unable to engage in the [constitutionally protected] activity without a very realistic fear of felony prosecution.").

If Plaintiff or one of its providers were to attempt to perform an appropriate and legal abortion under HB 3 at this time, then they would necessarily be in violation of HB 3 because of the impossibility of compliance. Such a violation could result in a Class D felony, fines of up to $1 million, and revocation of physician and facility licenses. [DE 3 at 113]. Until the Cabinet promulgates the appropriates rules and drafts the necessary forms, Plaintiff and its providers would be subject to these severe penalties for providing medical services approved by the Kentucky Legislature. [*Id.*]. Plaintiff claims it cannot risk continuing to perform abortions under the threat

of such severe penalties. [*Id.* at 118]. Women seeking otherwise legal and constitutionally protected abortions, see *Casey*, 505 U.S. at 864, cannot exercise their right to the procedure without a medical provider. Plaintiff is one of only two abortion providers in Kentucky. [DE 3 at 112]. Women cannot go elsewhere to receive these constitutionally protected medical procedures. Plaintiff can likely demonstrate irreparable harm based on the impairment of their patients' constitutionally protected right to a pre-viability abortion and their own fear of felony conviction for engaging in their business because there is not yet a means of compliance with HB 3. *See McCreary Cty.*, 354 F.3d at 445.

### 3. Whether Injunction Would Cause Others Substantial Harm

Next, the Court must consider whether injunctive relief would harm others. *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 542. While this factor is generally concerned with harm to third parties, courts also often consider the "balance of hardships" between the parties if an injunction were to issue. *See, e.g.*, *id.* at 550–51; *Nesco Res. LLC v. Walker*, No. 3:18-CV-00171-GNS, 2018 WL 2773321, at *5 (W.D. Ky. Apr. 23, 2018). Plaintiff carries "the burden of justifying [the injunctive] relief" it seeks. *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020).

Plaintiff is one of two clinics in the Commonwealth that can perform the procedures approved by the Kentucky Legislature in HB 3. [DE 3 at 112]. Without an injunction, Plaintiff will be unable to perform its services until the Cabinet provides a means to comply with HB 3. As a result, third parties will be unable to obtain medical procedures approved by the Kentucky Legislature. Thus, the Court balances the hardships between the Commonwealth's interest in enforcing its laws against the potential depravation of rights.

14

Attorney General Cameron argues that "the inability to enforce HB 3 irretrievably harms the women and unborn children it was enacted to protect." [DE 21 at 214]. However, if it is "unreasonable" for the Plaintiff to interpret HB 3 as requiring compliance with its reporting and registration components before the Cabinet has acted, [*id.* at 199], then enjoining enforcement of HB 3 while it is impossible to comply could not logically cause any irretrievable harm. In fact, it would merely be maintaining what Attorney General Cameron states is the "better interpretation" of the law. [*Id.*]. If there is no intent to enforce provisions of HB 3 until forms, regulations, and programs are created and promulgated then this restraining order could not possibly harm any interests of the "women and unborn children it was enacted to protect." [*Id.*] As the injunction on enforcement would not cause substantial harm to others, this factor supports injunctive relief.

    4. Whether Public Interest is Served by Issuance of Injunction

The Sixth Circuit has held that "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)). As noted above, Plaintiff easily satisfies this factor because there is a substantial likelihood that Defendants have violated Plaintiff's and its patients' due process rights under the Fourteenth Amendment. "The public interest will not be harmed by preserving the status quo pending a preliminary injunction hearing." *Planned Parenthood of Tennessee & N. Mississippi v. Slatery*, No. 3:20-cv-00740, 2020 WL 5797984, at * 5 (M.D. Tenn. Sept. 29, 2020). Moreover, Courts in the Sixth Circuit have held that public policy supports an injunction when there would be a disruption to medical services or a patient's continuity of care. *See, e.g.*, *Hagan v. Vision Serv. Plan*, No. 05-72517, 2005 WL 3447882, at *10 (E.D. Mich. Dec. 15, 2005); *Galper v. U.S.*

*Shoe Corp.*, 815 F. Supp. 1037, 1044 (E.D. Mich. 1993). If Plaintiff cannot comply with HB3 and must cease providing certain medical services until the Cabinet promulgates a means of compliance, then this disruption to medical services will no doubt interrupt the continuity of care for Plaintiff's patients. As a result, a temporary restraining order serves public policy.

As a result, all four of the factors support injunctive relief and Plaintiff's Motion for Temporary Restraining Order, [DE 3], is **GRANTED** to the extent set forth below.

