## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

PLANNED PARENTHOOD GREAT
NORTHWEST, HAWAII, ALASKA,
INDIANA, & KENTUCKY, INC.,

       Plaintiff,

EMW WOMEN'S SURGICAL CENTER,
P.S.C., on behalf of itself, its staff, and its
patients; ERNEST W. MARSHALL, M.D., on
behalf of himself and his patients,

       Intervenor Plaintiffs,

    v.

Case No.: 3:22-cv-198-RGJ

DANIEL CAMERON, in his official capacity as
Attorney General of the Commonwealth of
Kentucky; MICHAEL S. RODMAN, in his
official capacity as Executive Director of the
Kentucky Board of Medical Licensure; ERIC
FRIEDLANDER, in his official capacity as
Secretary of Kentucky's Cabinet for Health and
Family Services; and THOMAS B. WINE, in
his official capacity as Commonwealth's
Attorney for the 30th Judicial Circuit of
Kentucky,

       Defendants.

## VERIFIED COMPLAINT

Plaintiffs bring this Verified Complaint to make claims against the above-named

Defendants, their employees, agents, and successors in office, and in support thereof state the

following:

## INTRODUCTION

1.      This Verified Complaint raises a constitutional challenge to House Bill 3 (the "Act") on the ground that it bans abortion at 15 weeks in pregnancy, that the other provisions are tantamount to a ban on abortion, and that certain provisions violate patients' informational privacy.  When the Act became effective on April 13, 2022, it was impossible to comply with its vast provisions, resulting in an immediate ban on abortion in the Commonwealth, until this Court issued a TRO enjoining HB 3 in its entirety.

2.      In addition to enacting over 70 pages of unnecessary restrictions revising Kentucky's existing abortion laws and creating new requirements, the Act also bans abortion starting at 15 weeks in pregnancy.  The Act imposes criminal penalties, civil liability (including in one instance, potential penalties up to one million dollars), and potential loss of facility and medical licenses due to non-compliance.

3.      Plaintiffs are currently turning away patients seeking abortion at 15 weeks and beyond, causing irreparable harm to Plaintiffs and their patients.  Plaintiffs generally provide abortion Tuesday through Saturday, and nearly every day they have one or more patients scheduled for an abortion at or after 15 weeks in pregnancy.  Since April 13, Plaintiffs have turned away 23 patients seeking abortion care who were at or after 15 weeks of pregnancy.

4.      The de facto ban, and the 15-week ban, violate Plaintiffs' and their patients' procedural and substantive due process rights under the Fourteenth Amendment.

5.      In addition, the Act violates patient privacy by requiring abortion providers to submit to the Commonwealth highly detailed information regarding each abortion.  The Act deems these reports "public records," and they will include information that may be used to identify the individual and would reveal an individual's most sensitive confidential information, including

that the individual had an abortion, as well as information such as whether the patient has a sexually transmitted disease.

6.    A copy of the Act is attached as Exhibit A.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

8.    Plaintiffs claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

9.    Venue is appropriate under 28 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occur in this judicial district.

## PLAINTIFFS

10.    Plaintiff EMW Women's Surgical Center, P.S.C. ("EMW"), a Kentucky corporation located in Jefferson County (Louisville), is one of two licensed abortion facilities located in Kentucky. EMW has been providing reproductive health care, including abortion, since the 1980s. EMW sues on behalf of itself, its physicians, staff, and its patients.

11.    Plaintiff Ernest W. Marshall, M.D., is the owner of EMW, where he provides abortion, and he is a board-certified obstetrician-gynecologist. He sues on his own behalf and on behalf of his patients.

## DEFENDANTS

12.    Defendant Daniel Cameron is the Attorney General of the Commonwealth of Kentucky and, as such, is the Commonwealth's chief law enforcement officer.  Pursuant to KRS 15.241, the Attorney General may enforce the Act by seeking injunctive relief as well as civil and criminal penalties.  Furthermore, the Attorney General may initiate or participate in criminal

3

prosecutions for violations of the Act at the request of, *inter alia*, the Governor, any court of the Commonwealth, or local officials. KRS 15.190, 15.200. Defendant Cameron is likewise charged with seeking injunctive relief against "abortion facilities" to "prevent violations of the provisions of KRS Chapter 216B regarding abortion facilities or the administrative regulations promulgated in furtherance thereof." KRS 15.241. Those regulations include the requirement that all abortion facilities ensure "compliance with…state…laws," including the Act. 902 KAR 20:360, § 5(1)(a). Defendant Cameron is sued in his official capacity.

