UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD GREAT NORTHWEST, HAWAII, ALASKA, INDIANA, AND KENTUCKY, INC., ON BEHALF OF ITSELF, ITS STAFF, AND ITS PATIENTS, | Plaintiff |
| -and- | |
| EMW WOMEN'S SURGICAL CENTER, P.S.C., ON BEHALF OF ITSELF, ITS STAFF, AND ITS PATIENTS; ERNEST W. MARSHALL, M.D., ON BEHALF OF HIMSELF AND HIS PATIENTS, | Intervenor Plaintiffs |
| v. | Civil Action No. 3:22-cv-198-RGJ |
| DANIEL CAMERON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF KENTUCKY; ERIC FRIEDLANDER, IN HIS OFFICIAL CAPACITY AS SECRETARY OF KENTUCKY'S CABINET FOR HEALTH AND FAMILY SERVICES; MICHAEL S. RODMAN, IN HIS OFFICIAL CAPACITY AS EXCECUTIVE DIRECTOR OF THE KENTUCKY BOARD OF MEDICAL LICENSURE; AND THOMAS B. WINE, IN HIS OFFICIAL CAPACITY AS COMMONWEALTH'S ATTORNEY FOR THE 30TH JUDICIAL CIRCUIT OF KENTUCKY | Defendants |

\* \* \* \* \*

## MEMORANDUM OPINION & PRELIMINARY INJUNCTION

On April 21, 2022, the Court issued a Memorandum Opinion & Temporary Restraining

Order restraining Defendants form enforcing Kentucky House Bill 3, the Humanity in Healthcare

Act of 2022 [DE 1-1 ("HB 3")].[1]  [DE 27].  Plaintiff Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky, Inc., ("Planned Parenthood") moves for a preliminary injunction [DE 3] to block the enforcement of HB 3.  Intervening Plaintiff EMW Women's Surgical Center and Dr. Ernest W. Marshall ("EMW" and together with Planned Parenthood, "Plaintiffs") also moves for a preliminary injunction.  [DE 38].  Defendant Attorney General Daniel Cameron ("Attorney General Cameron") responded [DE 39; 41], and Plaintiffs replied [DE 42; 43].[2]

The Court held a hearing on Plaintiffs' motions for preliminary injunctions on May 2, 2022. [DE 3; 38; FRCP 65(b)(3)].  Based on the issues raised and discussions at the hearing, the Court requested the parties to submit proposed findings of fact and conclusions of law.  On May 4, for good cause shown and in order to consider the impending briefing, the Court extended and modified the Temporary Restraining Order.  [DE 49].[3]  At the Court's request, the Cabinet for Health and Family Services ("Cabinet") filed a status report stating the Cabinet's position on the forms and programs required under HB 3.  [DE 53].  Plaintiffs filed their findings of fact and conclusions of law [DE 54] and three corresponding declarations [DE 55; 56; 57].  Attorney General Cameron responded [DE 63] with separate findings of fact and conclusions of law [DE 63-1] and Plaintiffs replied [DE 64].

For the reasons below, Plaintiffs' Motions for a Preliminary Injunction [DE 3; 38] are **GRANTED IN PART** to the extent that Defendants are restrained from enforcing specific

---

[1] Pursuant to Federal Rule of Civil Procedure ("FRCP") 65(b)(2), a temporary restraining order can remain in effect for a time "not to exceed 14 days" unless extended for good cause for a like period.

[2] Responses to the motions for preliminary injunction have not been filed by Defendants Eric Friedlander, in his official capacity as Secretary of Kentucky's Cabinet for Health and Family Services, Michael S. Rodman, in his official capacity as Executive Director of the Kentucky Board of Medical Licensure, and Thomas B. Wine, in his official capacity as Commonwealth's Attorney for the 30th Judicial Circuit of Kentucky.  But these Defendants did appear, by counsel, at the May 2, 2022 hearing and were permitted to participate.

[3] The Court modified its Temporary Restraining Order to reflect the parties' agreement regarding provisions of HB 3 for which compliance was possible.  [DE 42-1].

2

provisions of HB 3 as set forth specifically below related to reporting and registration programs not yet created or promulgated by the Cabinet.  EMW's Motion for a Preliminary Injunction [DE 38] is also **GRANTED IN PART** pending the Supreme Court's decision in *Dobbs*.  This Order does not prevent the Cabinet from taking any steps it considers appropriate to comply with the Kentucky Legislature's mandates.

## I.     BACKGROUND

Planned Parenthood filed its Complaint [DE 1], asserting claims that HB 3 violates: (1) procedural due process under the Fourteenth Amendment on its behalf, "[b]y taking effect immediately, without providing Plaintiff and other abortion providers time to comply, and by subjecting Plaintiff to HB 3's penalties when the Cabinet has not yet created the forms that Plaintiff is required to use, or promulgate the required regulations," (2) substantive due process under the Fourteenth Amendment on its behalf, "[b]y requiring plaintiff to comply . . . despite compliance being impossible - . . . prevent[ing] Plaintiff from providing abortions and operating its business . . . ," (3) substantive due process on its patients' behalf under the Fourteenth Amendment in violation of patient's rights to liberty and privacy by taking "effect immediately, and making compliance impossible by requiring Plaintiff to use agency forms and processes not yet available," and (4) substantive due process on its patients' behalf under the Fourteenth Amendment in violation of Plaintiff's patients' rights to informational privacy.  [DE 1 at 21–23].  EMW filed a Complaint that reasserted Counts 1, 2, and 4 of Planned Parenthood's Complaint.  [DE 33].  Along with these claims, EMW alleges that HB 3 violates substantive due process "[b]y banning abortion at 15 weeks in pregnancy, a pre-viability point in pregnancy[.]"  [*Id.* at 414].  Plaintiffs argue that a temporary injunction is warranted because it is impossible to comply with multiple provisions of HB 3 and the 15-week ban violates due process.  [DE 54].

Planned Parenthood operates the Louisville Health Center of Louisville, Kentucky. [*Id.* at 806]. It provides various medical services to its patients, including birth control, HIV services, pregnancy testing, STD testing, treatment, and vaccines. [*Id.*]. Along with these services, Planned Parenthood provides procedural and medication abortion services once a week on Fridays until 13 weeks and 6 days. [*Id.*; DE 1 at 7]. EMW provides medication abortions up to 10 weeks, and procedural abortion up to 21 weeks and six days. [DE 54 at 806]. EMW provides its services Tuesday through Saturday, and nearly every day they have one or more patients scheduled for an abortion at or after 15 weeks in pregnancy. [*Id.*]. Plaintiffs operate the only two remaining abortion clinics in Kentucky. [*Id.*].

On March 29, 2022, the Kentucky Legislature passed HB 3, and Governor Andy Beshear vetoed it on April 8. [*Id.* at 807]. On April 13, the Kentucky Legislature voted to override Governor Beshear's veto. [*Id.*]. HB 3 contains an emergency provision which states that it has immediate effect under the Kentucky Constitution. HB 3, § 39. HB 3 revises Kentucky's existing abortion regulations and creates new requirements, including a new regulatory regime for abortion-inducing medication, new reporting, new informed consent requirements, new registration requirements, and new requirements for disposition of fetal remains. *Id.* HB 3 also bans abortions after 15 weeks. *Id.* §§ 27(2), 34. Violating HB 3 could result in a Class D felony, fines of up to $1 million, and revocation of physician and facility licenses. *Id.* § 28(6).

HB 3 directs the Cabinet to promulgate requisite regulations and create forms and programs for parties to comply with the law within 60 days after the law's effective date. *Id.* § 13(1). Due to the emergency clause, HB 3 became effective on April 13, 2022. Therefore, the Cabinet's 60-day period to create a means for compliance ends on June 13, 2022. At the Court's request, the Cabinet filed a status report stating that "unfunded requirements [in HB 3] may not be

4

implemented." [DE 53 at 795].  Specifically, the Cabinet notes that it may not be able to implement Sections 1, 4, 8, 9, 12, 13, 15, 16, 17, 18, 19, 21, 22, 26, 27, and 28.  [*Id.* at 795–97].

## II.   DISCUSSION

Plaintiffs assert that until the Cabinet creates the requisite forms and promulgates all necessary rules and regulations, they cannot provide abortion services without violating HB 3 because it is impossible to comply with all HB 3's registration and reporting requirements.  [DE 54].  Plaintiffs argue that by performing such services, they risk severe criminal and civil penalties associated with HB 3 which prevent them from providing legal abortion services.  [*Id.*].  EMW also argues that a 15-week ban on abortions violates its patients' due process right to a pre-viability abortion.  [*Id.* at 876].  The Court's Temporary Restraining Order ends on May 19, 2022.  [DE 49].  Without an injunction preventing HB 3 from being enforced, Plaintiffs claim that they will be unable to provide services to their patients, resulting in irreparable harm.  [DE 54 at 877–78].

