UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD GREAT NORTHWEST, HAWAII, ALASKA, INDIANA, AND KENTUCKY, INC., ON BEHALF OF ITSELF, ITS STAFF, AND ITS PATIENTS, | Plaintiff |
| -and- | |
| EMW WOMEN'S SURGICAL CENTER, P.S.C., ON BEHALF OF ITSELF, ITS STAFF, AND ITS PATIENTS; ERNEST W. MARSHALL, M.D., ON BEHALF OF HIMSELF AND HIS PATIENTS, | Intervenor Plaintiffs |
| v. | Civil Action No. 3:22-cv-198-RGJ |
| DANIEL CAMERON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF KENTUCKY; ERIC FRIEDLANDER, IN HIS OFFICIAL CAPACITY AS SECRETARY OF KENTUCKY'S CABINET FOR HEALTH AND FAMILY SERVICES; MICHAEL S. RODMAN, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE KENTUCKY BOARD OF MEDICAL LICENSURE; AND THOMAS B. WINE, IN HIS OFFICIAL CAPACITY AS COMMONWEALTH'S ATTORNEY FOR THE 30TH JUDICIAL CIRCUIT OF KENTUCKY | Defendants |

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

On June 30, 2022, the Sixth Circuit (Circuit Judges Clay, Stranch, and Rogers) remanded

Case No. 22-5451 to this Court for further proceedings in light of the United States Supreme

Court's decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). [DE 79]. On

1

the same day, Defendant Attorney General Daniel Cameron ("Attorney General") moved to lift the Court's Preliminary Injunction [DE 65], which enjoined enforcement of certain provisions of Kentucky House Bill 3, the Humanity in Healthcare Act of 2022 [DE 1-1 ("HB 3")] and stayed litigation pending the Supreme Court's decision in *Dobbs*.  [DE 80 at 1391].  Plaintiff Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky, Inc., ("Planned Parenthood") and Intervening Plaintiff EMW Women's Surgical Center and Dr. Ernest W. Marshall ("EMW" and together with Planned Parenthood, "Plaintiffs") responded in opposition [DE 82] and the Attorney General replied [DE 83].  The Court granted Plaintiffs the opportunity to file a sur-reply based on new arguments by the Attorney General and updated forms created by Kentucky's Cabinet for Health and Family Services ("Cabinet").  [DE 84].  Plaintiffs filed a sur-reply and EMW consented to lifting the Preliminary Injunction as it related to HB 3's 15-week ban.  [DE 82 at 1408].  In light of EMW's consent and *Dobbs*, the Court partially dissolved its Preliminary Injunction as it applied to HB 3 §§ 27, 33(2), (4), and (6), and 34 and requested additional information from Plaintiffs and the Cabinet.  [DE 87].  For the reasons below, the Attorney General's Emergency Motion to Lift the Preliminary Injunction [DE 80] is **GRANTED IN PART** and **REMAINS SUBMITTED TO THE COURT FOR CONSIDERATION** as it applies to all sections of HB 3 remaining enjoined pending further action by the Cabinet.

## I.     BACKGROUND

On Thursday May 19, 2022, the Court issued its Preliminary Injunction [DE 65] enjoining Defendants from enforcing or otherwise requiring compliance with the specific provisions[1] of HB

---

[1]  a.     Sections 1(2) and (9)–(11), 4(2)–(5), 6(1), 8, 9, 15, 16(2)–(3), 17, 20(2)–(3), 21(3)–(4), 22, 23(15), 25, 26, 29(1)–(4);

b.     Sections 13, 16(1), 18(1), 19 only to the extent they may be enforced against Plaintiffs; and

c.     Sections 2(27), 3(12) and (39), 4(8), 11, 18(2), 28(6), 29(5)–(6), 31, 35 only to the extent the Court also temporarily restrains the underlying law.

3 until the Cabinet creates a means for compliance. [DE 65 at 1289–90]. The Court also enjoined the Defendants from enforcing Sections 27, 33(2), (4), and (6), and 34 and stayed any related litigation on these sections pending the Supreme Court's decision in *Dobbs*. [*Id.*]. That same day, the Attorney General appealed the Court's Preliminary Injunction to the United States Court of Appeals for the Sixth Circuit.[2] [DE 66].

On June 30, the Sixth Circuit remanded Case No. 22-5451 to this Court "for further proceedings consistent with the Supreme Court's decision in *Dobbs*." [DE 78 at 1386]. The Attorney General filed this Emergency Motion to Lift the Preliminary Injunction. [DE 80].

On July 6, Judge Perry held a temporary injunction hearing in Case No. 22-CI-003225 regarding the enforcement of KRS 311.772 ("Trigger Ban") and KRS 311.7701–11 ("Six-Week Ban") both seeking to ban certain abortion services in the Commonwealth. [DE 82 at 1410]. On July 22, Judge Perry granted Plaintiffs' Motion for a Temporary Injunction, restraining enforcement of the Trigger Ban and Six-Week Ban. *See EMW Women's Surgical Ctr. v. Cameron*, No. 22-CI-003225, at 20 (Ky. Cir. July 22, 2022). However, on August 1, the Kentucky Court of Appeals granted the Attorney General's emergency motion to stay the Temporary Injunction. *See Cameron v. EMW Women's Surgical Ct., P.S.C.*, No. 2022-CA-0906-I, at 2 (Ky. App. Aug. 1, 2022). The Kentucky Supreme Court upheld the Court of Appeals' decision. *See EMW Women's Surgical Ctr., P.S.C. v. Cameron*, No. 2022-SC-0326-I, 2022 WL 3641196 (Ky. Aug. 18, 2022). As of the date of this Order, the Trigger Ban and Six-Week Ban are both enforceable in the Commonwealth. *See id.*

---

[2] Initially, the Attorney General only moved to stay the Court's Preliminary Injunction as it related to Section 1(2), (9), and (11) (the informed consent requirements) and Sections 20(3)–(4), 22(1)–(2) & (4), and 23(15) (requirements related to the disposal of fetal remains). [COA, DE 7-1 at 14]. The Attorney General later expanded his motion, asking the Sixth Circuit to stay the entirety of the Court's Preliminary Injunction pending appeal. [COA, DE 26 at 5].

In the Attorney General's reply as it relates to his Emergency Motion to Lift the Preliminary Injunction, he argued for the first time that compliance with Sections 1(9)–(11), 4(2)–(5) & (8), 9, 26(1), and 29 is possible because the Cabinet has revised forms VS-913 and VS-913P. [DE 83 at 1476].  The Court ordered the Cabinet to file a status report regarding its efforts to comply with HB 3's mandates and ordered Plaintiffs to file a sur-reply responding to the Attorney General's arguments.  [DE 84].  According to the Cabinet's Status Report, it is currently taking action to comply with HB 3 by updating forms, promulgating regulations, and developing new programs.  [DE 85].  However, Plaintiffs—the only two abortion clinics in the Commonwealth—informed the Court that they were not informed of the updates until July 7 when an EMW employee noticed that the normal reporting portal was locked.  [DE 86 at 1494].  Plaintiffs contend that updated forms VS-913 and VS-913P still do not satisfy the requirements of HB 3.  [*Id.* at 1496].  They also argue that the forms are over-inclusive of information and risk violating the Health Insurance Portability and Accountability Act ("HIPAA").  [*Id.* at 1498].  However, Plaintiffs also state that they have started productive discussions with the Cabinet regarding changes to the forms that could ultimately result in compliance with HB 3.  [*Id.* at 1495].