### D. Scope of the Injunction.

Attorney General Cameron claims that in a "sleight of hand" Plaintiff asks the Court to enjoin enforcement of the entirety of HB 3 "—not because Planned Parenthood has a valid objection to each of the reforms contained in HB 3—but because there are a handful of administrative requirements that Planned Parenthood is not able to comply with as of right now." [DE 21 at 194]. Attorney General Cameron asserts that there are only a "few provisions that require Planned Parenthood to submit forms that do not yet exist," and thus, if any relief should be granted it must be limited in scope. [*Id.* at 194]. The Court disagrees that there are only a "handful" of sections of HB 3 where Plaintiff could reasonably question its ability to comply based on forms or regulations not yet in place.

| Section | Description | Barriers to Compliance[6] |
|---------|-------------|---------------------------|
| Section 1 | Requires providers to maintain and submit forms regarding informed consent from minors who receive emergency abortions. | Section 13(1) requires the Cabinet to create a form for compliance with Section 1, but the form has not been created. |
| Section 2 | Allows the Cabinet to deny, suspend, or revoke a license for failure to comply with various requirements. | Section 2(27) requires compliance with Section 1, which, as noted in this chart, may be impossible to comply with absent the required forms. |
| Section 3 | Describes punishments for | As noted in this chart, Section 1 cannot be |

---

[6] The explanations in this column should not be construed as the only barriers to compliance for each section listed. To avoid being repetitive, the Court has only listed the most obvious barriers.

16

|  | violating sections of HB 3, including Section 1. | complied with because the Cabinet has not created the necessary forms. |
|---|---|---|
| Section 4 | Requires providers to submit forms recording all abortions. | Section 4(11)(a) requires this information to be submitted to the Bureau of Vital Statistics, which will promulgate regulations for compliance.  Section 13(1) requires the Cabinet to create a form for compliance.  No regulations have been promulgated and no forms have been created. |
| Section 5 | Defines terms used throughout Sections 5–11, including "Nonsurgical abortion provider." | To become a "Nonsurgical abortion provider," the Cabinet must create a certification program and forms as noted in Section 17. No program or forms have been created. |
| Section 6 | Requires that abortion-inducing drugs be provided only by a qualified physician who is registered with the Cabinet as a nonsurgical abortion provider. | To become a "Nonsurgical abortion provider," the Cabinet must create a certification program and forms as noted in Section 17. No program or forms have been created, so no provider can distribute abortion-inducing drugs. |
| Section 7 | Describes, among other things, information physicians must give patients when providing abortion-inducing drugs. | Under Section 6, a physician cannot prescribe abortion-inducing drugs unless they are registered as a nonsurgical abortion provider. The Cabinet has not created a means to become a nonsurgical abortion provider, so no physician could distribute abortion-inducing drugs. |
| Section 8 | Requires informed consent from a patient prior to prescribing abortion-inducing drugs. | Under Section 8(2), the Cabinet must create a form to obtain informed consent.  The Cabinet has not yet created the form. |
| Section 9 | Creates reporting requirements for abortion-inducing drugs prescribed by providers. | Section 26 requires the Cabinet to create a form to report each abortion inducing drug prescribed.  No form has been created. |
| Section 11 | Creates a civil action for providers who fail to comply with Sections 5–11. | Sections 5–11 concern abortion-inducing drugs.  Providers cannot prescribe abortion-inducing drugs unless they are nonsurgical abortion providers.  The Cabinet has not created a means to become a nonsurgical abortion provider under Section 17.  Therefore, any prescription for an abortion-inducing drug would violate Section 11 until the forms have been created. |
| Section 13 | Requires the Cabinet to create forms for Sections 1, 4, 8, 9, 25, 26, 27, and 29. | No forms have been created or distributed. |
| Section 14 | Imports the definitions used in | See reasoning for Section 5. |

17

|  | | |
|---|---|---|
|  | Section 5 and makes them applicable to Sections 14–19. | |
| Section 15 | Requires the Cabinet to create a program called the Kentucky Abortion-Inducing Drug Certification Program to regulate the distribution of abortion-inducing drugs. | The Cabinet has not yet created the program. |
| Section 16 | Requires that pharmacies, manufacturers, and abortion facilities participate in the Abortion-Inducing Drug Certification Program. Explains eligibility requirements and allows for enforcement. | The Kentucky Abortion-Inducing Drug Certification Program has not yet been created under Section 15. |
| Section 17 | Creates eligibility requirements for registering as a nonsurgical abortion provider and qualified physician. | Cabinet has not created a registration program for nonsurgical abortion providers under Section 17(1). Qualified physicians cannot maintain admitting privileges at a hospital that provides abortion-inducing drugs or an association agreement with a physician who prescribes abortion-inducing drugs under Section 17(2). The Kentucky Abortion-Inducing Drug Certification Program has not yet been created under Section 15, so no person or entity can prescribe abortion-inducing drugs. |
| Section 18 | Describes punishments and enforcement mechanisms for violating the Kentucky Abortion-Inducing Drug Certification Program. | The Kentucky Abortion-Inducing Drug Certification Program has not yet been created under Section 15. |
| Section 19 | Directs the Cabinet to create a website where individuals can report violations of the Kentucky Abortion-Inducing Drug Certification Program. | The Kentucky Abortion-Inducing Drug Certification Program has not yet been created under Section 15. |
| Section 22 | Describes methods of disposing of "fetal remains" and options available to the mother. | Section 22(3) requires the Cabinet to create a form to collect information related to the disposition of fetal remains, which has not yet been created. |
| Section 25 | Creates a reporting requirement for providers when patients suffer complications or an adverse | Section 13(1) requires the Cabinet to create a form for compliance, but the form has not yet been created. |