13.    Defendant Eric Friedlander is the secretary of the Cabinet for Health and Family Services ("the Cabinet")—an agency of the Commonwealth of Kentucky.  In his capacity as secretary of the Cabinet, Defendant Friedlander is charged with, *inter alia*, oversight and licensing of abortion providers and the regulatory enforcement of those facilities. KRS 216B.0431(1); 902 KAR 20:360, § 5(1)(a).  The Cabinet's regulations include the requirement that all abortion facilities ensure "compliance with . . . state . . . laws," including the Act. 902 KAR. 20:360, § 5(1)(a).  Defendant Friedlander is sued in his official capacity.

14.    Defendant Michael S. Rodman serves as Executive Director of the Kentucky Board of Medical Licensure ("KBML" or "the Board"), which is located in Jefferson County. Defendant Rodman and the Board possess authority to pursue disciplinary action up to and including license revocation against Kentucky physicians for violating the Act.  KRS 311.565; KRS 311.606.  Defendant Rodman is sued in his official capacity.

15.    Defendant Thomas B. Wine serves as Commonwealth's Attorney for the 30th Judicial Circuit of Kentucky.  In this capacity, Defendant Wine has authority to enforce the Act's criminal penalties in Jefferson County, where Plaintiffs are located.  *See* KRS 15.725(1); KRS 23A.010(1).  Defendant Wine is sued in his official capacity

## **FACTUAL ALLEGATIONS**

16.     People seek abortions for a variety of deeply personal reasons, including familial, medical, and financial.  Some have abortions because they conclude that it is not the right time in their lives to have a child or to add to their families: for example, some decide to end a pregnancy because they want to pursue their education; some because they feel they lack the necessary economic resources or level of partner support or stability; some because they are concerned that adding a children to their family will make them less able to adequately provide and care for their existing children.  Some seek abortions to preserve their life or health; some because they have become pregnant as a result of rape; and others because they decide not to have children at all. Some people decide to have an abortion because of an indication or diagnosis of a fetal medical condition or anomaly.  Some families do not feel they have the resources—financial, medical, educational, or emotional—to care for a child with special needs or to simultaneously provide for the children they already have.  The decision to terminate a pregnancy for any reason is motivated by a combination of diverse, complex, and interrelated factors that are intimately related to the individual woman's values and beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability.

17.     Approximately one in four women in this country will have an abortion by age forty-five. A majority of women having abortions (61%) already have at least one child, while most (66%) also plan to have a child or additional children in the future.

18.     Approximately half of all abortions in the United States and in Kentucky are procedural abortions, and the other half are medication abortions.[1]

19.     Legal abortion is one of the safest medical procedures in the United States, and is substantially safer than continuing a pregnancy through to childbirth.

20.     Pregnancy is commonly measured from the first day of a woman's last menstrual period ("lmp"). A woman's menstrual cycle is usually four weeks.  Fertilization typically occurs around two weeks lmp.  The medical profession considers pregnancy to actually begin when a fertilized egg implants in the uterus, typically around three weeks lmp, approximately a week before a woman with a typical and regular menstrual cycle will expect to get her period.  A full term pregnancy is approximately forty weeks as measured from the woman's lmp.

21.     Medication abortion involves a combination of two pills, mifepristone and misoprostol, which expel the contents of the uterus in a manner similar to a miscarriage, after the patient has left the clinic in a location of the patient's choosing, typically her own home.

22.     Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery," as it involves no incisions.  Instead, in a procedural abortion, the provider inserts a thin, flexible tube, and in some instances, other instruments, to empty the contents of the patient's uterus.

23.     For young people under age 18, Kentucky requires the consent of one parent before she obtains an abortion.  Alternatively, a minor may seek judicial authorization for an abortion without parental consent.  In Kentucky, almost all abortion patients under 18 years old obtain a parent's consent for their abortion; a small fraction of them obtain a judicial bypass allowing them to end their pregnancies without parental consent.