Attorney General Cameron maintains that Plaintiffs are not required to submit forms created by the Cabinet until the Cabinet creates the forms.  [DE 63 at 1150].  He claims that Plaintiffs have requested overly broad injunctive relief and failed to prove a likelihood of success on the merits [*Id.* at 1169].  Attorney General Cameron argues that EMW's motion for a preliminary injunction as to HB 3's 15-week ban should be denied because EMW has not demonstrated a likelihood of success on the merits.  [*Id.* at 1166].  He also claims that Plaintiffs have forfeited any argument that was not explicitly raised in their original motions for preliminary injunction.  [*Id.* at 1151, 1156].

### A. Preliminary Injunction Standard

A preliminary injunction "should be granted only if the movant carries his or her burden." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  However,

the moving party "is not required to prove his case in full at a preliminary injunction hearing." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981).  In the Sixth Circuit,

> [f]our factors guide the decision to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction."

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)).  "[T]hese are factors to be balanced, not prerequisites to be met." *Id.* (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).  "For example, 'a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, shown serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399–400 (6th Cir. 1997) (internal quotations and brackets omitted).

The moving party need only show a likelihood of success on the merits of one claim where there are multiple claims at issue in a complaint. *Transtex Composite, Inc. v. Laydon Composite, Ltd.*, No. CIV.A. 12-150-C, 2012 WL 5362191, at *2 (W.D. Ky. Oct. 30, 2012); *Georgia v. Biden*, No. 1:21-CV-163, 2021 WL 5779939, at *8 (S.D. Ga. Dec. 7, 2021) ("Plaintiffs need only show a substantial likelihood of success on the merits on one claim"); *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1384 (M.D. Fla.), *aff'd*, 403 F.3d 1223 (11th Cir. 2005) ("Plaintiffs have asserted five constitutional and statutory claims. To obtain temporary injunctive relief, they must show a substantial likelihood of success on at least one claim"); *Eatery Corp. v. City of New York,*

6

408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) ("Plaintiff need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims.'"); *Arnold v. Barbers Hill Indep. Sch. Dist.,* 479 F. Supp. 3d 511, 519 (S.D. Tex. 2020) ("When the plaintiff has brought multiple causes of action, he need only present a prima facie case on one of them.").

**B.  Plaintiffs' Motions for a Preliminary Injunction Based on Their Ability to Comply with Provisions of HB 3 [DE 3; 38]**

   *i.   Plaintiff's Alleged Waiver of Arguments*

Attorney General Cameron asserts that Plaintiffs have waived arguments not explicitly raised in their original motions for preliminary injunction throughout his briefing.  [DE 63 at 1150–51, 1152, 1156, 1159, 1162, 1163; DE 63-1 at 1178, 1182, 1185, 1188].  This assertion is levied against multiple arguments from Plaintiffs related to compliance with sections 1, 4, 9, 17, and 20. For this proposition, Attorney General Cameron cites *E. Brooks, Inc. v. Shelby Cnty.*, 588 F.3d 360, 371 (6th Cir. 2009) and *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013).  [DE 63 at 1151, 1156].  Yet these cases are distinguishable.  In *E. Brooks*, the waived claim appeared in the complaint but not in the party's memorandum of law in support of a preliminary injunction and the claim was not addressed by the district court.  *See E. Brooks, Inc.*, 588 F.3d at 371.  In *Kuhn*, the waived claim was not asserted in the opening brief for summary judgment but asserted in the reply.  *See Kuhn*, 709 F.3d at 624.  The Court finds Attorney General Cameron's waiver arguments unpersuasive.

Plaintiffs' original motions for preliminary injunction requested that HB 3 be enjoined in its entirety.  Attorney General Cameron opened the door to these specific arguments when he asserted that the Court should narrow the scope of its injunction and cited to various examples of individual subsections as capable of compliance.  [DE 21 at 204].  The Court heard arguments on

these specific examples and on the individual sections and subsections of HB 3 that Plaintiffs' assert are incapable of compliance during the hearing.  The Court then asked for additional briefing in the form of findings of facts and conclusions of law based on the arguments and discussions as to these individual sections and subsections of HB 3.  These arguments were necessary as the Court considered whether narrowing the scope of its injunction to specific sections of HB 3 was appropriate.  The arguments contested by Attorney General Cameron were included in Plaintiffs' briefing and Defendants were given an opportunity to fully respond both at the hearing and in writing.  [DE 54].  As a result, these arguments are not waived but go directly to the breadth of the preliminary injunction.

> ii.   *Statutory Interpretation Regarding the Creation of Forms and Reporting Requirements*

In Kentucky, "[t]he cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *Wade v. Poma Glass & Specialty Windows, Inc.*, 394 S.W.3d 886, 888 (Ky. 2012).  "To determine legislative intent, [the court] look[s] first to the language of the statute, giving the words their plain and ordinary meaning," *id.*, because "we assume that the '[legislature] meant exactly what it said, and said exactly what it meant.'" *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 648 (Ky. 2017) (quoting *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005)).  The words of the text must be interpreted in their context, meaning a court must scrutinize not just the words of the statute at issue, but also other statutes that are relevant. *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 721 (Ky. 2012). And unless that context mandates otherwise, words are presumed to be understood in their ordinary meanings. *Owen v. Univ. of Ky.*, 486 S.W.3d 266, 270 (Ky. 2016).

Attorney General Cameron first argues that there is no need to comply with forms and programs not yet created and thus, no injunction is necessary.  [DE 63 at 1150].  This argument,

however, is contrary to statutory construction which assumes that when the Kentucky Legislature creates a requirement in the statute that it "meant exactly what it said, and said exactly what it meant.'" *Rothstein*, 532 S.W.3d at 648 (quoting *O'Daniel*, 153 S.W.3d at 819). This Court must read the plain language of HB 3 as requiring what it states regardless of whether there are forms and regulatory guidance available.

Attorney General Cameron concedes that HB 3 requires forms for sections 1(10), 8(1)–(4), 9(1) and (3), 21(4), 26(1), and 27(4) because all these sections explicitly require a form created by the Cabinet.  [DE 63 at 1150].  However, Section 13 requires the Cabinet to create and distribute forms for sections 1, 4, 8, 9, 25, 26, 27, and 29.  HB 3 § 13(1).  Not all the sections listed in Section 13 explicitly require a form, instead requiring reports be submitted to the Cabinet for the purpose of data collection.  For example, Section 4 does not require a form but lists extensive reporting requirements for each abortion procedure performed by Plaintiffs.

Attorney General Cameron asserts that, at most, only the sections explicitly requiring a form are incapable of compliance.  Further Attorney General Cameron suggests that Plaintiffs can fully comply with many of the reporting requirements "by simply reporting the required information in a manner it finds expedient."  [DE 21 at 202 (discussing the ability to comply with Section 4 of HB 3)].  Yet Attorney General Cameron's approach is impermissible because it would strip meaning from Section 13 of HB 3.  His interpretation violates the canon against surplusage reflecting "the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'"  *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (alteration in original) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012)); *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 257–58 (6th Cir. 2020).  "Under accepted canons of statutory

interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) (quoting *Lake Cumberland Trust, Inc. v. U.S. E.P.A.*, 954 F.2d 1218, 1222 (6th Cir. 1992)). Section 13 was necessitates the Cabinet to create forms for compliance where HB 3 includes reporting requirements.  Under Attorney General Cameron's interpretation, Section 13 would become mostly inoperative. Because the Court must interpret the language of Section 13 to have meaning, the Court will not subscribe to Attorney General Cameron's narrow reading.

      *iii.*    *Summary of Applicable HB 3 Provisions*

      a.  <u>Sections 1, 2(27), and 3(39)</u>

Section 1 of HB 3 regulates the informed consent requirements and judicial bypass options for minors to obtain abortions.  The physician must secure the informed written consent of the minor and one legal guardian with joint or physical custody and certify that the consenting parent or legal guardian of the minor has made a reasonable attempt to notify any other parent with joint or physical custody at least 48 hours prior to providing the informed written consent.  HB 3 § 1(2)(a).  The certification by the consenting parent or legal guardian must be in a signed, dated, and notarized document that has been initialed on each page with specific language. *Id.* § 1(2)(b). If a medical emergency exists that would require an immediate abortion, the physician must document the medical necessity and inform the minor's legal guardian in writing. *Id.* § 1(9).  The Cabinet must create a form for physicians to record abortions performed without informed consent. *Id.* § 1(10).  Failure to receive consent required by Section 1 may open physicians to civil liability. *Id.* § 1(11).  Section 13 of HB 3 directs the Cabinet to create forms required by Section 1. *Id.* § 13(1).  State agencies may suspend or revoke facility licenses, *id.* § 2(27), and providers may be

subject to a Class D felony for failure to comply with Section 1, *id.* § 3(12).