Based on this new information, the Court ordered Plaintiffs and the Cabinet to provide additional briefing regarding "progress made towards compliance with HB 3, the applicability of any new forms or regulations, the process of promulgating these regulations, and the status of the Plaintiffs' remaining claims set forth in the original complaints as it relates to the rapidly changing status of the law in the Commonwealth."  [DE 87 at 1512].

## II.    STANDARDS

### A.  Preliminary Injunction Standard

A preliminary injunction "should be granted only if the movant carries his or her burden." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  However,

the moving party "is not required to prove his case in full at a preliminary injunction hearing."

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In the Sixth Circuit,

> [f]our factors guide the decision to grant a preliminary injunction: "(1) whether the
> movant has a strong likelihood of success on the merits; (2) whether the movant
> would suffer irreparable injury absent the injunction; (3) whether the injunction
> would cause substantial harm to others; and (4) whether the public interest would
> be served by the issuance of an injunction."

*S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir.

2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "[T]hese are

factors to be balanced, not prerequisites to be met." *Id.* (citing *Certified Restoration Dry Cleaning

Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). "For example, 'a finding that

the movant has not established a strong probability of success on the merits will not preclude a

court from exercising its discretion to issue a preliminary injunction if the movant has, at

minimum, shown serious questions going to the merits and irreparable harm which decidedly

outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding

Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399–400 (6th Cir. 1997) (internal quotations and

brackets omitted).

The moving party need only show a likelihood of success on the merits of one claim where

there are multiple claims at issue in a complaint. *Transtex Composite, Inc. v. Laydon Composite,

Ltd.*, No. CIV.A. 12-150-C, 2012 WL 5362191, at *2 (W.D. Ky. Oct. 30, 2012); *Georgia v. Biden*,

No. 1:21-CV-163, 2021 WL 5779939, at *8 (S.D. Ga. Dec. 7, 2021) ("Plaintiffs need only show a

substantial likelihood of success on the merits on one claim"); *Schiavo ex rel. Schindler v. Schiavo*,

357 F. Supp. 2d 1378, 1384 (M.D. Fla.), *aff'd*, 403 F.3d 1223 (11th Cir. 2005) ("Plaintiffs have

asserted five constitutional and statutory claims. To obtain temporary injunctive relief, they must

show a substantial likelihood of success on at least one claim"); *725 Eatery Corp. v. City of New

*York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) ("Plaintiff need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims.'"); *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 519 (S.D. Tex. 2020) ("When the plaintiff has brought multiple causes of action, he need only present a prima facie case on one of them.").

### B.   Standard to Lift a Preliminary Injunction

A preliminary injunction may be dissolved under Federal Rule of Civil Procedure 60(b)(5). *See Associated Builders & Contractors v. Michigan Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008) ("Under Rule 60(b)(5) of the Federal Rules of Civil Procedure, a court may dissolve an injunction if it 'is based on an earlier judgment that has been reversed or vacated' or if applying the injunction prospectively 'is no longer equitable.'").

"The principle that an equitable remedy should be enforced only so long as the equities require is one that is deeply rooted in the traditions of common law.   A court has continuing jurisdiction to terminate or modify an injunction." *In re Detroit Auto Dealers Ass'n, Inc.*, 84 F.3d 787, 789 (6th Cir. 1996).   As the Sixth Circuit acknowledged, this Court is in the best position to reconsider its injunction.   [DE 78 at 1386].

> Injunctions are one of the law's most powerful weapons. Ongoing injunctions should be dissolved when they no longer meet the requirements of equity. The law changes and clarifies itself over time. Neither the doctrines of res judicata or waiver nor a proper respect for previously entered judgments requires that old injunctions remain in effect when the old law on which they were based has changed.

*In re Detroit Auto Dealers Ass'n, Inc.*, 84 F.3d at 789 (quoting *Sweeton v. Brown*, 27 F.3d 1162, 1166–67 (6th Cir. 1994).   Moreover, the Sixth Circuit has "recognized the necessity [of] modifying or dissolving injunctions if 'the statutory or decisional law has changed to make legal what the decree was designed to prevent.'"   *Id.* (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992).

6

### III.    ENFORCEMENT OF HB 3'S CONSENT, DISPOSAL, AND REPORTING REQUIREMENTS

Planned Parenthood's Complaint alleges HB 3 violates: (1) procedural due process on behalf of itself and its providers, "[b]y taking effect immediately, without providing Plaintiff and other abortion providers time to comply, and by subjecting Plaintiff to HB 3's penalties when the Cabinet has not yet created the forms that Plaintiff is required to use, or promulgate the required regulations," (2) substantive due process on its behalf, "[b]y requiring plaintiff to comply . . . despite compliance being impossible - . . . prevent[ing] Plaintiff from providing abortions and operating its business . . . ," (3) substantive due process on its patients' behalf in violation of patient's rights to liberty and privacy by taking "effect immediately, and making compliance impossible by requiring Plaintiff to use agency forms and processes not yet available," and (4) substantive due process on its patients' behalf in violation of Plaintiff's patients' rights to informational privacy.  [DE 1 at 21–23].  EMW's Complaint alleges the same violations but adds to Count 3 a violation of substantive due process on behalf of its patients because HB 3 bans abortions after 15 weeks.  However, EMW consented to lifting the Preliminary Injunction as it related to HB 3's 15-week ban in light of *Dobbs* and other current litigation in the state court.  [DE 82 at 1408].

In its Preliminary Injunction, the Court only analyzed Count 1 and Count 3 finding that Plaintiffs satisfied their burden to preliminarily enjoin HB 3 on both Count 1 and Count 3.  [DE 65 at 1277].  The Court did not analyze Count 2 or Count 4 because a plaintiff need only show a likelihood of success on the merits of a single claim.  *See Transtex Composite, Inc.*, 2012 WL 5362191, at *2.

The Attorney General argues that the Preliminary Injunction should be lifted as it applies to compliance with HB 3.  [DE 80 at 1394].  First, he asserts that Plaintiffs and their patients no

longer have a claim under Substantive Due Process after *Dobbs*. [*Id.*]. Next, the Attorney General claims that the Court's holding regarding the likelihood of success on the merits of Plaintiffs' and their providers' Procedural Due Process claim was incorrect. [*Id.* at 1399]. Finally, he generally asserts that all remaining factors weigh in favor of lifting the Preliminary Injunction. [*Id.* at 1401]. In response, Plaintiffs argue that the Preliminary Injunction should remain in place for three reasons: (1) the merits of their procedural due process claim remain unchanged [DE 82 at 1411]; (2) their substantive due process claim persists post-*Dobbs* [*id.* at 1413]; and (3) the remaining preliminary injunction factors remain unchanged [*id.* at 1415].