| | | condition. |
|---|---|---|
| Section 26 | Creates a reporting requirement for abortion-inducing drugs prescribed by providers, adverse events, and physician billing practices. | Section 13(1) requires the Cabinet to create a form for compliance, but the form has not yet been created. |
| Section 27 | Requires, among other things, the physician to submit a report on a form provided by the Cabinet that includes information required by Section 4. | Sections 13(1) and 27(4) require the Cabinet to create a form for compliance, but the form has not yet been created |
| Section 29 | Requires providers to report each time medication used to induce an abortion was prescribed. | Section 13(1) requires the Cabinet to create a form for compliance, but the form has not yet been created. |

While the Court has done its best to examine HB 3 in detail, this is an urgent and time sensitive matter that neither permits the Court to understand every possibility under HB 3, nor has the Court been presented with enough information to determine at this stage whether there are provisions of HB 3 that can be complied with before the Cabinet creates the forms and promulgates the regulations.[7]

Under Fed. R. Civ. P. 65 the temporary restraining order entered will "expire at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." Rule 65 thus sets a 28-day maximum for effectiveness of a temporary restraining order, after which any TRO in place becomes an appealable preliminary injunction. *See H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.,* 694 F.3d 827, 845 (7th Cir. 2012) (citing Fed. R. Civ. P. 52(a)(2)); *see also*

---

[7] For example, Attorney General Cameron argues the Plaintiff does not have to comply with the form required under Section 1(10) until supplied by the Cabinet. [DE 21 at 202]. Yet, Section 1(10) was in the prior law as Section 1(9) and it appears that only the number has changed. Thus the Court has no frame of reference as to whether the form exits, or if, as Attorney General Cameron suggests, it is yet to be supplied by the Cabinet, presumably pursuant to the newly amended Section 13.

*Sampson v. Murray*, 415 U.S. 61, 86–88 (1974) (finding that extension of temporary restraining order past statutory limit effectively creates a preliminary injunction). Given the 60-day timeframe that the Cabinet has to promulgate the forms and regulations required by HB 3, the parties are encouraged to explore whether they can reach an agreement regarding enforcement during the 60-day period. If no agreement can be reached, the Court will consider additional proof as to which individual provisions and subsections are capable of compliance at the preliminary injunction hearing. It is the Court's intent to set a hearing date before the temporary restraining order expires.

### E. Security

The Court has "discretion over whether to require the posting of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (emphasis omitted) (internal quotation marks omitted); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1996). Plaintiff has represented that it is a health care provider who serves low-income and underserved communities. [DE 3 at 127]. Requiring it to secure a bond would strain its limited financial resources. [*Id.*]. As a result, Plaintiff need not post security.

### III.    CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1)    Plaintiff's Motion for a Temporary Restraining Order [DE 3] is **GRANTED**, and HB 3 shall be unenforceable;

(2)    Defendants Daniel Cameron, in his official capacity as Attorney General, Eric Friedlander, in his official capacity as Secretary of Kentucky's Cabinet for Health and Family Services, Michael S. Rodman, in his official capacity as Executive Director of the Kentucky Board of Medical Licensure, and Thomas B. Wine, in his official capacity as Commonwealth's Attorney

for the 30th Judicial Circuit of Kentucky, are **TEMPORARILY ENJOINED** from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with HB 3;

(3)     This TRO is effective as of **April 21, 2022, at 3:00 p.m**. and shall remain in effect until such further dates as set by the Court or stipulated by the parties, but, absent a request for an extension, shall not exceed fourteen (14) days from the date of entry of this order under Federal Rule of Civil Procedure 65(b)(2);

(4)     The requirement of security under Federal Rule of Civil Procedure 65(c) is waived due to the strong public interest involved; and

(5)     The parties will be contacted by the Court's deputy to schedule a preliminary injunction hearing.

Rebecca Grady Jennings, District Judge
United States District Court

April 21, 2022

21