---

[1] Kentucky Annual Abortion Report for 2020, Dept. for Public Health, Office of Vital Statistics, at 12.

24.     Fifteen weeks in pregnancy is a pre-viability point in pregnancy.

25.     Prior to the enactment of the Act, Kentucky law prohibited abortion after 21.6 weeks lmp, which is before viability. KRS 311.782.

26.     People face many obstacles in accessing abortion care in Kentucky.  There are only two outpatient abortion providers in the entire Commonwealth.  Both are located in Louisville. Both provide medication abortion up to 10 weeks from the patient's last menstrual period ("lmp"). Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky ("Planned Parenthood") provides procedural abortion until 13 weeks and 6 days lmp.  Prior to the enactment of the Act, Plaintiff EMW provided abortion up to 21 weeks and 6 days lmp.

27.     If a woman is forced to continue a pregnancy against her will, it can pose a risk to her physical, mental, and emotional health, and even her life, as well as to the stability and wellbeing of her family, including her existing children.

## HOUSE BILL 3

28.     The Kentucky Legislature passed the Act and delivered it to Governor Beshear on March 30, 2022.  Governor Beshear vetoed the bill on April 8, 2022.  The governor's veto statement observed that the new administrative burden associated with the Act is an estimated $1 million, a testament to its complexity and wide-reaching nature, and noted that the Cabinet is under no legal obligation to carry out an unfunded mandate.[2]  On April 13, 2022, the legislature voted to override Governor Beshear's veto and the Act became law and took immediate effect.  On April 21, 2022, this Court granted a TRO blocking its enforcement in its entirety in *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky v. Cameron, et al.* (Case No. 3:22-cv-00198-RGJ, Doc. 27).

---

[2] https://apps.legislature.ky.gov/record/22rs/hb3/veto.pdf

29.     The Act bans abortion after 15 weeks in pregnancy lmp.  Act §§ 27, 32–35.  The

Board of Medical Licensure shall revoke the medical license of a physician who violates the law.

KRS 311.782(4).  In addition, the Attorney General has the authority to bring an action in law or in

equity to enforce the 15-week ban.  Act § 35.  There is a very limited exception to the 15-week ban,

namely that the abortion must be necessary to prevent the death of the pregnant woman or to avoid

serious risk of the substantial and irreversible impairment of a major bodily function of the woman,

KRS 311.783, and their other limited affirmative defenses, KRS 311.782(2)(b).  The Section of the

Act that creates the 15-week ban also adds a new requirement for every abortion to be reported

on a form to be created by the Cabinet that includes the gestational age of the fetus and the

"results of inquiries of the pregnant person and any medical examinations or tests performed."

Act § 27(4).

30.     The Act also creates numerous new, unnecessary requirements for providers of

abortion, many of which cannot be complied with immediately.

31.     <u>New Requirements to Report Detailed Information Regarding Each Abortion</u>.

Section 4 of the Act requires immediately that abortion providers submit to the Vital Statistics

Branch reports containing detailed information about each abortion within three (3) days after the

end of each month.  Act § 4(1), KRS 213.101(1).  Reports must include, among other things:

- The full name and address of the physician who performed the abortion

- The full name and address of the referring physician, agency or service

- The patient's city, county, state, and zip code

- That patient's age, race, and ethnicity

- The age of the "father" of the fetus

- The total number and dates of the patient's previous pregnancies, live births, and

abortions

- A list of the patient's pre-existing medical conditions that may complicate the pregnancy

- Whether the patient suffered any complications or adverse events

- The reason for the abortion, if known, including abuse or trafficking, and

- Whether the patient was tested for sexually transmitted diseases and the outcome of those tests.

Act § 4(2), KRS 213.101(2).

32.     While the Act provides that the report shall not include the name of the patient, the patient's Social Security number or motor vehicle operator's number, and that it shall not include "other information or identifiers that would make it possible to ascertain the patient's identity," Act § 4(3), KRS 213.101(3), it contains no protection for patients whose identities can be determined based on the information required to be included in the report (e.g., zip code, age, race, pre-existing conditions, previous pregnancies).

a.  The Act provides that the reports and/or report forms containing this information shall be public records.  Act § 13(3).

b. Pursuant to KRS 213.101(10), the Vital Statistics Branch "shall promulgate administrative regulations in accordance with KRS Chapter 13A to assist in compliance with this section."  Regulations addressing new provisions of KRS 213.101 added by the Act have not been promulgated and could take months to promulgate and implement.