Sections 2(27) and 3(12) create severe penalties for failing to comply with Section 1, including felony prosecution. Plaintiffs are reasonably concerned about these penalties given the difficulty of complying with Section 1. For example, Plaintiffs must get a copy of the minor's government-issued identification to satisfy the written consent requirement. *Id.* § 1(2)(a)(2)(a). However, HB 3 does not define "government-issued identification." Plaintiffs claim the Cabinet would typically provide the necessary guidance through forms or regulations. [DE 64 at 1219]. The Court, and presumably Plaintiffs, cannot determine whether a birth certificate, social security card, passport, or child identification card would be acceptable as a form of identification. Under the plain language of HB 3, a physician could be subject to a class D felony simply for accepting one form of identification not deemed to comply instead of another. HB 3 § 3(12). Similarly, Plaintiffs must make a "reasonable attempt" to notify any other parent before performing an abortion on a minor. *Id.* § 1(2)(a). The Kentucky Legislature does not specify what type of a search must be made for other parents or what Plaintiffs must do to comply with the notification requirement. Without guidance from the Cabinet, Plaintiffs cannot be sure they are adequately complying with Section 1. As such, forms or regulatory guidance are needed to assure compliance.

Plaintiffs have acknowledged that they already collect some of the informed consent information in Section 1. [DE 51 at 678, Hrg. Tr. 25:5–12]. They have further indicated that compliance with Section 1's new requirements will be possible once the Cabinet creates the necessary forms and provides additional guidance. [DE 54 at 814]. Yet, the Court finds that forms and additional guidance are also necessary for compliance with Sections 1(2) and (9)–(11).

Attorney General Cameron claims that Sections 2(27) and 3(12) should only be enjoined

to the extent the Court enjoins the underlying law.[4]  [DE 63 at 1154].  Because of Section 13(1)'s directive that the Cabinet create forms for compliance with Section 1, and because the Court finds these forms are necessary, compliance with Sections 1(2) and (9)–(11) is currently impossible.

b.  <u>Sections 4(2)–(5)</u>

Section 4 requires that each abortion must be reported to the Vital Statistics Branch within three days after the end of the month in which the abortion occurred.  HB 3 § 4(1).  Section 4 also requires reporting of new information that was not previously recorded on the Cabinet's Report of Abortion form.  [DE 54 at 815–17].  Common identifiers such as the patient's name and social security number may not be included in the report.  HB 3 § 4(3).  This section also applies to medication abortions.  *Id.* § 4(5).  The Cabinet is required to create forms for compliance with Section 4.  *Id.* § 13(1).  Although HB 3 attempts to limit patient identifiers, Plaintiffs may not be able to simultaneously comply with The Health Insurance Portability and Accountability Act ("HIPPA") without guidance from the Cabinet.  HIPPA prevents Plaintiffs from disclosing protected health information.  *See* 45 C.F.R. § 164.105.  Hundreds of Kentucky zip codes have a population of less than 1,000. [DE 64 at 1220].  The Commonwealth is 50.7% female, 87.5% white, 8.5% Black or African American, 1.6% Asian, 2% two or more races, and 3.9% Hispanic or Latino. [*Id.*].  Where these pieces of information are reported in combination for a particular patient, along with other personal information such as previous pregnancies, and are of public record, Plaintiffs are at risk of disclosing protected health information.  Disclosure of patient medical information subjects Plaintiffs to penalties under HIPPA and the failure to disclose would subject them to penalties under HB 3 as well.  Forms and regulatory guidance are needed to remedy the lack of clarity, the potentially conflicting obligations with HIPPA, and protect patient medical

---

[4] Because the Court will enjoin the underlying law, the Court finds that it is harmless to enjoin the accompanying enforcement provisions.

information.

Plaintiffs have represented that they cannot comply with Section 4 and protect patient privacy according to federal law without a form and guidance from the Cabinet.  [DE 54 at 819].  Attorney General Cameron argues that compliance is possible because a form is not required.  [DE 63 at 1155].  However, this argument again fails to consider Section 13's directive that the Cabinet develop forms for compliance with Section 4.  Because the forms do not exist and because regulatory guidance is necessary to prevent disclosing patient information in conflict with federal law, the Court finds that compliance with Sections 4(2)–(5) is impossible.

c.  <u>Sections 6(1), 7, 8, 9</u>

Section 6(1) prohibits the distribution of abortion-inducing drugs by anyone except for qualified physicians who are registered with the Cabinet as nonsurgical abortion providers by following the procedures established in Sections 7, 8, and 9.  Section 7 creates new directives for qualified physicians who provide abortion-inducing drugs.  Plaintiffs already comply with many of these requirements, such as verifying that a pregnancy exists, determining if a patient's blood type is Rh negative, documenting the gestational age of the pregnancy and whether the patient received treatment for Rh negativity, and offering to schedule follow-up visits.  [DE 54 at 845].  Section 8 requires qualified physicians to obtain informed consent from patients on a form created by the Cabinet before any abortion-inducing drugs may be provided.  Section 9 requires that each abortion-inducing drug provided to a patient be reported to the Cabinet in addition to information related to any adverse events that occur contemporaneous with the abortion.  Section 13 requires the Cabinet to create forms for Plaintiffs to comply with Sections 8 and 9.  HB § 13(1).

Plaintiffs claim that they cannot comply with these sections until the forms have been created and they receive guidance from the Cabinet.  [DE 54 at 841–42].  Attorney General

Cameron concedes that Sections 8, 9(1), 9(3), and 26 all require forms created by the Cabinet. [DE 63 at 1160 ("[U]ntil those forms have been created or amended, Plaintiffs cannot comply with those reporting requirements.")].  Section 9(2) requires a report captured within the directive of Section 13(1), which requires the Cabinet to create reporting forms required by section 9.  Section 6(1) explicitly incorporates Sections 7, 8, and 9, making it impossible to comply unless Plaintiffs can fulfill the requirements of these sections.  Based on the foregoing, the Court finds that compliance with Sections 6(1) and 9(2) is impossible.

Excluding certification as a nonsurgical abortion provider, Plaintiffs assert they are very close to complying with the requirements of Section 7.  Plaintiffs have indicated that it is possible to inform every patient "that the remains of the unborn child may be visible in the process of completing the abortion" (HB 3 §7(2)(c)); schedule follow-up visits within 7 to 14 days after each medication abortion regardless of patient request or clinical need (*id.* §7(3)(a)); make "all reasonable efforts to ensure that the patient returns for the scheduled appointment" (*id.* §7(3)(b)); and include a "brief description of the efforts made to comply with Section 7(3), including the date, time, and identification by name of the person making such efforts" in the medical record. [DE 54 at 846].  Because the Court will enjoin Sections 8, 9, 26, and any section requiring compliance with the Kentucky Abortion-Inducing Drug Certification Program, the Court finds that compliance with Section 7 is possible.

### d.  Sections 15, 16(2)–(3), and 17

Section 15 directs the Cabinet to create the Kentucky Abortion-Inducing Drug Certification Program, which will establish certification requirements for manufacturers and distributors to transport, supply, or sell abortion-inducing drugs.  The certification requirement must include a "recognition that abortion-inducing drugs may only be provided to patients by qualified physicians

who are registered as nonsurgical abortion providers . . . ." HB 3 § 15(2).  Section 16 creates eligibility requirements for the certification program, including that parties only fulfill prescriptions requested by qualified physicians registered as nonsurgical abortion providers.  *Id.* § 16(2)(b).  Section 17 creates requirements for physicians to register as nonsurgical abortion providers.  To be eligible to register as a nonsurgical abortion provider, the Cabinet must require a qualified physician to, among other things, sign an annual "Dispensing Agreement Form."  *Id.* § 17(1)(c).

The Kentucky Legislature did not include language excluding the Kentucky Abortion-Inducing Drug Certification Program in Section 15 or the requirements related to nonsurgical abortion provider in Sections 16 and 17.  HB 3 § 39.  Although Plaintiffs concede that Sections 16(2) and (3) apply primarily to pharmacies, manufacturers, and distributors [DE 64 at 1223], Plaintiffs will be directly affected.  Plaintiffs will be unable to procure abortion-inducing drugs unless pharmacies, manufacturers, and distributors are also able to participate in a certification program yet to be created by the Cabinet.