### A. Likelihood of Success on the Merits of Plaintiffs' Substantive Due Process Claim

The Attorney General argues that *Dobbs* "did away with the purported right to an abortion." [DE 80 at 1395]. In response, Plaintiffs contend that their substantive due process claim persists even after *Dobbs*. The Court recognizes that *Dobbs* creates a significant shift in the case law regarding the right to an abortion under substantive due process. There is no doubt that *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) have been overruled. *See Dobbs*, 142 S. Ct. at 2242 ("We hold that *Roe* and *Casey* must be overruled."). In its Preliminary Injunction, the Court based its substantive due process holding on *Roe* and *Casey*. [DE 65 at 1270–72]. Therefore, the Court will reconsider the likelihood of success on the merits of Plaintiffs' substantive due process claim using the standard in *Dobbs*.

For reasons explained below, Plaintiffs' substantive due process claim remains likely to succeed based on the right to a nonelective, emergency abortion, for the life and health of the pregnant woman. The Court is unaware of any state that has banned abortion without at least an exception or affirmative defense that would protect physicians from criminal prosecution when the life of the pregnant woman is at stake. Indeed, Kentucky's Trigger Ban contains such an

exception.  Under the current state of the law in Kentucky, abortion is legal "to prevent the death or substantial risk of death due to a physical condition, or to prevent the serious, permanent impairment of a life-sustaining organ of a pregnant woman."  KRS 311.772(4)(a).  If the Court were to lift its Preliminary Injunction, then HB 3 would apply to all abortions performed in the Commonwealth, including those to save the life or health of a pregnant woman.  All of HB 3's provisions, including those that are impossible to comply with, would apply to legal abortions contemplated under the Trigger Ban.  Therefore, physicians who perform emergency, life-saving abortions, could face criminal penalties under HB3 when they are unable to comply with its requirements. By requiring compliance that is impossible while subjecting a physician who fails to comply to criminal penalties, HB 3 turns Kentucky's Trigger Ban into an exceptionless law for the life or health of the pregnant woman if HB 3 is permitted to go into effect.  Such a result would contradict the plain language of Kentucky's Trigger Ban and does not appear to be what the Supreme Court addressed in *Dobbs* when overturning *Casey* and *Roe*.

The Supreme Court's decision in *Dobbs* resolves "whether all pre-viability prohibitions on *elective* abortions are unconstitutional."  *Dobbs*, 142 S. Ct. at 2244 (emphasis added).  However, the Supreme Court does not define the term "elective" anywhere in its opinion.[3]  Therefore, the Court must look elsewhere to understand the scope of the Supreme Court's holding.  Courts have described elective procedures as those "performed to improve the patient's health" and to "distinguish emergency procedures from those that can be scheduled at the convenience of doctor and patient."  *Perez v. Nidek Co.*, 711 F.3d 1109, 1116 (9th Cir. 2013) (finding that a cosmetic surgery would likely be elective); *see also Hum. Res. Inst. of Norfolk, Inc. v. Blue Cross of Virginia*, 484 F. Supp. 520, 543 (E.D. Va. 1980) (defining an elective procedure as "medically

---

[3] Although neither party adequately briefed the elective versus non-elective issue, it is necessary for the Court to conduct this analysis based on the Parties' arguments and the Supreme Court's holding in *Dobbs*.

acceptable [but] not always necessary"); *Aepli v. Aepli*, No. CA 92-11, 1992 WL 362586, at \*2 (Ohio Ct. App. Dec. 4, 1992) ("The trial court properly defined elective as necessary for the health and well-being[.]"). Based on these descriptions, courts and the healthcare industry have noted difference between an elective procedure and an emergency procedure.[4]

The Court also finds support for differentiating between elective and emergency abortion procedures in *Dobbs*. The Mississippi law at issue had an exception for medical emergencies. *See* Miss. Code Ann. § 41–41–191(4)(b) (2018) ("Except in a medical emergency or in the case of a severe fetal abnormality, a person shall not intentionally or knowingly perform . . . or induce an abortion of an unborn human being if the probable gestational age of the unborn human being has been determined to be greater than fifteen (15) weeks."). When discussing the state of abortion regulations in America before *Roe* was decided, the Court noted that a majority of states prohibited abortion except in emergencies to "save the life of the pregnant woman." *Dobbs*, 142 S. Ct. at 2253. Therefore, based on the plain language of the Supreme Court in its opinion, *Dobbs* is limited to elective procedures and does not appear to affect the substantive due process right to a non-elective, emergency abortion for the life or health of the pregnant woman.

Further support for a substantive due process right to abortion for non-elective procedures can be found in the right to bodily integrity, a liberty interest found under the Substantive Due Process Clause of the Fourteenth Amendment. The Supreme Court has held that "[n]o right is

---

[4] The medical community also differentiates between elective procedures and non-elective, emergency procedures. Johns Hopkins Medicine defines an elective surgery as one that "can be scheduled in advance." *Health, Types of Surgeries*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/types-of-surgery (last visited July 12, 2022). An emergency surgery is defined as one that "is done because of an urgent medical condition" that may be life threatening. *Id.* The medical community further differentiates procedures into additional categories, such as "urgent" or "expedited," but the court does not need to examine these additional categories at this juncture. *See The NCEPOD Classification of Intervention*, Nat. Confidential Enquiry into Patient Outcome and Death, https://www.ncepod.org.uk/classification.html (last visited July 12, 2022).

held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891). "[T]o show that the government has violated one's right to bodily integrity, a plaintiff need not 'establish any constitutional significance to the means by which the harm occurs[.]'" *Guertin v. State*, 912 F.3d 907, 919 (6th Cir. 2019) (quoting *Boler v. Earley*, 865 F.3d 391, 408 n.4 (6th Cir. 2017)). The Sixth Circuit uses the "shock the conscience" analysis to evaluate bodily integrity claims. *See id.* at 922 (citing *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996)). To succeed on a "shock the conscience" claim, a plaintiff must prove (1) the deprivation of a liberty or property interest and (2) conscience-shocking conduct. *See EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 861 (6th Cir. 2012). An intentional injury and deliberate indifference by the government can indicate conscious-shocking conduct. *See In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2021 WL 821569, at \*5 (S.D. Ohio Mar. 4, 2021). This prong may also be satisfied if the state "know[s] that the danger has occurred, caused great bodily harm, and is certain to occur again unless remediated." *Washington v. Hous. Auth. of City of Columbia*, No. CV 3:21-148-JFA, 2021 WL 3886595, at \*5 (D.S.C. Aug. 31, 2021).

Parties have asserted bodily integrity claims as they relate to abortion procedures in the past. In *Planned Parenthood Southwest Ohio Region v. DeWine*, plaintiffs asserted a state law regulating abortion medications violated a woman's right to bodily integrity under the Fourteenth Amendment. *See* 696 F.3d 490, 506 (6th Cir. 2012). However, the Sixth Circuit held that "*Casey* and its progeny serve as the proper cases for examining bodily-integrity claims in the abortion context" and refused to apply the traditional bodily integrity tests to the state law. *Id.* at 507. As noted above, the Supreme Court was clear that *Casey* and *Roe* have been overruled. *See Dobbs*,

142 S. Ct. at 2242 ("We hold that *Roe* and *Casey* must be overruled.").  While the Supreme Court was clear that states must merely have a rational basis for laws regulating elective abortions, there is no indication that *Dobbs* affected the substantive due process right to an emergency abortion to save the life or health of the pregnant woman.  *Dobbs* merely changed the framework by which lower courts must evaluate regulations on elective abortions.  Therefore, the Court must find that Plaintiffs' patients retain a liberty interest in non-elective, emergency abortion procedures for the life or health of the pregnant woman, which is protected by the Due Process Clause of the Fourteenth Amendment.[5]  *See Dobbs*, 142 S. Ct. at 2244.