33.     Multiple other provisions of the Act require the same information called for in the above Section 4 to be included in connection with other report forms to be created by the Cabinet, including:

9

a.  The requirement that health care facilities and physicians file a written report of any complication or adverse event suffered after an abortion, to include "at minimum the information required by Section 4 of this Act."  Act § 25(1).  The Act contains no protection for patients whose identities can be determined based on the information required to be included in the report (e.g., zip code, age, race, pre-existing conditions, previous pregnancies).  Act § 25(2).

b.  The requirement that each prescribing "qualified physician" report "at minimum the information required by Section 4 of this Act." Act §§ 9, 26.

c.  The requirement that for each abortion conducted, the physician additionally "submit a report on a form provided by the cabinet" including the probable gestational age of the fetus and "at a minimum the information required by Section 4 of this Act." Act § 27(4) (KRS 311.783(4)).

34.  <u>New Restrictions and Reporting Requirements for Abortions Performed for Minors</u>. The Act immediately requires that for a minor seeking an abortion: (a) the attending physician secures written consent for the abortion by the minor and a consenting parent or guardian; (b) 48 hours prior to providing consent, the consenting parent or guardian makes a "reasonable attempt" to notify any other parent with joint or physical custody (absent limited exceptions for parents enjoined or subject to a protective order on account of domestic abuse or convicted of certain criminal offenses); (c) the written consent includes a copy of the minor's government-issued identification, a copy of the consenting parent or guardian's government issued identification, and documentation of parental or guardian status such as a birth certificate, court-ordered custodial paperwork, or tax return; (d) a notarized certification of consent by the consenting parent or guardian; (e) the physician keeps the notarized written consent in the medical file for at least 5 years after the minor reaches 18, or for 7 years, whichever is longer; and (f) an affidavit by the attending physician certifying,

10

"according to my best information and belief, a reasonable person under similar circumstances would rely on the information presented by both the minor and her parent or legal guardian as sufficient evidence of identity."  Act § 1(2)(a)(1-4) (KRS 311.732(2)(a)(1-4)).

35.     Requirement for Creation of a "Drug Certification Program" and Associated Regulations and Reporting Requirements for Medication Abortions.

a.  Under the Act, medication abortions can now only be provided pursuant to the Kentucky Abortion-Inducing Drug Certification Program by "qualified physicians" and "certified" abortion facilities, pharmacies, manufacturers, and distributors.  Act § 15.  The Cabinet is tasked with promulgating administrative regulations to create the Drug Certification Program and establish certification requirements for abortion facilities (licensed under KRS 216B.0431), including Plaintiffs' facility, in addition to pharmacies, manufacturers, and distributors of abortion-inducing medication.  *Id.* at § 15(1).  The Act does not provide a timeframe for the promulgation of the requisite regulations or the creation of the Drug Certification Program.

b.  The Act sets out numerous new procedures a physician must follow to be deemed "qualified" and to register under the Act, including, but not limited to, signing an annual "Dispensing Agreement Form" to be developed and provided by the Cabinet (Act § 17(1)) (the form does not yet exist), and securing admitting privileges or entering into a written associated physician agreement.  Act § 17(2); *see also* Act §§ 7 and 8.  There is no process established yet to confirm that a physician is qualified and registered for purposes of compliance with the law, and there are criminal penalties associated with non-compliance.  Act § 28(6) (KRS 315.990(6)); 39(a) (KRS 311.990(39)(a)).

c.  The Act requires that abortion providers obtain written consent from a patient 24-hours prior to dispensing abortion medication to the patient, absent limited exceptions for risk of

death or physical impairment or major bodily injury, on "a form created by the Cabinet for Health and Family Services to obtain the consent required prior to providing an abortion-inducing drug" and that they submit the completed form to the Cabinet.  Act § 8(1–2).  The required consent form does not exist, and there are criminal penalties associated with violations of these provisions.  Act § 39(a) (KRS 311.990(39)(a)).