Plaintiffs claim that they cannot comply with these requirements because the Cabinet has not created the necessary forms or a registration process for any certification programs.  [DE 54 at 849].  Attorney General Cameron argues that Plaintiffs have failed to prove that these sections apply to them.  [DE 63 at 1157].  He argues that Section 15 only applies to the Cabinet and Section 16 applies to pharmacies, manufacturers, and distributors of abortion-inducing drugs.  [*Id.* at 1157–58].  Attorney General Cameron repeats his argument that the registration requirements of Section 17 do not apply to Plaintiffs because it has not yet been created.  [*Id.* at 1159].  The Court finds that Sections 15, 16(2)–(3) and 17 are impossible to comply with because they involve compliance with programs that the Cabinet has not yet created and affect Plaintiffs ability to procure abortion-

inducing drugs necessary to provide such services.

    e.  <u>Sections 20(2)–(3), 21(3)–(4), 22 and 23(15)</u>

Section 20 of HB 3 prohibits fetuses from being cremated or transported without a permit but allows for simultaneous cremation.  Section 21 allows the patient to request that the provider complete a form created by the Cabinet to obtain a medical certification and provide the patient with a death certificate.  HB 3 § 21(3)–(4).  Section 22 defines the term "fetal remains," which creates a new meaning for the term "pathological waste."  *Id.* § 23(15).  It then allows the mother to choose the final disposition of fetal remains by either (1) "[r]elinquishing the guardianship of the fetal remains . . . to the guardianship of the healthcare facility or abortion clinic" or (2) "[r]etain the guardianship for the fetal remains and designate that fetal remains shall be released to the parent or parents for disposition."  *Id.* § 22(2)(c)(1)–(2).  The Cabinet must create forms to document the age of the parent and the disposition of fetal remains.  HB 3 § 22(3).  Section 22 also creates new restrictions for the transportation and disposal of fetal remains.  *Id.* § 22(4).  The Court will not enjoin the entirety of Section 23 because ten of the nineteen defined terms in this section are not used again in HB 3 and are of no effect.  Therefore, the Kentucky Legislature made this section largely inoperative by not using the majority of its defined terms.[5]

The Court notes that HB 3 uses but does not define the term "guardianship."  Therefore, the Court looks elsewhere for context.  The Kentucky Legislature has defined "guardian" as any individual, agency, or corporation appointed by the court to manage the personal affairs of a disabled person" for purposes of KRS 387.500 to 387.770 and 387.990.  KRS § 387.510.  Black's Law Dictionary defines "guardianship" as "[t]he fiduciary relationship between a guardian and a

---

[5] The unused defined terms from Section 23 include: authorizing agent, casket, closed container, cremation authorization form, cremation container, crematory operator, holding facility, retort operator, scattering area or garden, and temporary container.

ward or other incapacitated person, whereby the guardian assumes the power to make decisions about the ward's person or property. A guardianship is almost always an involuntary procedure imposed by the state on the ward." *Guardianship*, Black's Law Dictionary (11th ed. 2019). Because "guardianship" carries a legal meaning that does not logically fit in this section, Plaintiffs cannot reasonably comply without additional guidance from the Cabinet.

Plaintiffs have explained that they cannot comply with these provisions until the Cabinet has created the forms and promulgated regulations. [DE 54 at 854–55]. The Cabinet has not yet created the forms required by Section 21. [DE 53 at 797]. Without a form from the Cabinet, Plaintiffs will be unable to obtain a death certificate if one was requested by the patient or comply with reporting requirements under Section 21. Moreover, Plaintiffs have attempted to engage with new vendors for disposal of fetal remains, but vendors remain unwilling until the Cabinet provides more guidance on the proper procedure for simultaneous cremation and commingling of remains. [*Id.* at 867–68].

Attorney General Cameron argues that Plaintiffs have failed to satisfy their burden that they cannot comply with these sections.[6] [DE 63 at 1163–66]. He argues that Plaintiffs could simply inter fetal remains in lieu of cremation. [*Id.*]. However, Attorney General Cameron's own exhibits detailing the options available for interring fetal remains are based on law that existed prior to the enactment of HB 3. [DE 63-2; 63-3; 63-4; 63-5; 63-6]. Presumably, these cemeteries and hospitals referenced in Attorney General Cameron's exhibits will now be subject to HB 3's new requirements. Plaintiffs included a declaration explaining that crematory and interment services are highly regulated in Kentucky. [DE 57]. Without guidance from the Cabinet and the required forms, Plaintiffs will be unable to secure vendors to comply with these sections. [DE 54

---

[6] The Court notes that Attorney General Cameron's Exhibits 1–5 were cited in the findings of fact and conclusions of law, but not the operative brief.

at 854–55].  Because disposal of human remains and medical waste is a highly regulated field, the Court finds that Plaintiffs cannot comply with Sections 20(2)–(3), 21(3)–(4), 22 and 23(15) without the necessary forms or regulatory guidance from the Cabinet.

f.   <u>Sections 25 and 26</u>

Section 25 requires providers to "file a written report with the Cabinet regarding each patient who comes under the [provider's] care and report[] any complication or adverse event as defined under Section 5 of [HB 3], requires medical treatment, or suffers a death that the attending physician, hospital staff, or facility staff has reason to believe is a primary or secondary result of an abortion."  HB 3 § 25(1).  The report must contain the information required by Section 4.  *Id.* § 25(2).  Section 26 requires any prescription issued for an abortion-inducing drug to be reported on a form provided by the cabinet within three days after the prescription was issued.  *Id.* § 26(1).  The report must also contain the information required by Section 4 and information related to any adverse event.  *Id.* § 26(4).  Section 13 requires the Cabinet to create the forms necessary for compliance with Sections 25 and 26. *Id.* § 13(1).

The Cabinet has not created the forms required under Sections 25 and 26.  [DE 54 at 834].  Plaintiffs claim that reporting information required by Section 4 would risk violating HIPPA.  [*Id.* at 831, 834].  Sections 25 and 26 suffer from the same deficiencies as Section 4.  Without guidance from the Cabinet, Plaintiffs could easily submit patient information that would be available to the public in violation of federal law.  Until the Cabinet creates the forms and provides the necessary guidance, Plaintiffs argue that they are unable to comply with Sections 25 and 26.  [*Id.* at 835].

Attorney General Cameron concedes that a form is required for section 26 but argues that there is no form requirement for Section 25.  [DE 63 at 1160–62].  Again, this argument is squarely inconsistent with Section 13(1)'s directive to the Cabinet.  Because these sections could cause

18

Plaintiffs to violate federal law without additional guidance from the Cabinet, the Court finds that compliance with Sections 25 and 26 is impossible.

g. Sections 29(1)–(4)

Section 29 creates new reporting requirements for pharmacies that distribute certain drugs. Specifically, prescriptions for "RU-486, Cytotec, Pitocin, mifeprex, misoprostol, or any other drug or combination of drugs for which the primary indication is the induction of abortion . . . shall be reported to the Vital Statistics Branch." HB 3 § 29(1). These reports must be made within three days after the end of the month in which the prescription was dispensed. *Id.* They must also contain extensive information about the pharmacy and pharmacist. *Id.* § 29(2). Section 13 directs the Cabinet to create and distribute the forms necessary to report information required by Section 29. *Id.* § 13(1).

Plaintiffs claim that compliance with Section 29 is impossible until the forms are available. [DE 54 at 839]. Attorney General Cameron argues that Section 29 does not apply to Plaintiffs because they are not pharmacies. [DE 63 at 1163]. Even if Plaintiffs are not considered pharmacies, they may need to write prescriptions for medication abortions. Pharmacies would be unable to fill the prescription since the forms are not yet available. The Court finds that Plaintiffs cannot comply with Sections 29(1)–(4) because the forms are not available.

h. Sections 13, 16(1), 18(1), and 19

Several sections of HB 3 require the Cabinet to create forms or certification programs and promulgate regulations. These include Sections 13, 16(1), 18(1) and 19. Section 13 directs the Cabinet to create and distribute the report forms required by Sections 1, 4, 8, 9, 25, 26, 27, and 29. HB 3 § 13(1). The Cabinet must require completion of the Kentucky Abortion-Inducing Drug Certification Program for pharmacies, manufacturers, distributors, and abortion facilities. *Id.* §

19

16(1)(a).  Section 19 directs the Cabinet to create a complaint portal for the public to report potential violations of the Kentucky Abortion-Inducing Drug Certification Program.  The Court temporarily restrained these provisions only to the extent that they may be enforced against the Plaintiffs. [DE 49]. The Court did not prohibit the Cabinet from working to comply with these provisions.