The Court has reviewed HB 3 and provided a detailed analysis of the provisions at issue. [DE 65 at 1258–70].  Based on the Court's analysis, HB 3's requirements apply to all abortions performed in the Commonwealth, including emergency abortions performed to save the life or health of the pregnant woman.  HB 3 does have some limited emergency exceptions, but these exceptions do not apply to the entire Act.  Under HB 3 § 1(9), a physician is not required to comply with the informed consent requirements of Section 1(2)–(4) if "a medical emergency exists that so complicates the pregnancy as to require an immediate abortion." The physician must still document the medical emergency and attempt to contact the minor's parents after the procedure. HB 3 § 9(b)–(c).  There is also an exception to the 24-hour advance informed consent requirement of Section 8 if complying with that section could result in the death of the patient or impairment of a major bodily function.  *Id.* § 8(1)(a)–(b).  Section 27 alleviates the requirement that a physician determine the probable gestational age of the fetus in the event of a medical emergency.  *Id.* §27(1). Physicians may also perform abortions beyond fifteen weeks if there is a medical emergency.  *Id.*

---

[5] Because the Court must apply precedent from higher courts and because the Supreme Court did not appear to articulate the standard applicable to laws regulating non-elective, emergency abortions for the life and health of the pregnant woman, the Court will apply the Sixth Circuit's test for violations of bodily integrity.

§ 27(2).  Section 34 also creates an affirmative defense to the 15-week limit on abortions.  *Id.* § 34(2)(b).  Except in an emergency, Section 34 includes a list of requirements that must be met before physicians can avail themselves to the protections of § 34(2)(b).  *Id.* § 34(3)(b)(1)–(6).

Despite the foregoing emergency exceptions, HB 3 does not provide emergency exceptions for myriad of HB3's new requirements.  There is no emergency exception to the requirement that abortion-inducing drugs only be provided by a qualified physician registered with the Cabinet as a nonsurgical abortion provider.  *Id.* §§ 6(1), 17.  There is no emergency exception to the Kentucky Abortion-Inducing Drug Certification Program and its related requirements.  *See Id.* §§ 15–16.  There is no emergency exception to sections of HB 3 that create new disposal requirements for fetal remains.  *See Id.* §§ 20(2)–(3), 21(3)–(4), 22, 23(15).  As noted in the Preliminary Injunction and discussed further below, the Court has found that compliance with these sections of HB 3 is impossible until the Cabinet creates the necessary forms and promulgates rules and regulations.  [DE 65 at 1258–70].  Nevertheless, without the Preliminary Injunction, physicians could be criminally prosecuted for providing lifesaving treatment, which would discourage such treatment and potentially violate a patient's right to access medical care.  *Id.* §§ 3(12) and (39), 31.

Because the inability to comply with HB 3 would discourage access to emergency abortion care and potentially violate a patient's right to access medical care in Kentucky, the Court finds that Plaintiffs could prove the state has deprived its patients of a protected liberty interest.  *See EJS Properties, LLC*, 698 F.3d at 861.  Therefore, Plaintiffs would merely be required to demonstrate conscious-shocking conduct on behalf of the state.  *See id.*  One of the key considerations in a "shock the conscious" analysis is the risk of harm.  *Guertin*, 912 F.3d at 921.  It is common knowledge that there are severe risks, including death, associated with pregnancy.  *See Washington*, 2021 WL 3886595, at *5.  In this case, the harm associated with the deprivation of

13

liberty can include organ failure and death.  Plaintiffs could likely prove conscience-shocking conduct that would violate their patients' substantive due process rights.  It is likely conscience-shocking that a doctor could not provide lifesaving emergency abortion services to a woman because the doctor is unable to comply with HB 3.  It is also likely conscience-shocking that a doctor would be subject to felony penalties for saving the life of a pregnant woman because of a failure to comply with HB 3's reporting requirements.  Accordingly, the Court finds that enforcing sections of HB 3 without a means of compliance violates the substantive due process rights of Plaintiffs' patients.[6]  Because Plaintiffs have shown a likelihood of success on the merits for their substantive due process claim under Count 3, the Court need not analyze Counts 1, 2, or 4.[7]  *See Transtex Composite, Inc.*, 2012 WL 5362191, at *2.

### B.  Plaintiffs' Irreparable Injury Absent an Injunction

The next factor that the Court must balance is whether Plaintiffs would suffer irreparable injury absent an injunction.  *See S. Glazer's Distributors of Ohio, LLC*, 860 F.3d at 849.

The Sixth Circuit has held that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. Civil Liberties Union of Kentucky v.*

---

[6] Application of the Eighth Amendment to these same circumstances demonstrates the rationale behind the Supreme Court's decision in *Dobbs*.  The Supreme Court has held that withholding medical care from a prisoner suffering from a serious illness would constitute cruel and unusual punishment in violation of the Eight Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976).  The Sixth Circuit has held that the Eight Amendment even applies to inmates on death row.  *See Hodges v. Tennessee Dept. of Corr.*, 283 F.3d 421 (Table) (6th Cir. 2000).  If an inmate required an abortion as an emergency lifesaving procedure, then the Eighth Amendment would preempt the requirements of HB 3.  *See Estelle*, 429 U.S. at 104–105.  As explained, the Court could reach the same conclusion under a separate constitutional analysis.

[7] Although Plaintiffs have not yet asserted a claim under the Emergency Medical Treatment and Labor Act ("EMTALA"), the Court recognizes the possibility that HB 3 could be preempted by federal law in light of *United States v. Idaho*, No. 1:22-CV-00329-BLW, 2022 WL 3692618 (D. Idaho Aug. 24, 2022).  EMTALA requires medical providers to stabilize patients who present with emergency medical conditions.  42 U.S.C. § 1395dd.  To the extent enforcement of HB 3 conflicts with EMTALA, if at all, it is likely that HB 3 would be preempted by the federal statute.  *See* U.S. Const. art. VI, cl. 2; *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015) ("Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation.").

*McCreary Cnty., Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd sub nom. McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844 (2005) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905, 924–25 (S.D. Ind. 2011) (quoting *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) ("It is well-established that, 'when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'")).  Plaintiffs' patients still have a constitutionally protected right to a non-elective, emergency abortion for the life and health of the pregnant woman.  *Dobbs*, 142 S. Ct. at 2244.  Thus, a finding of irreparable harm is mandated.  *Am. Civil Liberties Union of Ky.*, 354 F.3d at 445.