      d.  The Act requires that for any adverse event experienced by a patient within 15 days after use of abortion medication, the physician who provided the medication must report such adverse event within three days of the event to the federal Food and Drug Administration.  Act § 9(2) *see also* Act §§ 25(1), 26(3) (also requiring submission of report for adverse events and/or complications).   Any physician or health care provider who diagnoses or knowingly treats a patient experiencing an adverse event related to the medication abortion must make a report to the Cabinet of such adverse event on a report form provided by the Cabinet within three days after the diagnosis or treatment was provided.  *Id.* at § 9(3).  Forms have not yet been created for purposes of complying with these requirements.

      e.  The Act requires physicians providing medication abortions to a patient to, within three days after providing the medication, report the issuance of the prescription "on a form provided by the cabinet" and signed by the physician.  Act § 26(1).  It also requires physicians to state in the report of all abortions required by KRS 213.101 whether there were "adverse events" as defined by the Act. *Id.* at §26(3).  This report must include all of the personal and identifying information required in the form to be created by the Cabinet for all abortions under Section 4 of the Act, as well additional information.  Act § 26(4).

      f.  The Act makes it unlawful for any manufacturer, distributor, physician or any other person to provide abortion inducing drugs to a pregnant person via courier, delivery or mail service.

Act § 6(2).  There are criminal penalties associated with violations of these provisions.  *Id.* at §
3(39)(a).

g.  The Act sets forth the penalties for, *inter alia*, physician noncompliance with the
Drug Certification Program, including but not limited to, referral to law enforcement, assessment of
a $100,000 per offense fine on physicians, suspension or revocation of certification, and reporting
and recommending sanctions to the Board of Medical Licensure or Board of Pharmacy.  Act §
18(1).  In addition, it provides that individuals shall have a private right of action to seek restitution
and damages for any intentional, knowing or reckless violation of Sections 14–19 of the Act.  *Id.* at
§ 18(2).

36.  <u>New Restrictions and Reporting Requirements on Handling of Fetal Tissue Derived
from an Abortion.</u>

a.  The Act defines "fetal remains" to mean "the biological remains of a human child
resulting from the termination of a pregnancy by a surgical or medication abortion prior to birth or
miscarriage."  Act § 22(1).

b.  Under the Act, fetal tissue derived from an abortion may no longer be disposed of as
medical waste, Act § 22(4)(a), as has consistently been permitted under Kentucky law.  *See* 902
K.A.R. § 29:106; 902 K.A.R. § 20:360.  With limited exceptions for law enforcement or
pathological examination purposes or private interment by the patient, the Act bars transport of such
fetal tissue for any purpose other than final disposition by a licensed crematory or funeral
establishment.  Act §§ 22(4)(d)(1)-(6).  Thus, in most instances, products of conception now must
be cremated or interred.

c.  The Act provides that "[t]he Cabinet shall design forms through administrative
regulations that document (a) the age of the parent or parents of the fetal remains"; (b) consent by

the parent or guardian of the patient and/or the father if either is a minor; (c) "[t]he status of fetal remains from an abortion for the purpose of cremation that shall meet any requirements for a birth-death, provisional death, or death certificate for transport or cremation;" (d) "[a] designation of how the fetal remains shall be disposed of and who shall be responsible for final disposition;" and (e) "any other information required by the cabinet." Act § 22(3). The forms do not yet exist, and the Act does not specify a timeframe within which the Cabinet is required to make such forms available.

      37. <u>Creation and Publication of Report Forms and Promulgation of Regulations.</u>

         a. Pursuant to Section 13 of the Act, "[t]he cabinet shall create and distribute the report forms required in Sections 1, 4, 8, 9, 15, 25, 26, 27 and 29 of this Act within sixty (60) days after the effective date of this Act." Act § 13(1). As stated above, these sections require several different forms required for use in all abortions, abortions by minors, medication abortions, and abortions involving complications or adverse events. The forms have not yet been created for purposes of compliance with these requirements.

         b. Pursuant to Section 13, the reports "shall be deemed public records and shall be provided to the Kentucky Board of Medical Licensure, the Kentucky Board of Pharmacy, state law enforcement offices, and child protective services upon request for use in the performance of their official duties." Act § 13(3).