> i.   <u>Sections 3(39), 4(8), 11, 18(2), 28(6), 29(5)–(6), 31, and 35</u>

Other sections of HB 3 create enforcement mechanisms.  Section 3(39) makes it a Class D felony for anyone to violate Sections 5 through 11.  Section 4(8) creates a fine and a civil enforcement action for any person or institution who fails to timely file a report required by the Section 4.  Section 11 provides a basis for a civil malpractice action and a professional disciplinary action for any party who fails to comply with Sections 5 through 11.  Section 18 requires the Cabinet to enforce with Kentucky Abortion-Inducing Drug Certification Program through fines of no less than $5 million and the suspension of facility certifications.  It also creates a private right of action for individuals to seek recourse for violations of Sections 14 through 19.  HB 3 § 18(2).  Section 28(6) makes it a Class D felony and levies a fine no more than $1 million for any violation of Sections 14 through 19.  Section 29(5) allows the Vital Statistics Branch to bring a civil action against any party who fails to submit a report required by Section 29.  Any falsification of a report submitted under Section 29 is a Class A misdemeanor.  *Id.* § 29(6).  Sections 31 and 35 allow the Attorney General to bring an action to enforce compliance with HB 3.  The Court temporarily restrained the enforcement provisions of HB 3 to the extent the Court also restrained the underlying law.  [DE 49].

> iv.   *Likelihood of Success on the Merits*

>> a.   <u>Substantive Due Process—Right to Liberty and Privacy</u>

Plaintiffs assert violations of substantive due process on behalf of their patients[7] because HB 3, "by passing a law that takes effect immediately, and making compliance impossible by requiring [Plaintiffs] to use agency forms and processes not yet available, [Plaintiffs] will be forced to stop providing abortion immediately, creating a de facto ban on all forms of legal abortion in violation of its patient's rights to liberty and privacy." [DE 1 at 22].

The Court recognizes that there is a constitutionally protected right to a pre-viability abortion under the Fourteenth Amendment. *See Planned Parenthood of Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992); *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2135 (2020) ("*Casey* reaffirmed the most central principle of *Roe v. Wade*, a woman's right to terminate her pregnancy before viability."). The Sixth Circuit has held that "[t]he right to an abortion before viability is *not* absolute." *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 520 (6th Cir. 2021) (en banc) (emphasis in original). A "[s]tate may regulate abortion *before viability* as long as it does not impose an undue burden on a woman's right to terminate her pregnancy." *Id.* (emphasis in original) (quoting *Women's Med. Pro. Corp. v. Taft*, 353 F.3d 436, 443 (6th Cir. 2003)). A law regulating pre-viability abortions is valid if it satisfies two requirements: (1) it must be "reasonably related to a legitimate state interest" and (2) it "must not have the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *EMW Women's Surgical Ctr., P.S.C.*

---

[7] The Supreme Court has established that abortion providers have standing to assert their patients' rights. *Singleton v. Wulff*, 428 U.S. 106, 117 (1976); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 794 n. 2 (6th Cir.), *reh'g en banc dismissed,* 831 F. App'x 748 (6th Cir. 2020), *cert. granted in part sub nom. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 141 S. Ct. 1734 (2021), and *rev'd and remanded sub nom. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002 (2022) (hereinafter "*EMW I*"); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1395-96 (6th Cir. 1987). In *Singleton*, the Court stated that abortion providers are "uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against," the patient's decision to have an abortion. 428 U.S. at 117.

*v. Friedlander*, 978 F.3d 418, 433–34 (6th Cir. 2020) (hereinafter "*EMW II*") (internal citations omitted).

The Court will not address whether HB 3 is reasonably related to a legitimate state interest because the inability to comply with provisions of HB 3 creates a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* Providers of legal abortion services cannot comply with HB 3 until the Cabinet creates the required forms and promulgates the necessary regulations. Because Plaintiffs cannot comply with certain provisions of HB 3 and thus cannot legally perform abortion services, their patients face a substantial obstacle to exercising their rights to a pre-viability abortion. *EMW II*, 978 F.3d at 433–34. This undue burden on the patients' rights to a pre-viability abortion would likely violate substantive due process. *McCloud*, 994 F.3d at 520. Therefore, Plaintiffs, on behalf of their patients, have a strong likelihood of success on the merits of their substantive due process claim.

b.  Procedural Due Process

Plaintiffs have a strong likelihood of success on the merits of their procedural due process claims. The Fourteenth Amendment prohibits any state from depriving "any person of life, liberty, or property without due process of law," and protects "the individual against arbitrary action of government." *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 459–60 (1989); *Meachum v. Fano*, 4427 U.S. 215, 223 (1976); *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974). "Liberty and property interests are intricately related in our system of political economy, a system based on free choice of careers and occupations, private property, and the right to compete." *Wilkerson v. Johnson*, 699 F.2d 325, 612 (6th Cir. 1983) (citing *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 552 (1972)); *see also Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (holding that a person's liberty interest under the Fourteenth Amendment includes the right "to engage in the common occupations

22

of life").  To establish a procedural due process claim, Plaintiffs must show that (1) they had a life, liberty, or property interest protected by the Due Process Clause; (2) they were deprived of this protected interest; and (3) the state did not afford it adequate procedural rights prior to depriving it of the protected interest.  *See Hahn v. Star Bank,* 190 F.3d 708, 716 (6th Cir. 1999).

First, Plaintiffs and their providers would likely be able to prove that they have a right to engage in their professions and earn a living doing the same.  Courts in the Sixth Circuit and elsewhere have held that "due process protects an interest in the continued operation of an existing business," which includes "a protected property interest in the continued operation of [an abortion] clinic."  *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 611–12 (6th Cir. 2006) (recognizing abortion clinic operator's protected property interest in the continued operation of his business); *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *7 (S.D. Ohio Apr. 21, 2020) (holding that a bridal shop forced to close during the COVID-19 pandemic had a right to continued operations); *see also Louis K. Liggett, Co. v. Baldridge*, 278 U.S. 105, 111 (1928) ("That appellant's business is a property right . . . and as such entitled to protection against state legislation in contravention of the federal Constitution, is, of course, clear."); *United States v. Tropiano,* 418 F.2d 1069, 1076 (2d Cir. 1969) ("The right to pursue a lawful business . . . has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution."); *Small v. United States,* 333 F.2d 702, 704 (3d Cir. 1964) ("The right to pursue a lawful business or occupation is a right of property which the law protects against intentional and unjustifiable interference.").  Planned Parenthood provides a variety of medical services and abortions one day each week.  [DE 54 at 806].  EMW provides abortions 5 days a week and typically has at least one abortion scheduled each day.  [*Id.*].  Thus, Plaintiffs and their physicians

have a constitutionally protected right to continue to operate their businesses. *See Baird,* 438 F.3d at 611–12; *Hartman*, 2020 WL 1932896, at *7.

Plaintiffs and their providers would also likely be able to prove they have a right to a reasonable time to comply with a change in the law, or that enforcement of a law in which compliance is impossible is arbitrary, in violation of their due process rights. As noted above, the law protects "the individual against arbitrary action of the government." *Thompson*, 490 U.S. at 459–60 (1989); *Meachum*, 4427 U.S. at 223; *Wolf*, 418 U.S. at 558.  A law may be arbitrary and violate due process where compliance is impossible or a reasonable time is not given to comply. *See Campbell v. Bennett*, 212 F. Supp. 2d 1339, 1343 (M.D. Ala. 2002) (finding due process violation where defendants changed deadline for independent candidate registration without leaving plaintiff sufficient time to meet the deadline); *see also Landgraf v. USl Film Products*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."); *Planned Parenthood of Wisconsin, lnc. v. Van Hollen*, 738 F.3d 786, 789 (7th Cir. 2013) ("The impossibility of compliance with the statute" by abortion providers "is a compelling reason for the preliminary injunction"); *United States v. Dumas*, 94 F.3d 286, 291 n.3 (7th Cir. 1996) ("[T]he validity of a law with which it is impossible to comply may be questioned.")*; Planned Parenthood of Tennessee & N. Mississippi v. Slatery*, No. 3:20-cv-00740, 2020 WL 5797984, at *5 (M.D. Tenn. Sept. 29, 2020) (temporarily enjoining abortion restriction where state had up to 90 days after law's effective date to make required materials available and had not done so when law took effect).