In addition, this Court fully examined irreparable harm in its Preliminary Injunction.  [DE 65 at 1277–79].  The Court again finds that irreparable harm may be present where engaging in the prohibited conduct would result in the realistic possibility of felony prosecution.  *United States v. Williams*, 872 F.2d 773, 777 (6th Cir. 1989) ("[A] felony conviction irreparably damages one's reputation."); *Michigan Chamber of Com. v. Land*, 725 F. Supp. 2d 665, 699 (W.D. Mich. 2010) ("[S]taying today's injunction would irreparably harm these plaintiffs by leaving them unable to engage in the [constitutionally protected] activity without a very realistic fear of felony prosecution.").  If Plaintiffs or one of their providers were to attempt to perform an appropriate and legal abortion, then they would necessarily be in violation of HB 3 because of the impossibility of compliance.  Such a violation could result in a Class D felony, fines of up to $1 million, and revocation of physician and facility licenses.  HB 3 § 28(6).

### C.  Whether an Injunction Would Cause Other Substantial Harm

Next, the Court must consider whether injunctive relief would harm others.  *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 542.  While this factor is generally concerned with harm to third parties, courts also often consider the "balance of hardships" between

the parties if an injunction were to issue. *See, e.g.*, *id.* at 550–51; *Nesco Res. LLC v. Walker*, No. 3:18-CV-00171-GNS, 2018 WL 2773321, at *5 (W.D. Ky. Apr. 23, 2018). Plaintiffs carry "the burden of justifying [the injunctive] relief" they seek. *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020). Neither party has analyzed this factor in their briefs. [DE 80 at 1401; DE 82 at 1415]. Because the Court has again found that HB 3 violates a constitutional right, this analysis remains the same. Therefore, the Court reincorporates its analysis from its preliminary injunction. [DE 65 at 1279–80].

### D.  Whether the Public Interest is Served by the Issuance of an Injunction

The Sixth Circuit has held that "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)). As noted above, Plaintiffs easily satisfy this factor because there is a substantial likelihood that Defendants have violated Plaintiffs' patients' due process rights under the Fourteenth Amendment. "The public interest will not be harmed by preserving the status quo pending a preliminary injunction hearing." *Planned Parenthood of Tennessee & N. Mississippi v. Slatery*, No. 3:20-CV-00740, 2020 WL 5797984, at *5 (M.D. Tenn. Sept. 29, 2020). Moreover, courts in the Sixth Circuit have held that public policy supports an injunction when there would be a disruption to medical services or a patient's continuity of care. *See, e.g.*, *Hagan v. Vision Serv. Plan*, No. 05-72517, 2005 WL 3447882, at *10 (E.D. Mich. Dec. 15, 2005); *Galper v. U.S. Shoe Corp.*, 815 F. Supp. 1037, 1044 (E.D. Mich. 1993). If Plaintiffs cannot comply with HB3 and must cease providing certain medical services until the Cabinet promulgates a means of compliance, then this disruption to medical services will no doubt interrupt the continuity of care for Plaintiffs' patients. As a result, a preliminary injunction serves the public interest.

## IV.   WHETHER THE EQUITIES REQUIRE DISSOLVING THE PRELIMINARY INJUNCTION

Notwithstanding the Cabinet's assertion that it is not required to comply with an unfunded mandate, the Cabinet has taken action in accordance with HB 3.  [DE 88; DE 92].  The Cabinet has updated forms VS-913 and VS-913P to comply with HB 3 Section 1.  [DE 88 at 1513].  To address compliance with Sections 4, 8, 13, 26, 27 and 28, the Cabinet promulgated 901 KAR 5:120E, which became effective immediately as an emergency regulation.  [*Id.* at 1514–16 (citing KRS 13A.190(3)(a))].  The Cabinet updated material on its website to comply with portions of Section 12.  [*Id.* at 1514].  On July 13, the Cabinet filed 901 KAR 5:130 and 901 KAR 5:140 with the Kentucky's Legislative Research Commission to address HB 3 Sections 21 and 22 respectively.  [*Id.* at 1515–16].  On July 15, the Cabinet filed 902 KAR 20:365 to comply with HB 3 Sections 15, 16, and 17.[8]  [*Id.* at 1515].  The Cabinet has also made meaningful efforts towards compliance with HB 3 Sections 18 and 19.  [DE 88 at 1515].

Plaintiffs represent that they have also made meaningful steps towards compliance with HB 3 and are currently complying with provisions that are now enforceable.  [DE 89 at 1519].  Plaintiffs have been engaged in substantive discussions with counsel to the Cabinet regarding newly created means of compliance with HB 3.  [*Id.*].  These discussions culminated into a public comment on the Cabinet's new forms.  [*Id.*].  Plaintiffs continue to assert that they will need time to comply with any final regulations and are concerned that compliance will risk disclosing private patient information.  [*Id.* at 1520].  Plaintiffs also argue that all counts asserted in their complaints remain live.  [*Id.* at 1520].  At this time, Plaintiffs are still engaging in discussions with the Cabinet.  [*Id.* at 1521].  Prosecution and resolution of their claims is ultimately dependent on the final

---

[8] This is the first step in the process of enacting these regulations, however, at this time the regulations are not yet final.  *See* KRS §§ 13A.200–13A.314.

17

procedures and protocols adopted by the Cabinet.  [*Id.*].

Because the Cabinet has promulgated 901 KAR 5:120E and updated forms VS-913 and VS-913P, it likely created a means of compliance with certain sections of HB 3 that were enjoined by the Court.  Therefore, the Court must, again, analyze whether Plaintiffs can comply with provisions of HB 3.  The Court will limit its analysis to provisions applicable to 901 KAR 5:120E, the only regulation that is currently effective.[9]

### A.  Section 1(2) & (9)–(11)

The Court enjoined Section 1(2) and (9)–(11) of HB 3.  [DE 65 at 1290].  The physician must secure the informed written consent of the minor and one legal guardian with joint or physical custody and certify that the consenting parent or legal guardian of the minor has made a reasonable attempt to notify any other parent with joint or physical custody at least 48 hours prior to providing the informed written consent.  HB 3 § 1(2)(a).  Notice need not be provided to a parent who has previously been enjoined by a domestic violence order or interpersonal protective order or who has been convicted of a criminal offense against the patient.  *Id.* § 1(2)(a)(1).  The informed written consent must include a copy of the minor's government-issued identification, a copy of the consenting legal guardian's government issued identification, and written documentation establishing that they are the legal guardian of the minor.  *Id.* § 1(2)(a)(2)(a).  The informed written consent must also include the legal guardian's notarized signature on a document containing specific language as indicated in § 1.  *Id.* § 1(2)(a)(2)(b).  The attending physician must execute an affidavit with specific language and keep a copy of it, along with a copy of the informed written consent, in the minor's medical records.  *Id.* § 1(2)(a)(3)–(4).  Plaintiffs would only need the

---

[9] The Court also does not analyze § 27, which is no longer enjoined.  [DE 87].

minor's informed written consent if the minor is emancipated or obtained an order from the courts. *Id.* § 1(2)(b)–(c).