      38. <u>Criminal and Civil Penalties for Violation of the Act</u>. The Act provides that "any person who intentionally, knowingly, or recklessly performs an abortion upon a minor without obtaining the required consent pursuant to Section 1 of this Act shall be guilty of a Class D felony" (Act § 3(12)(a)) and "a person who intentionally, knowingly, or recklessly violates Sections 5 to 11 of [the] Act [restrictions on medication abortions] is guilty of a Class D felony." Act § 3(39)(a).

Similarly, it provides that "[a]ny person who intentionally, knowingly, or recklessly violates Sections 14 to 19 of this Act [abortion Drug Certification Program] is guilty of a Class D felony." Act § 28(6)(a).  And it provides "[a]ny person who intentionally, knowingly, or recklessly violates Sections 14 to 19 of this Act is guilty of a Class D felony" and "shall be fined not more than one million ($1,000,000)."  Act §§ 31(2)(a), (b).

39.     <u>Denial, Suspension or Revocation of License for Violation of the Act</u>. Pursuant to the Act, the board may deny, suspend, limit, restrict or revoke a license (including but not limited to an abortion facility license) upon proof of a failure to comply with the requirements of the Act regarding reporting of all abortions under Section 4 (Act § 4(8)(c)) and regarding abortions by minors under Section 1 of the Act.  Act § 2(27) (<u>KRS 311.595</u>).  The Attorney General and the Cabinet also may take action against facility licenses for violations of the Act.  *See* <u>KRS 216B.990</u>; <u>KRS 15.241</u>

40.     <u>Civil Liability for Violation of Act</u>.  Pursuant to the Act, violations of the restrictions on medication abortions can provide the basis for a civil malpractice action for actual and punitive damages, provide a basis for a professional disciplinary action, and provide a basis for recovery for a patient's survivors for wrongful death.  Act § 11(1).

41.     <u>"Emergency Clause"</u>.  The Act took "effect upon its passage and approval by the Governor or upon its otherwise becoming law."  Act § 39.  The forms and regulations required by the Act do not presently exist.

### *De Facto* Ban on Abortion Based on Impossibility of Compliance

42.     Because the Act took effect immediately, Kentucky abortion providers including Plaintiffs are at immediate risk of committing felonies or incurring serious fines, civil liability or revocation of their licenses if they continue to provide abortions, absent relief from this Court.

43.     Until the Cabinet publishes the forms required for compliance with the Act and/or promulgates the required administrative regulations, no facility or physician, including Plaintiffs, cannot provide abortion services in compliance with the Act.  Thus, the Act is an unlawful ban on all abortions in Kentucky, absent relief from this Court.

44.     Within 60 days of its enactment, the Act requires the Cabinet to create at least eight new forms providers must use to comply with its provisions:

- Section 1 requires a new form for providers to document provision of emergency medical abortion services to minors without consent;

- Section 4 requires a new form through which abortion providers report *every* abortion they perform within the Commonwealth;

- Section 8 requires a new form through which abortion providers obtain the informed consent of a patient before providing medication abortion;

- Section 9 requires a new form through which abortion providers report each provision of medication abortion and any complications or adverse events, as well as any resulting treatment, related to abortion medication;

- Section 25 requires a new form through which abortion providers report any complications or adverse events related to abortion;

- Section 26 requires a new form through which abortion providers report each abortion medication prescription issued, each abortion performed, and all adverse events;

- Section 27 requires abortion providers to report the gestational age of the fetus as well as the results of inquiries of the patient as to gestational age and any medical exams or tests performed; and

- Section 29 requires a report of each prescription dispensed by a pharmacy for abortion medication.