Second, Plaintiffs and their providers would likely be able to prove that they have been deprived of a protected interest.  As courts have recognized, Plaintiffs have a protected interest in

their right to operate their businesses under the Fourteenth Amendment. *See id.* HB 3 requires Plaintiffs to comply with myriad new regulations and programs, none of which have been brought to fruition by the Cabinet. Because the Cabinet has not promulgated the necessary regulations or created applicable forms, Plaintiffs cannot conform to many of HB 3's requirements. *See, e.g.*, *Campbell*, 212 F. Supp. 2d at1343 (M.D. Ala. 2002) (quoting *Landgraf,* 511 U.S. at 264 (1994) ("Fundamentally, what is at issue in this case is the due-process concept of fair notice, which is central to the legitimacy of our legal system: 'Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly.'")). If Plaintiffs and their providers fail to conform to HB 3's requirements, they could be subject to a Class D felony, fines of up to $1 million, and revocation of physician and facility licenses. HB 3 § 28(6). Therefore, Plaintiffs and their providers could likely prove that they have been prohibited from operating their businesses.

Attorney General Cameron has argued that Plaintiffs must show a deprivation of a valid property interest to succeed on their procedural due process claims. [DE 21 at 207]. He claims that the Act "merely imposes some requirements on [Plaintiff's] operations." [*Id.*]. But again, Plaintiffs cannot comply with many provisions of HB 3 because no means of compliance currently exists. The inability to comply deprives Plaintiffs of "a constitutional right to continue to operate their business." *Baird,* 438 F.3d at 611–12; *Hartman*, 2020 WL 1932896, at *7. Therefore, Plaintiffs could likely prove this element of a procedural due process claim.

Third, Plaintiffs could likely prove that the Commonwealth of Kentucky did not provide them with adequate procedural rights prior to depriving them of their right to continually operate their businesses. The Sixth Circuit has held that a plaintiff could establish a procedural due process violation if the state deprived them of a protected interest without adequate procedural rights before

25

the deprivation. *See Hahn*, 190 F.3d at 716. "In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990).

The Court is unaware of any process provided to Plaintiffs before depriving Plaintiffs of their right to operate their businesses. Because the state is depriving Plaintiffs and their providers of a constitutionally protected property interest—the right to continued operation of their businesses—Plaintiffs would likely be able to show that they were not afforded adequate process. *See id.* Attorney General Cameron has argued that procedural due process may be satisfied with a pre- or post-deprivation hearing. [DE 21 at 208]. However, Attorney General Cameron has not indicated whether there will be any hearing, likely because no rules or regulations have been promulgated by the Cabinet. Attorney General Cameron has also claimed that this matter is not yet ripe because Plaintiffs have not been ordered to cease operations. [*Id.*]. Yet, the plain language of HB 3 states that Plaintiffs shall not engage in their business until they have come into compliance with the Cabinet's programs. HB 3 § 15(2) ("The certification requirements shall include recognition that abortion-inducing drugs may only be provided to patients by qualified physicians who are registered as nonsurgical abortion providers and that abortion-inducing drugs shall not intentionally, knowingly, or recklessly be provided directly to a patient outside of the parameters of Kentucky's Abortion-Inducing Drug Certification Program."); *Rothstein*, 532 S.W.3d at 648 (quoting *O'Daniel*, 153 S.W.3d at 819)("we assume that the '[legislature] meant exactly what it said, and said exactly what it meant.'"). Moreover, the penalties for noncompliance include fines over $1 million and potential felony charges. *Id.* § 28(6). HB 3 deprives Plaintiffs of their constitutionally protected interest to continue to operate their businesses. *See Hartman*,

26

2020 WL 1932896, at *7.  Therefore, Plaintiffs could likely prove that they did not receive due process.  *See Zinermon*, 494 U.S. at 132.

After reviewing all three elements of Plaintiffs' procedural due process claims, the Court finds that Plaintiffs have a strong likelihood of success on the merits of their claims. Because there is likelihood of success on the merits of one or more claims, the Court need not consider in detail the merits of each and every claim. *Transtex Composite, Inc.*, 2012 WL 5362191, at *2.

### v.   *Plaintiffs' Irreparable Injury Absent an Injunction*

The next factor that the Court must balance is whether Plaintiffs would suffer irreparable injury absent an injunction.  *See S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).

The Sixth Circuit has held that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd sub nom. McCreary Cty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844 (2005) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Buquer v. City of Indianapolis*, 797 F. Supp. 905, 924–25 (S.D. Ind. 2011) (quoting *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) ("It is well-established that, 'when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'")). As noted above, women have a constitutionally protected right to a pre-viability abortion under the Fourteenth Amendment.  *See Casey*, 505 U.S. at 846. Likewise, as discussed above, Plaintiffs have constitutionally protected due process rights protecting against arbitrary action under HB 3, *see Campbell*, 212 F. Supp. 2d at 1343, and in the continued operation of their business, *see Baird*, 438 F.3d at 611–12.

Courts have also held that irreparable harm may be present where engaging in the prohibited conduct would result in the realistic possibility of felony prosecution. *United States v. Williams*, 872 F.2d 773, 777 (6th Cir. 1989) ("[A] felony conviction irreparably damages one's reputation."); *Michigan Chamber of Com. v. Land*, 725 F. Supp. 2d 665, 699 (W.D. Mich. 2010) ("[S]taying today's injunction would irreparably harm these plaintiffs by leaving them unable to engage in the [constitutionally protected] activity without a very realistic fear of felony prosecution."). Plaintiffs may also demonstrate irreparable harm "through the loss of customers, goodwill or business." *Hagan v. Vision Serv. Plan*, No. 05-72517, 2005 WL 3447882, at *10 (E.D. Mich. Dec. 15, 2005); *see also Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 599 (6 Cir. 2001); *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1181 (D. Kan. 1988).

There is a realistic possibility Plaintiffs and their providers would be subject to felony charges for engaging in their businesses, which would severely damage their reputations and result in irreparable harm. *Williams,* 872 F.2d at 777. Moreover, the threat of felony charges and other severe penalties deprive Plaintiffs and their providers of a constitutionally protected right—continued operation of their businesses. *Hartman*, 2020 WL 1932896, at *7. Plaintiffs' irreparable harm is compounded by the state's deprivation of this constitutionally protected interest. *See Buquer*, 797 F. Supp. 2d at 924–25.

The Eastern District of Michigan has found irreparable harm under similar circumstances in *Galper v. U.S. Shoe Corp.*, 815 F. Supp. 1037 (E.D. Mich. 1993). In *Galper*, the court held that an optometrist who subleased space from a manufacturer and seller of prescription eyeglasses could not quantify the amount of money that she would lose if evicted after six years. *Id.* at 1044. The *Galper* Court reasoned that the eviction would "injure [the optometrist's] reputation as a

professional and drive away customers and that such losses are impossible to quantify in money damages." *Id.* Similarly, Plaintiffs and their providers will lose customers and suffer damage to their reputations that is impossible to quantify if they are unable to operate their businesses. *See id.* As in *Galper*, medical service professionals who cannot provide their services will be forced to terminate doctor-patient relationships and disrupt any continuity of care. *See id.* As a result, Plaintiffs and their providers will suffer unquantifiable damages to their businesses and reputations if they are unable to perform services approved by the Kentucky Legislature. *See id.*

If Plaintiffs or one of their providers were to attempt to perform an appropriate and legal abortion, then they would necessarily be in violation of HB 3 because of the impossibility of compliance. Such a violation could result in a Class D felony, fines of up to $1 million, and revocation of physician and facility licenses. HB 3 § 28(6). Until the Cabinet promulgates the appropriates rules and drafts the necessary forms, Plaintiffs and their providers would be subject to these severe penalties for providing medical services approved by the Kentucky Legislature. *Id.* Women seeking otherwise legal and constitutionally protected abortions, *see Casey*, 505 U.S. at 864, cannot exercise their right to the procedure without a medical provider. Plaintiffs are the only two abortion providers in Kentucky. [DE 54 at 804]. Women cannot go elsewhere to receive these constitutionally protected medical procedures. Plaintiffs can likely demonstrate irreparable harm based on the impairment of their patients' constitutionally protected right to a pre-viability abortion and their own fear of felony conviction for engaging in their business because there is not yet a means to comply with HB 3. *See McCreary Cty.*, 354 F.3d at 445.

### vi.   *Whether an Injunction Would Cause Others Substantial Harm*

Next, the Court must consider whether injunctive relief would harm others. *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 542. While this factor is generally

concerned with harm to third parties, courts also often consider the "balance of hardships" between the parties if an injunction were to issue.  *See, e.g.*, *id.* at 550–51; *Nesco Res. LLC v. Walker*, No. 3:18-CV-00171-GNS, 2018 WL 2773321, at \*5 (W.D. Ky. Apr. 23, 2018).  Plaintiffs carry "the burden of justifying [the injunctive] relief" they seek.  *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020).

Plaintiffs are the only two remaining clinics in the Commonwealth that can perform abortion procedures approved by the Kentucky Legislature in HB 3.  [DE 54 at 804].  Without an injunction, Plaintiffs will be unable to perform their services until the Cabinet provides a means to comply.  As a result, third parties will be unable to obtain medical procedures approved by the Kentucky Legislature.  Thus, the Court balances the hardships between the Commonwealth's interest in enforcing its laws against the potential depravation of rights.