If a medical emergency exists that would require an immediate abortion, the physician is not required to obtain informed consent from a legal guardian. *Id.* § 1(9)(a). However, the physician must make reasonable efforts to alert the patient's legal guardian and must note the reasons for the medical necessity in the patient's medical records. *Id.* § 1(9)(b). The physician must contact the patient's legal guardian with 24 hours to relay the nature of the medical emergency and provide the same information by mail. *Id.* § 1(9)(c). On a form provided by the Cabinet, physicians must report to the Cabinet the basis for any medical judgment that warrants failure to obtain consent. *Id.* § 1(10). Failure to receive consent required by Section 1 may open physicians to civil liability. *Id.* § 1(11).

Form VS-913 includes a section related to consent. [DE 83-1 at 1479]. Specifically, the section asks the date of consent, whether the patient was a minor, whether consent was received in accordance with HB 3 § 1(2)(a), whether the notification was provided in accordance with HB 3 § 1(9)(c), whether the patient was emancipated in accordance with HB 3 § (2)(b), and whether the minor patient received court approval in accordance with HB 3 § (4)(a). [*Id.*]. The form also provides a section for the physician to describe the basis for any medical judgment that warrants failure to obtain consent. [*Id.*]. While HB 3 does require that the Cabinet provide a form to comply with § 1(10), there is no requirement that the Cabinet provide a form for informed consent under § 1(2) or § 1(9). Because the Cabinet has updated form VS-913, the Court finds that Plaintiffs can now comply with § 1(2) and (9)–(10).

### B. Section 4(2)–(5) and (8)

The Court enjoined Section 4(2)–(5) and (8) of HB 3. [DE 65 at 1290]. Section 4 requires physicians to collect new demographic and health information before performing an abortion. HB

19

3 § 4(2).  Section 4(2) requires a list of at least 19 separate items that must be reported.  *Id.*  The report must not include the patient's name, common identifiers, or "[a]ny other information or identifiers that would make it possible to ascertain the patient's identity.  *Id.* § 4(3).  These reporting requirements are also applicable to persons who maintain records on the physician's behalf.  *Id.* § 4(4).  Section 4 also requires prescriptions for abortion-inducing drugs to be reported to the Vital Statistics Branch within three days after the end of the month in which the prescription was issued but may not identify the patient or anyone picking up the drug on the patient's behalf. *Id.* § 4(5).  Section 4(8) exposes persons and institutions to civil penalties for failure to submit complete or incomplete reports as required by § 4.

Plaintiffs are now required to submit forms VS-913 or within three days after the end of the month in which the abortion was performed.  901 KAR 5:120E(2)(3).  Form VS-913 includes places to enter most of the information required by HB 3 § 4(2).  [DE 83-1 at 1479–80].  After careful review by the Court, the form will allow Plaintiffs to comply with § 4(2)(a), (c)–(m), and (o)–(s).  [*Id.*].  Section 4(2)(b) requires "[t]he address at which the abortion was performed or the address at which the abortion-inducing drug was provided by a qualified physician."  Because there is not a means of compliance with Kentucky Abortion-Inducing Drug Certification Program, Plaintiffs cannot comply with any provisions that require a "qualified physician."  *Id.* § 15.  Form VS-913 does not contain a section to describe what reasonable efforts were made by the "qualified physician" to reschedule a follow-up appointment, which is required by HB 3 § 4(2)(n).  Based on the Court's analysis, Plaintiffs cannot comply with HB 3 § 4(2)(b) and (n) despite form VS-913.

Form VS-913 does not include a place for the patient's name or common identifiers.  [DE 83-1].  Moreover, the emergency regulation promulgated by the Cabinet prohibits Plaintiffs from reporting this information that would reveal the identity of the man or woman.  901 KAR

5:120E(2)(4)(b).   Nothing in form VS-913 or 901 KAR 5:120E would prevent persons who

maintains records on the physician's behalf from reporting the same information.  HB 3 § 4(4).

Finally, the Cabinet has promulgated form VS-913P to report prescriptions for abortion-inducing

drugs in conformity with § 4(5).  [DE 83-2 at 1481–82].

      If Plaintiffs fail to submit completed forms, then they could be subject to penalties under

Section 4(8).  Plaintiffs have argued that reporting certain information required by Section 4 to the

Cabinet would put it at risk of violating HIPAA.  [DE 86 at 1498–500].  As covered entities, see

45 C.F.R. § 164.105, Plaintiffs must

> (1) Ensure the confidentiality, integrity, and availability of all electronic protected
> health information the covered entity or business associate creates, receives,
> maintains, or transmits.  (2) Protect against any reasonably anticipated threats or
> hazards to the security or integrity of such information.  (3) Protect against any
> reasonably anticipated uses or disclosures of such information that are not permitted
> or required under subpart E of this part.  (4) Ensure compliance with this subpart
> by its workforce.

45 C.F.R. § 164.306. HIPAA sets a mandatory, federal floor for protecting a patient's health

information. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 47 F. Supp. 3d 1069, 1082 (D.

Haw. 2014), *aff'd*, 810 F.3d 631 (9th Cir. 2015).  "[A] provision or requirement under [HIPAA],

or a standard or implementation specification adopted or established under [HIPAA], shall

supersede any contrary provision of State law." 42 U.S.C. § 1320d-7.  HIPAA allows entities to

de-identify protected health information by removing names, all geographic subdivisions smaller

than a state (street address, city, county, precinct, zip code, and geocodes), all elements of dates

related to the individual except for year, telephone numbers, fax numbers, email addresses, and

other identifiers.  45 C.F.R. § 164.514.

      Hundreds of Kentucky zip codes have a population of less than 1,000. [DE 64 at 1220].

The Commonwealth is 50.7% female, 87.5% white, 8.5% Black or African American, 1.6% Asian,

21

2% two or more races, and 3.9% Hispanic or Latino.  [*Id.*].  Where these pieces of information are reported in combination for a particular patient, along with other personal information such as previous pregnancies, and are of public record, Plaintiffs are at risk of disclosing protected health information that could be used to identify patients.  [DE 55 at 1029–30].  Disclosure of patient medical information subjects Plaintiffs to penalties under HIPAA and the failure to disclose would subject them to penalties under HB 3 as well.  Moreover, records held by the Cabinet are subject to inspection by citizens of the Commonwealth.  *See* KRS § 61.872(1).  Forms submitted to the Cabinet with protected health information could be considered public records.  *See Id.* § 61.870(2) (Public records include "all books, papers, maps, photographs, cards, tapes, discs, diskettes, recordings, software, or other documentation regardless of physical form or characteristics, which are prepared, owned, used, in the possession of or retained by a public agency.").  The Court finds that it would be possible to ascertain the identity of patients if the information required by form VS-913 were published as is required by HB 3 § 13(2) and the Kentucky Open Records Act.

Requiring Plaintiffs to report information in § 4(2) would seem to conflict with HB 3's directive that "[t]he report shall not contain . . . [a]ny other information or identifiers that would make it possible to ascertain the patient's identity."  *Id.* § 4(3)(c).  However, the Court must interpret HB 3 so that "every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."  *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (alteration in original) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012)); *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 257–58 (6th Cir. 2020).  "Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute

inconsistent, meaningless or superfluous." *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) (quoting *Lake Cumberland Trust, Inc. v. U.S. E.P.A.*, 954 F.2d 1218, 1222 (6th Cir. 1992)). Reading § 4(2) strictly would render § 4(3) and 901 KAR 5:120E(2)(4)(b) inoperable since the information required by § 4(2) would, in fact, make it possible to ascertain the patient's identity. Therefore, to avoid rendering § 4(3) inconsistent, meaningless, or superfluous, see *Menuskin*, 145 F.3d at 768, the Court must read § 4(3) as a safeguard to protect patients from being identified regardless of the information sought by § 4(2).