Act § 13(1).  Such forms do not presently exist. Rather, they are "to be developed and provided by the [C]abinet." *Id.*

45.     The Act requires that the Cabinet create additional forms without any deadline for completion and/or the creation of programs and promulgation of regulations to enable compliance, but those forms, regulations, and programs do not presently exist:

- Section 4, which requires abortion providers to report *every* abortion they perform within the Commonwealth, provides that "[t]he Vital Statistics Branch shall promulgate administrative regulations in accordance with KRS Chapter 13A to assist in compliance with this section";

- Sections 5 through 9 require that a physician be "registered" as a "nonsurgical abortion provider" in order to lawfully provide abortion medication to a patient;

- Sections 15 and 17 bar a facility from providing abortion medication to a patient unless it is certified under the Kentucky Abortion-Inducing Drug Certification Program, pursuant to regulations to be promulgated;

- Section 17 requires providers to sign a "Dispensing Agreement Form" to register as a "nonsurgical abortion provider," a prerequisite to being legally authorized to prescribe and provide abortion medication to patients;

- Section 22 directs that the disposition of tissue remains be documented through forms to be created by the Cabinet "through administrative regulations"; and

- Section 29, which requires a report of each prescription dispensed by a pharmacy for abortion medication, provides that "[t]he Vital Statistics Branch shall promulgate administrative regulations in accordance with KRS Chapter 13A to assist in compliance with this section."

46.     Plaintiffs also cannot immediately comply with provisions of the Act that require engagement or contracting with third parties for compliance.  For example:

a. It is impossible for Plaintiffs to comply immediately with the provisions regarding handling of fetal tissue because Plaintiffs currently contract with third-party vendors to safely dispose of products of conception as pathological waste, pursuant to Commonwealth regulations for infectious waste.  Compliance with the Act with respect to handling of fetal tissue will necessarily require Plaintiffs to enter into one or more new contracts with a third-party

17

crematorium or funeral establishment, and Plaintiffs will need time to identify such businesses that are willing and able to provide services in compliance with the Act.

b. With respect to abortions for minors, the Act does not establish processes for convenient access to notaries to carry out the required consent. Act § 1(2)(a)(2)(b). On information and belief, some of Plaintiffs' patients may not have confidential access to a notary in a timely manner, or at all.

47.     The Act stands as a substantial obstacle in the path of a woman seeking an abortion because it is tantamount to an abortion ban. It is arbitrary and unconstitutional to enforce penalties for noncompliance while failing to provide a means of immediate compliance. Plaintiffs, in fairness, must be granted time to comply with these sweeping changes to the provision of abortion care. Otherwise, the existence of regulatory requirements uncoupled from the means to comply with them will result in a complete ban on abortion within Kentucky.

**Impact of Personal Information Disclosures Required by the Act**

48.     As noted, the Act dramatically increases the personally identifiable and sensitive information that must be reported to the Office of Vital Statistics by abortion providers for each and every abortion (medical and procedural) in Kentucky.

49.     The Act provides that the reports containing this private medical and personal identifying information about people who undergo abortions shall be "public records." Act § 13.

50.     These public reports will make sensitive and confidential information related to sexually transmitted diseases, prior pregnancies, current and prior abortions, and pre-existing medical conditions available to the public. Act § 4; *see also* Act §§ 25, 26, 27, 29.

51.     On information and belief, the public reports required under the Act will make individually identifiable health information available to the public. For example, reports

disclosing the combination of county, zip code, age, and/or race may readily reveal patient identity. Kentucky is comprised of 759 zip codes[3] and 120 counties.[4] Hundreds of Kentucky zip codes have a population of less than 1,000.[5] Kentucky is 50.7% female. Per the U.S. Census, Kentucky is 87.5% white, 8.5% black or African American, 1.6% Asian, 2% two or more races, and 3.9% Hispanic or Latino. 54.7% of Kentuckians are between the ages of 18 and 65.[6] Accordingly, where the patient's zip code, age, race, ethnicity and other personal information such as previous pregnancies, are of public record, there are numerous zip codes where the identity of the patient may be determined.

52.     Further, once the patient's identity is ascertained, the Act's public record reports may reveal highly sensitive, personal information about a patient, including that she obtained an abortion, as well as whether she has a sexually transmitted disease or a pre-existing medical condition, in addition to whether she sought the abortion because of abuse.

53.     By mandating the disclosure of individually identifiable health information of the most sensitive nature (abortions, sexually transmitted infections, whether the patient was seeking the abortion because she was abused), the Act requires the unlawful disclosure of private medical information about an individual's sexual life and procreation (among others) in violation of their fundamental right to privacy.

---

[3] https://www.kentucky-demographics.com/zip_codes_by_population (based on U.S. Census Bureau data collected on March 17, 2022).