Attorney General Cameron argues that the Commonwealth will be harmed because it will be unable to enforce a constitutional law.  [DE 63 at 1170].  However, the Court is not enjoining HB 3 in its entirety, only the provisions without a means of compliance.  Attorney General Cameron argues that "the better reading of HB 3 is that where a specific form is expressly required, the provision is not effective until it is available."  [*Id.* at 1151].  Enjoining these provisions will not harm the Commonwealth because it argues they were already unenforceable.  Therefore, any harm that the Commonwealth could potentially suffer by being unable to enforce its laws is mooted.  As the injunction on enforcement would not cause substantial harm to others, this factor supports injunctive relief.

### vii.    *Whether Public Interest is Served by Issuance of Injunction*

The Sixth Circuit has held that "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent

violation of a party's constitutional rights." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)).  As noted above, Plaintiff easily satisfies this factor because there is a substantial likelihood that Defendants have violated Plaintiffs' and their patients' due process rights under the Fourteenth Amendment.  "The public interest will not be harmed by preserving the status quo pending a preliminary injunction hearing." *Slatery*, 2020 WL 5797984, at * 5.  Moreover, courts in the Sixth Circuit have held that public policy supports an injunction when there would be a disruption to medical services or a patient's continuity of care.  *See, e.g.*, *Hagan v. Vision Serv. Plan*, No. 05-72517, 2005 WL 3447882, at *10 (E.D. Mich. Dec. 15, 2005); *Galper*, 815 F. Supp. at 1044.  If Plaintiffs cannot comply with HB3 and must cease providing certain medical services until the Cabinet promulgates a means of compliance, then this disruption to medical services will no doubt interrupt the continuity of care for Plaintiffs' patients.  As a result, a preliminary injunction serves the public interest.

All four of the factors support injunctive relief and Planned Parenthood's and EMW's Motions for a Preliminary Injunction Order, [DE 3; 38], are **GRANTED IN PART** to the extent set forth below.

### viii.    *The Cabinet's Implementation of HB 3*

The Cabinet filed a status report on the requirements HB 3 places on the Cabinet to create forms and promulgate administrative regulations.  [DE 53].  The Cabinet's status report summarizes sections 1, 4, 8, 9, 12, 13, 15, 16, 17, 18, 19, 21, 22, 26, 27, and 28 of HB 3, all of which impose requirements on the Cabinet.  [DE 53 at 794-97].  The Cabinet states these requirements may not be implemented because the Kentucky General Assembly did not

appropriate any funds to the Cabinet in HB 3. [DE 53 at 795].[8] The Cabinet argues that this lack of funding makes the bill an unfunded mandate. [DE 53 at 795].

Under Kentucky law, a bill that requires funding to execute but does not contain a funding provision cannot immediately take effect. *See Fletcher v. Com.*, 163 S.W.3d 852, 866 (Ky. 2005) ("Only those statutes specifically mandating that payments or contributions be made can be interpreted as self-executing appropriations."). Furthermore, "[a] mandated appropriation cannot be inferred from the mere existence of an unfunded statute." *Id.*

It is undisputed that HB 3 does not contain funding for the forms, regulations, and programs required in HB 3.[9] The Cabinet has stated that without appropriation, the unfunded requirements— the forms, regulations, and programs—may not be implemented. [DE 53 at 795–97]. Attorney General Cameron's silence on the merits of the Cabinet's position concede that without funding, the Cabinet may not be required to create the forms or promulgate the regulations within the 60 days provided.

Attorney General Cameron's only response to this issue is that "only the Plaintiffs' ability to comply with the various provisions of HB 3 is at issue here" and "whether any other entity— including the Cabinet—can comply with HB 3's requirements is not before the Court." [DE 63 at 1148, FN 1]. The Court disagrees as the issue of an unfunded mandate goes to the possible length of time before the requisite forms are created and regulatory guidance is issued. In short, it goes

---

[8] Although neither considered by, nor necessary to, the Court's analysis, the Kentucky Legislature did not include a fiscal note with HB 3 estimating the cost of implementation. But Governor Beshear estimated that the bill would initially cost the Cabinet $1,000,000 to implement the new requirements under HB 3. "Governor's Veto Message" https://apps.legislature.ky.gov/record/22rs/hb3/veto.pdf (last visited May 19, 2022). Governor Beshear also noted that HB 3 would require the Cabinet "to, among other things, create three new full-time positions, build an electronic database to store and track a certification and complaint program, and establish additional public reporting requirements." *Id.*

[9] The Court has found no such provision, nor has Attorney General Cameron pointed to any provision or made any argument regarding the Cabinet's status report on the lack of funding.

to the potential length of this injunction.  Therefore, the Court will enjoin the relevant provisions of HB 3 that hinge on the Cabinet  as long as HB 3 remains unfunded or until such time as the forms, regulations, and programs are implemented by Cabinet.

### C.  EMW's Motion for Preliminary Injunction [DE 38]

EMW has moved for a preliminary injunction on HB 3's ban on abortions after 15 weeks. [DE 38].  Planned Parenthood does not provide abortion services after 15 weeks [DE 54 at 806], so this section is primarily applicable to EMW.  Attorney General Cameron argues that EMW has failed to meet its burden to demonstrate likely to succeed on the merits.  [DE 63 at 1166].

#### i.    *Summary of Applicable HB 3 Provisions*

Sections 27, 33(2), (4), and (6), and 34 are the provisions that relate to the ban on abortion after 15 weeks. Section 27(1) requires physicians to determine, in the physician's reasonable medical judgment, the probable gestational age of any unborn child prior to performing any abortion.  Before making this determination, the physician must 'make inquiries' of the pregnant woman and make any medical exams or tests that the physician considers necessary.  HB 3 § 27(1).

Section 27(2) provides that no physician shall intentionally perform an abortion after the probable gestational age of fifteen weeks, except in a medical emergency, without first entering the determinations and associated medical findings from section 27(1) in the pregnant woman's medical record.

Section 27(3) suspends a physician that violates section 27 from the practice of medicine for at least six months.

Section 27(4) is a new subsection that requires physicians to report on a form the same information required by Section 4, in addition to probable gestational age determined by the physician and the results of the inquiries and medical exams or tests performed by the physician.

HB 3 § 4(a)(b). Section 13 of HB 3 directs the Cabinet to create forms required by Section 27. *Id.* § 13. Because section 27(4) requires the same information required by section 4, Plaintiffs indicated they cannot comply with section 27(4) for the same reasons it cannot comply with section 4. [DE 54 at 836–37].

Section 33 provides definitions applicable to KRS 311.781 through 311.786. Section 33 also adds definitions for "gestational age," HB 3 § 33(2), and "probable gestational age," *id.* § 33(6). The Court notes that the Kentucky Legislature added a definition for the term "pain-capable unborn child" but failed to use the defined term at any other place in HB 3. *Id.* § 33(4). If these definitions were to be incorporated into HB 3, they would inadvertently amend the existing 20-week ban on abortions to an 18-week ban. [DE 64 at 1239].

Section 34(1) prohibits any person from performing or inducing an abortion on a pregnant woman after the probable gestational age of the unborn child is fifteen weeks.

Section 34(2) provides an affirmative defense for physicians performing abortions. The affirmative defense applies under subsection (2)(a) if the physician knew the probable gestational age was less than fifteen weeks. The affirmative defense applies under subsection (2)(b) if the physician knew the abortion was necessary to prevent the death or serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman. The abortion is not deemed necessary, and thus the affirmative defense does not apply, if based on a reason related to mental health of the pregnant woman, or if based on conduct that the pregnant woman will engage in. HB 3 § 34(2)(b).

Section 34(3)(a) provides that, except when a medical emergency prevents compliance, it is not an affirmative defense that the physician knew the probable gestational age was less than fifteen weeks unless the physician makes a determination of the probable gestational age, or the

physician relies on another physician's determination.   If relying on another physician's determination, they must certify in writing that based on the results of the tests performed and physician's reasonable medical judgment the child's probable gestational age is less than fifteen weeks.