HIPAA provides further support for this interpretation of HB 3.  "[U]nder the *in pari materia* cannon of statutory construction, statutes addressing the same subject matter generally should be read 'as if they were one law.'" *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315–16 (2006) (*Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)).  HB 3 and HIPAA both address patient privacy.  Plaintiffs must protect against disclosure of their patients' protected health information.  *See* 45 C.F.R. § 164.306.  In instances where Plaintiffs could release identifying information, they must "de-identify" documents by removing information could be read with publicly available information to identify plaintiffs.  *Id.* § 164.514.  State law requiring otherwise is expressly preempted by HIPAA.  *See* 42 U.S.C. § 1320d-7.  However, reading HB 3 and HIPAA *in pari materia*, there is no need find that HIPAA preempts § 4(2).  Instead, § 4(3) provides an legal means for Plaintiffs to omit information that could otherwise be used to identify Plaintiffs.

Applying the cannons of surplusage and *in pari materia*, the Court finds that § 4(3) allows Plaintiffs to omit information from form VS-913 that could be used together or with publicly available information to identify their patients.  Holding otherwise would require the Court to find the Kentucky Legislature intended to make it possible for third parties to identify and target women of color in rural counties who sought Plaintiffs' services.  Nevertheless, applying this analysis to

§ 4(8) is problematic because form VS-913 must be "completed" to avoid penalties.  *See* HB 3 §
4(8).  Even an "incomplete report" to the Cabinet could expose Plaintiffs to liability.  *Id.* § 4(8)(b).
HB 3 directs the Cabinet to create forms and promulgate regulations that will allow Plaintiffs to
maintain compliance with HB 3.  *Id.* § 13.  While the Court applauds the Cabinet for its efforts to
make it possible for Plaintiffs to comply with HB 3, form VS-913 does not allow Plaintiffs to omit
information, as required by § 4(3), and still avoid liability under § 4(8).  For example, Plaintiffs
may need to omit city or town, county, zip, race, age, or previous live births to avoid violating
HIPAA or HB 3 § 4(3) even if those items are required by § 4(2).[10]  Reading 901 KAR 5:120E
and VS-913 together in their current form, Plaintiffs could likely be penalized for omitting
identifying information.  Therefore, allowing enforcement under § 4(8) would prevent Plaintiffs
from complying with § 4(3).

Based on the Court's analysis of Section 4, it is now possible for Plaintiffs to comply with
§ 4(2)(a), (c)–(m), (o)–(s), and (3)–(5).

## C.  Section 8

The Court enjoined Section 8 of HB 3.  [DE 65 at 1290].  Section 8 requires a "qualified
physician" to obtain a patient's informed consent on a form created by the Cabinet prior to
performing an abortion.  HB 3 § 8(2).  Abortion-inducing drugs may not be provided to patients
without informed consent, unless a "qualified physician" determines compliance with this
requirement would pose a risk of death to the patient or substantial and irreversible physical
impairment.  *Id.* § 8(1).  The consent form is not valid unless the patient initials each entry, the

---

[10] The error could be corrected with minor alterations to the form and emergency regulation.  If form VS-
913 remains the same, the Cabinet need only add language stating that a report on VS-913 shall not be
considered incomplete if the person filling out the form omits information in boxes two or three to prevent
identifying the patient.

patient signs the consent statement, and the "qualified physician" signs the "qualified physician declaration." *Id.* at 8(3).  Section 8 then includes requirements for the consent form.  *Id.* § 8(4).

As the Court has previously noted, it is impossible to comply with provisions that require a "qualified physician."  *Id.* § 15.  The Cabinet has represented that the consent form has been created.  [DE 92 at 1535].  However, no version of the consent form has been included in the record for the Court to analyze.  Without the consent form and without a means for Plaintiffs' providers to become "qualified physicians" under the Kentucky Abortion-Inducing Drug Certification Program, compliance with Section 8 remains impossible.

### D.  Section 9

The Court enjoined Section 9 of HB 3.  [DE 65 at 1290].  Abortion-inducing drugs prescribed by "qualified physicians" must be reported to the Cabinet.  HB 3 § 9(1).  If a "qualified physician" provides an abortion-inducing drug to a patient and they suffer an adverse event, then the "qualified physician" must provide a written report to the FDA via the MedWatch reporting system, the Cabinet, and the board.  *Id.* § 9(2).  Finally, any physician treating a patient for an adverse event after they received a drug-induced abortion must report the adverse event to the Cabinet on a form including, at a minimum, the information required by HB 3 § 4.

 Section 9(1)–(2) requires a "qualified physician," which is impossible until the Cabinet creates a means of compliance.  *Id.* § 15.  Therefore, compliance with § 9(1)–(2) remains impossible.  However, § 9(3) applies to all physicians.  Therefore, compliance with § 9(3) is possible to the extent the Court has not enjoined § 4.

### E.  Section 25

The Court enjoined Section 25 of HB 3.  [DE 65 at 1290].  It requires hospitals, healthcare facilities, or physicians to file a written report with the Cabinet when a patient under their care experiences an adverse event or complication that is the result of an abortion.  HB 3 § 25(1).  The

report must be signed by the attending physician and transmitted to the Cabinet within 30 days of the discharge or death of the patient. *Id.* The report must contain, at a minimum, the information required by § 4. *Id.* § 25(2). However, the report cannot contain the patient's name, common identifiers, or other information that would make it possible to identify the patient. *Id.* § 25(3).

Form VS-913 does not include a place for the patient's name or common identifiers. [DE 83-1]. Moreover, the emergency regulation promulgated by the Cabinet prohibits Plaintiffs from reporting information that would reveal the identity of the man or woman. 901 KAR 5:120E(2)(4)(b). The Cabinet has updated forms VS-913 and VS-913P to largely comply with the reporting requirements of § 4. However, § 25 reiterates § 4(3)'s requirement not to include "information or other identifiers that would make it possible to identify, in any manner or under any circumstances, a patient who has obtained an abortion and subsequently suffered an abortion complication or adverse event." HB 3 § 25(3)(c). Because this section implicates the same issues, the Court reincorporates its earlier analysis related to § 4 and HIPAA.

The Court finds that Plaintiffs can comply with § 25's reporting requirements using the updated forms, [DE 83-1; DE 83-2], but only to the extent that they can also comply with § 4.