[4] "States, Counties, and Statistically Equivalent Entities" U.S. Census Bureau https://www2.census.gov/geo/pdfs/reference/GARM/Ch4GARM.pdf

[5] https://www.kentucky-demographics.com/zip_codes_by_population (based on U.S. Census Bureau data collected on March 17, 2022).

[6] https://www.census.gov/quickfacts/fact/table/KY/fips#fips (last accessed April 8, 2022).

54.     The prospect of such disclosures will dissuade some people from seeking an abortion they have decided to have, particularly if they have a need to keep their abortion decision from an abusive parent, partner, or spouse.  As such, the Act imposes an undue burden on a woman's right to access abortion in Kentucky.

## CLAIMS FOR RELIEF

### COUNT I

(Procedural Due Process)

55.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 54.

56.     By taking effect immediately, without providing Plaintiffs and other abortion providers time to comply, and by subjecting Plaintiffs to the Act's penalties when the Cabinet has not yet created the forms Plaintiffs are required to use, or promulgated the required regulations, the Act violates Plaintiffs' right to procedural due process under the Fourteenth Amendment to the United States by depriving them of liberty and/or property without due process of law.

### COUNT II

(Substantive Due Process)

57.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 54.

58.     By requiring Plaintiffs to comply with the Act despite compliance being impossible—thereby preventing Plaintiffs from providing abortions and operating its business— the Act is arbitrary and violates Plaintiffs' rights as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it is not rationally related to any legitimate state interest.

COUNT III

(Substantive Due Process - Right to Liberty and Privacy)

59.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 54.

60.     By banning abortion at 15 weeks in pregnancy, a pre-viability point in pregnancy, the Act violates patients' rights to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

61.     By passing a law that takes effect immediately, and making compliance impossible by requiring Plaintiffs to use agency forms and processes not yet available, HB 3 created a de facto ban on abortion in violation of its patients' rights to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

COUNT IV

(Substantive Due Process – Plaintiffs' Patients' Right to Informational Privacy)

62.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 54.

63.     By requiring involuntary disclosure of Plaintiffs' patients' individually identifiable health information of the most sensitive nature and/or the public disclosure of such information, the Act violates Plaintiffs' patients' rights to privacy as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

**INJUNCTIVE RELIEF**

64.     If HB 3 is allowed to take effect, Plaintiffs and their patients will be subject to irreparable harm for which no adequate remedy at law exists.

65.     Enforcement of HB 3 will cause irreparable harm by threatening Plaintiffs and their staff with substantial criminal penalties for providing abortion services; and by preventing Plaintiffs' patients from obtaining an abortion in Kentucky, thereby causing them to suffer significant medical, emotional, and other harm.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A.     To immediately issue a temporary restraining order and/or preliminary injunction, and a permanent injunction, restraining Defendants, their employees, agents, and successors in office from enforcing the Act.

B.     To declare that the Act violates the Fourteenth Amendment to the United States Constitution by depriving Plaintiffs' patients of their rights to liberty and privacy.

C.     To declare that the Act violates the Fourteenth Amendment to the United States Constitution by depriving Plaintiffs of property without due process of law.

D.     To award Plaintiffs its attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

E.     To grant such other and further relief as the Court deems just and proper.


Dated: April 25, 2022                    Respectfully submitted,


/s/ Heather L. Gatnarek
Heather L. Gatnarek
ACLU of Kentucky Foundation
325 West Main Street, Suite 2210
Louisville, Kentucky 40202
(502) 581-9746
heather@aclu-ky.org

Michele Henry
Craig Henry PLC
401 West Main Street, Suite 1900

Louisville, Kentucky 40202
(502) 614-5962
mhenry@craighenrylaw.com

Brigitte Amiri*
Rachel Reeves*
Jennifer Dalven*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2633
bamiri@aclu.org
rreeves@aclu.org
jdalven@aclu.org

*pro hac vice motions forthcoming


ATTORNEYS FOR PLAINTIFFS


<u>DECLARATION</u>

I declare under penalty of perjury that the statements contained in the Verified Complaint are true and accurate to the best of my knowledge and belief.


<u>s/Ernest W. Marshall, M.D.</u>
Ernest W. Marshall, M.D.