Section 34(3)(b) provides that, except when a medical emergency prevents compliance with the following conditions, the affirmative defense of preventing the death or serious risk of impairment of major bodily function of the pregnant woman does not apply unless the physician performing the abortion complies with all of the following conditions: (1) the performing physician certifies in writing that, in the physician's reasonable medical judgement and on facts known to the physician at that time, the abortion is necessary to prevent the death or serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman; (2) a different, not professionally related physician certifies in writing that, based on the physician's reasonable medical judgment and on facts known to that physician at that time, the abortion is necessary to prevent death or serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman; (3) the abortion is performed in a hospital or facility that has appropriate neonatal services for premature infants; (4) the performing physician does so in a manner that provides the best opportunity for the unborn child to survive, unless the physician determines based on the physician's reasonable medical judgment and the facts known to the physician at the time that the termination of the pregnancy has a greater risk of death or substantial and irreversible impairment of a major bodily function of the pregnant woman than other methods of abortion; (5) the physician certifies in writing both the available methods and the reasons for choosing the method employed; and (6) the performing physician has arranged at least one other

physician to be present who will take control of, provide immediate medical care for, and take all reasonable steps to preserve the life and health of the unborn child.

Section 34(4) revokes the license of any physician who violates or fails to comply with section 34.

Section 34(5) places civil liability on any physician who performs an abortion on a pregnant woman with actual knowledge or heedless indifference that neither of the affirmative defenses set forth in 34(2) apply.

Section 34(6) prevents any liability for pregnant women on whom an abortion was performed in violation of 34(1).

EMW also asked that the Court enjoin Section 32.  [DE 38 at 506].  Section 32 lists general findings from the Kentucky Legislature but does not include any operative provisions.  The Court will not enjoin Section 32 because it will enjoin the operative provisions of HB 3 where EMW has demonstrated a likelihood of success on the merits.  Section 32 does not include any operative provisions that would prevent EMW from performing abortions once Sections 27, 33(2), (4), and (6), and 34 have been enjoined.

The Court notes that its analysis related to the 15-week ban on abortion does not turn on whether Plaintiffs can comply with provisions of HB 3 as it does in the prior section of this Order. Attorney General Cameron has argued that compliance with Section 27 is possible because it "merely require[s] a gestational-age determination."  [DE 63 at 1166].  However, the success of EMW's motion for a preliminary injunction turns on whether it can demonstrate that the 15-week ban violates due process.  Therefore, the Court will not consider compliance arguments related to the 15-week ban.

     *ii.*   *Likelihood of Success of the Merits*

EMW asserts that it has a strong likelihood of success on the merits because the ban violates its patients' substantive due rights under the fourteenth amendment.  [DE 38 at 508].

As stated above, the Court recognizes that there is a constitutionally protected right to a pre-viability abortion under the Fourteenth Amendment.  *See Casey*, 505 U.S. 833, 846 (1992).  Therefore, for EMW to succeed on the merits, it must prove that HB 3 (1) is not reasonably related to a legitimate state interest or (2) has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.  *See Preterm-Cleveland*, 994 F.3d at 520.

Attorney General Cameron argues that EMW is not likely to succeed on the merits because Plaintiffs have not shown that the 15-week provision "places a substantial obstacle in the path of a large fraction of women seeking previability abortions."  [DE 63 at 1169].  He further argued at the Preliminary Injunction hearing that the 15-week ban does not constitute a substantial obstacle because the court in *Casey* was applying "the undue burden test on the facts before it," and the facts at issue in *Casey* are different than those here."  [DE 51, 774–75, Hrg. Tr. 121:17–122:6].  Attorney General Cameron argues that section 34 of HB 3 was the only section that "prohibits some (but certainly not all) previability abortions."  [DE 21 at 205-6].  Inherent to this argument is the premise that previability ends at some point after 15 weeks, as HB 3 section 34 bans all abortions after 15 weeks.

Regardless of the differences in facts between this case and *Casey*, the Sixth Circuit has recognized that an outright previability ban, "[u]nder the Chief Justice's controlling opinion" in *June Medical*, 140 S. Ct. 2103, 2120 (2020),  would constitute a substantial obstacle.[10]  *See*

---

[10] Quoting an earlier Sixth Circuit case, the court in *McCloud* stated that a "law remains facially valid so long as it does not impose an undue burden in a large fraction of the cases in which the regulation is relevant."  *McCloud*, 994 F.3d at 525.  Here, HB 3 sections 27, 33, and 34 operate as an outright ban after 15 weeks, rather than as a regulation, with limited exceptions for preventing the death or serious risk of substantial and irreversible impairment of a major bodily function of the woman.

*McCloud*, 994 F.3d at 525.  This substantial obstacle—as exists here—creates an undue burden in the path of a woman seeking an abortion of a nonviable fetus.  *Id.* at 524.

Because Sections 27, 33(2), (4), and (6), and 34 are an undue burden to women seeking an abortion of a nonviable fetus, and because the ban violates their substantive due process rights, EMW has demonstrated a likelihood of success on the merits.

          iii.     *Plaintiffs' Irreparable Injury, Substantial Harm to Others, and Public Interest*

As discussed above, EMW must also prove irreparable harm, whether an injunction would cause substantial harm to others, and whether the public interest would be served by an injunction. *S. Glazer's Distribs. of Ohio, LLC*, 860 F.3d at 849.  Because the Court fully analyzes these elements in the preceding section of this Order, the Court reincorporates the relevant portions of its analysis here.  The Court finds that EMW has satisfied all four elements required for a preliminary injunction.  Because EMW has satisfied the requirements for a preliminary injunction related to Sections 27, 33(2), (4), and (6), and 34, the Court **GRANTS IN PART** EMW's Motion for a Preliminary Injunction [DE 38] as set forth below.

          iv.     *Duration of the Preliminary Injunction*

EMW is also plaintiff in a case pending in this district before Judge David J. Hale.  *EMW Women's Surgical Center, P.S.C., et al. v. Eric Friedlander, et al.*, Case No. 3:19-cv-00178-DJH-RSE ("EMW Case").  The defendants in that case are identical to those here.  In the EMW Case, where the issue concerned the constitutionality of two Kentucky bills regulating abortion, EMW and Defendants agreed on March 22, 2022, to stay the EMW Case pending the United States Supreme Court's decision in *Dobbs v. Jackson Women's Health*, 945 F.3d 265 (5th Cir. 2019).  *Id.* at *3.  The United States Supreme Court is expected to soon render a decision in *Dobbs* regarding the constitutionality of a Mississippi law that banned abortion after 15 weeks.  *See Dobbs*, 945

F.3d 265.  The issue in *Dobbs* is identical to the issue in this case.  Although the parties consented to a stay in the EMW Case, the Court has authority to stay provisions of a law and related litigation pending a decision from a higher Court.  *See Trump v. Hawaii*, 138 S. Ct. 542 (2017); *Charities v. Gordon*, No. 1:19-CV-286, 2020 WL 7872348, at *2 (W.D. Mich. May 5, 2020) ("In contrast, the Supreme Court's decision in *Fulton* will provide significant guidance, if not a controlling rule of federal law.").  Thus, the Court will stay the issue pending the Supreme Court's decision in *Dobbs*.

### D.  Security

The Court has "discretion over whether to require the posting of security."  *Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (emphasis omitted) (internal quotation marks omitted); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1996).  Plaintiffs have represented that they are health care providers who serve low-income and underserved communities.  [DE 3 at 127; DE 38 at 512].  Requiring them to secure a bond would strain its limited financial resources.  [*Id.*].  As a result, Plaintiff need not post security.

### III.    CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1)    Defendants Daniel Cameron, in his official capacity as Attorney General, Eric Friedlander, in his official capacity as Secretary of Kentucky's Cabinet for Health and Family Services, Michael S. Rodman, in his official capacity as Executive Director of the Kentucky Board of Medical Licensure, and Thomas B. Wine, in his official capacity as Commonwealth's Attorney for the 30th Judicial Circuit of Kentucky, are **PRELIMINARILY ENJOINED** from enforcing,

attempting to enforce, threatening to enforce, or otherwise requiring compliance with the following provisions of HB 3 until the Cabinet creates a means for compliance:

    a.   Sections 1(2) and (9)–(11), 4(2)–(5), 6(1), 8, 9, 15, 16(2)–(3), 17, 20(2)–(3), 21(3)–(4), 22, 23(15), 25, 26, 29(1)–(4);

    b.   Sections 13, 16(1), 18(1), 19 only to the extent they may be enforced against Plaintiffs; and

    c.   Sections 2(27), 3(12) and (39), 4(8), 11, 18(2), 28(6), 29(5)–(6), 31, 35 only to the extent the Court also temporarily restrains the underlying law.

(2)    Sections 27, 33(2), (4), and (6), and 34 are **PRELIMINARILY ENJOINED** and any related litigation is **STAYED** pending the Supreme Court's decision in *Dobbs*; and

(3)    The requirement of security under Federal Rule of Civil Procedure 65(c) is waived due to the strong public interest involved.

Rebecca Grady Jennings, District Judge
United States District Court

May 19, 2022

40