### F.  Section 26

The Court enjoined Section 26 of HB 3. [DE 65 at 1290]. Section 26 requires any prescription issued for an abortion-inducing drug to be reported on a form provided by the cabinet within three days after the prescription was issued. HB 3 § 26(1). The report must be signed by a "qualified physician." *Id.* Information regarding the potential ability to reverse the effects of abortion-inducing drugs must be provided with each prescription for an abortion-inducing drug. *Id.* § 26(2). For each abortion reported to the Vital Statistics Branch, the physician or other healthcare provider must complete and sign a report indicating whether any adverse event or medical treatment was known to the provider as a result of the abortion. *Id.* § 26(3). The report

must contain information required by § 4 and several other pieces of information related to the adverse event. *Id.* § 26(4)

Section 26(1) requires a "qualified physician," which is impossible until the Cabinet creates a means of compliance. *Id.* § 15. However, there is no indication that Plaintiffs cannot supply patients with information on the potential ability to reverse the effects of an abortion-inducing drug. *Id.* § 26(2). Because forms VS-913 and VS-913P include sections related to adverse events [DE 83-1 at 1480; DE 83-2 at 1481], the Court finds that Plaintiffs can comply with § 26(3). Finally, form VS-913 includes a section where physicians can indicate the level of care or intervention required for adverse events, the date the pregnant patient presented for treatment of the adverse event, and the amount billed for treatment of complications. [DE 83-1 at 1480]. Therefore, Plaintiffs can comply with § 26(4)(a)–(b) and (d).

Compliance with § 26(4)(c) would require a "qualified physician." After reviewing forms VS-913 and VS-913P, the Court cannot identify an area where physicians can list complications, adverse events or treatments that occurred, list emergency transfers, or list any follow-up treatment. HB 3 § 26(4)(e)   Accordingly, Plaintiffs cannot comply with § 26(4)(c) and (e). Moreover, § 26(4) requires the information mandated by § 4, with which the Court has not found compliance possible for every provision. Due to the updated forms, the Court finds Plaintiffs can comply with § 26(2)–(3) and (4)(a)–(b) and (d) to the extent Plaintiffs can also comply with § 4.

## G.  Section 29

The Court enjoined Section 29(1)–(6) of HB 3. [DE 65 at 1290]. Each prescription for a drug meant to induce an abortion must be reported to the Vital Statistics Branch within three days after the end of the month in which the prescription was dispensed. HB 3 § 29(1). Section 29(2) includes a list of demographic information and drug-related information that must be included in the report. The report cannot include the name of the patient, common identifiers, and any other

27

information that would make it possible to identify the patient. *Id.* § 29(3). The name of the person completing the report and the reporting institution will not be subject to disclosure. *Id.* § 29(4). Section 29(5)–(6) include penalties for failure to comply with the reporting requirements of § 29. Those who fail to submit a report or submit an incomplete report are subject to civil penalties. *Id.* § 29(5). Intentional falsification of a report would expose Plaintiffs and their providers to criminal liability. *Id.* § 29(6).

Emergency regulation 901 KAR 5:120E(3)(2) requires prescription drugs dispensed for the purpose of performing an abortion to be reported on form VS-913P. The form must be completed within three (3) days after the end of the month in which the prescription was issued and must not contain information that would identify the patient. 901 KAR 5:120E(3). After careful review, the Court finds that form VS-913P includes sections to insert all the information required by § 29(2). [DE 83-2 at 1481].

Form VS-913P does not include a place for the patient's name or common identifiers. [DE 83-2]. Moreover, the emergency regulation promulgated by the Cabinet prohibits Plaintiffs from reporting this information that would reveal the identity of the man or woman. 901 KAR 5:120E(3)(3). Section 29 specifically prohibits Plaintiffs from including "[a]ny other information or identifiers that would make it possible to ascertain the patient's identity." HB 3 § 29(3)(c). This section incorporates the same language that has been found in Sections 4 and 26. The Kentucky Legislature included other provisions in § 29 similar provisions to the § 4, such as requiring the patient's city, town, county, state, country, and zip code (*Id.* § 29(2)(d)), requiring the patient's age, race, and ethnicity (*Id.* § 29(2)(e)), and imposing penalties on Plaintiffs for submitting an "incomplete report" to the Cabinet (*Id.* § 29(5)(b)). These provisions implicate the same issues the Court addressed in its analysis regarding § 4. Therefore, the Court reincorporates

its analysis from § 4 and applies it equally to § 29.  The Court must read § 29(3) to prevent Plaintiffs

and their providers from reporting information identified in 29(2) that would reveal the patient's

identity. Reading 901 KAR 5:120E and VS-913P together in their current form, Plaintiffs could

likely be penalized for omitting identifying information.  Allowing enforcement under § 29(5)–(6)

would prevent Plaintiffs from complying with § 29(3).  Accordingly, the Court finds that Plaintiffs

can now comply with § 29(1)–(4).

### H.  Weighing the Equities in Light of New Avenues of Compliance

As noted in the Preliminary Injunction, all four of the factors support injunctive relief.  [DE

65].  The Court cannot lift its Preliminary Injunction under Federal Rule of Civil Procedure

60(b)(5) as it applies to provisions of HB 3 with which Plaintiffs still cannot comply.  Moreover,

the Court cannot lift its Preliminary Injunction on provisions of HB 3 that would allow the Attorney

General to enforce sections of the law without a means of compliance.  However, Plaintiffs may

now comply with several provisions thanks to the Cabinet's creation of new forms and the

promulgation of an emergency regulation.  [DE 92].  The Court will not continue to enforce an

equitable remedy when the equities that required it no longer exist.  *See In re Detroit Auto Dealers*

*Ass'n, Inc.*, 84 F.3d at 789.  Therefore, the Attorney General's Motion to Lift Preliminary

Injunction [DE 80] is **GRANTED IN PART** as set forth below.

### V.    CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise

sufficiently advised, the Court **ORDERS** that:

(1)    The Attorney General's Motion to Lift Preliminary Injunction [DE 80] is

**GRANTED IN PART** as it applies to HB 3 §§ 1(2) and (9)–(10), § 4(2)(a), (c)–(m), (o)–(s), and

(3)–(5), and 29(1)–(4);

(2)     The Attorney General's Emergency Motion to Lift Preliminary Injunction [DE 80] is **GRANTED IN PART** as it applies to HB 3 §§ 9(3), 25, and 26(2)–(3) and (4)(a)–(b) and (d) only to the extent Plaintiffs can comply with § 4;

(3)     The Preliminary Injunction [DE 65] is **PARTIALLY DISSOLVED** as it applies to the sections of HB 3 listed above, effective 5:00 P.M. EST on August 31, 2022;

(4)     The Attorney General's Motion to Lift Preliminary Injunction [DE 80] **REMAINS SUBMITTED TO THE COURT FOR CONSIDERATION** as it applies to all enjoined sections of HB 3;

(5)     The Cabinet and Plaintiffs shall file status reports and/or additional briefing by close of business on **September 16, 2022**, describing any progress made towards compliance with the remining enjoined portions of HB 3, the applicability of any new forms or regulations, specifically those still in the finalization process, the promulgation of any new regulations, and the status of the Plaintiffs' remaining claims set forth in the original complaints as it relates to the rapidly changing status of the law in the Commonwealth.  Any other Defendant may also file a status report and/or additional briefing regarding Plaintiffs' ability to comply with provisions of HB 3 in light of the new forms and regulations and the status of the Plaintiffs' remaining claims.

Rebecca Grady Jennings, District Judge

United States District Court

August 30, 2022

30